6276 NW 11 Ave., Suwanee River Estates South
Bell, FL 32419-4389
November 20, 2016

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 2 5 2016

Markos V. Wells Fargo Bank, N.A.
Case No. 1:15-CV-01156-LMM (N.D. Ga.)
Clerk of the Court
U.S. District Court for the Northern District of Georgia
2211 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

To whom it may concern:

I am writing regarding the Wells Fargo TCPA Settlement.
I received the Wells Fargo Mortgage and Home Equity TCPA Settlement
Claim form on 9/26/16. My Claim ID is 01681805; and my Confirmation
No. is 1187677266. I am taking the action on the form
(see copy of form) of (2), remain a class member but object to the
settlement. My objections in this letter and any supporting
documents will be sent to Class Counsel, defense counsel and
the Court; and must be postmarked by November 22, 2016. I
am complying with this, as I am sending my objection
to you in this letter. I am objecting to the settlement
amount I would receive by only sending back the
claim form itself by December 22, 2016. The claim amount I
would receive by only sending back the postcard would be
approximately $25.00 to $75.00. I do not think that this
amount for a claim for violation of the Federal Telephone
Consumer Protection Act is correct or sufficient enough.
I read the TCPA Act was passed in Congress in 1991
in response to an increasing number of consumer complaints
about telemarketer and debt collector phone calls.

Wells Fargo TCPA Settlement    Page 2    November 20, 2016

also that TCPA is to reduce the number of nuisance calls;
and most importantly, protect the consumers right to privacy.
If I had given prior express consent to allow telemarketer
or debt collection calls, the consumer can revoke that
consent by notifying the telemarketer or debt collector
to stop calling the cell phone. I have received a few to
several calls from Wells Fargo in connection with my
Residential Mortgage Loan (Loan # 0207176777). I
have received more calls to a residential telephone line
than my cellular phone number. My residential phone
numbers were (352) 489-3839 and (352) 322-5598.
My cell phone telephone number was (352) 682-4128.
I am objecting for another reason besides the
settlement amount. It is because of all the
calls I have received whether to a residential
telephone or cellular phone. Also, if the phone calls
were made by people who would have more authority
to make the phone calls. Some people should not be
allowed to review my loan documents and file; and
a violation of this has occurred. Even if I had
received phone calls from people authorized to do so,
the exiting of my home as part of the Deed-in-Lieu
in Foreclosure agreement was anything but a
smooth transition. The representatives all
involved with my mortgage at that time (2013), did
not make anything easy for me. I felt pressured
and experienced hardship from the representatives
who I thought I had to answer to from Wells
Fargo and the legal firm Aldridge Connors, LLC.
I can't be sure how others in the same situation
would be treated for being delinquent on the mortgage loan.

Wells Fargo + CPS Settlement, Page 3 November 20, 2016

I do not like to explain my previous experiences too much except that I've been hurt by them; and I needed help from my parents and grandmother to get me situated again. I am not receiving all of the help that I would have liked to receive; but right now I have to do what I can to help myself, because there is not too much other help being offered. The help I received from my family was before I purchased any home; and those home investments I made did not prove to be successful. My first home in Palm Bay, Fl in 1998 was sold after I resided there for just under two years. I had purchased a Maronda home for $59,000.00 and it sold for $65,000.00 after being listed for one - two months.

For the home that was involved in foreclosure (11111 SE 135th Ct., Finch Rd., Rainbow Lakes Estates, Dunnellon, Fl 34431-8029, Wells Fargo Home Mortgage Loan #0207176777), my investment was $35,840.00 for the purchase of the home built by J Neil Fisher Builder, 3611 SE 58th Ave., Ocala, Fl 34471-6443, $60.00 window replacement for an incidentally broken window upon move-in, $2000.00 for the one acre lot purchased through Century 21 Realty, Rainbow Lakes Estates, Dunnellon, Fl 34431, $300.00 for the lot survey done by Tri-Country Engineering, PO Box 2031, Dunnellon, Fl 34430, (352) 489-0485; a title insurance policy and add-on (the cost I do not remember), purchased from Rainbow Title Company of Dunnellon, Fl 34431, (352) 489-2889; and some landscaping which I paid the labor by check (I do not remember the exact amount) to the contractor.

Wells Fargo TCPA Settlement  Page 4  November 20, 2016

I had tried to ask Rainbow Title for a copy of my title insurance policy at the time of foreclosure, and I was told they "lost" the documents. They said they do not have them anymore. It was not explained to me that maybe, after my loan was approved through Amerisave, the title documents changed because of the $65,000.00 loan now on the home. On the American Title Insurance Company National Lenders Advantage Final Statement, it shows that the creditors on the loan were paid (Item 1303 - Item 1312) and Item 303 which was the amount of $12,635.21 cash out to the buyer which would be myself, Marianne Kapitan. The other charges on the Final Statement were charges associated with the loan. Wells Fargo took over the loan approved through Amerisave Mortgage Corporation ($65,000.00 - Sixty five thousand dollars and 00/100). The Amerisave settlement date was 1/14/08; and the payments received on the loan (Wells Fargo Loan # 0207176777) were received from 2/15/08 - 12/19/13. Please refer to the documents which I will be enclosing such as the First American Final Statement and the four page Customer Account Activity Statement. I am not enclosing the complete Note and the Wells Fargo Loan Modification agreement because of the amount of paperwork involved; but if a copy is needed it could be obtained. If you have any questions about the payments made on the loan or questions about other documents, please contact Mr. Jason Cantelope at Wells Fargo at 1-800-853-8516 extension 1335621015.

Wells Fargo TCPA Settlement     Page 5     November 20, 2016

Please contact Mr. Jason Cantelope only from Wells Fargo Monday - Friday 8:00 AM - 5:00 PM Central Time as he is the representative familiar with the records and can answer all of your questions. He most recently, a few weeks ago, prepared copies of the documents, to send to me.

The payments on my Wells Fargo Home Mortgage Loan # 0207176777 that was paid back from 2/15/08 - 12/19/13 was $22,309.34 (Twenty two thousand three hundred nine and 34/100). I don't know if this amount that Wells Fargo has in their records; but it is the amount that I calculated. This amount also includes the interest paid.

I received moving assistance of $2850.00 of the $3000.00 agreed upon for the Deed-in-Lieu of Foreclosure. This was offered by Wells Fargo representative Jay Gehrt and also needed final approval by Delores Murillo, the Home Preservation Specialist Supervisor who approved the Deed-in-Lieu of Foreclosure offer. The other Wells Fargo associate that worked on my loan was Shania Quan. I requested to work with new associates from Wells Fargo after a previous disagreement or conflict of interest with Wells Fargo associate Mr. Jason Chapman and another associate. There was a disagreement over the telephone.

A requirement for the Deed-in-Lieu of Foreclosure to be accepted was the writing of a hardship letter. In my hardship letter, I wrote that I was a victim of a money gram scam which occurred at two Walmart stores in Ocala, FL.

Wells Fargo TCPA Settlement Page 6 November 20, 2016

This was a really serious issue as I was told
over the telephone that I won money; and in
order to receive the amounts of $500,000.00 to
$750,000.00, I was to send money to a relative in
Toronto, Canada. The amount of money sent was
over $11,000.00 sent in two transactions through
Moneygram at Walmart and the money was
taken as cash advances to my credit cards.
It had been almost five years that I could
not receive a refund of this money through
Walmart or Moneygram, that in 2013, about
when I was to leave my premises involved in
the foreclosure, I was notified by mail
that there was a Class Action lawsuit
being taken against Moneygram. In 2014
a settlement had been reached and I
received the difference in the amount that
was not returned, approximately $10,000.00.
I had received another amount previously
through the FTC (Federal Trade Commission)
in the amount of $1100.00 - $1200.00. I received
all of the money lost in the exact amount,
however it took alot of requesting and claiming
to receive it back. I just wanted to let you
know that since it was an issue in my hardship
letter to Wells Fargo, that it was taken
care of. (Approximately $1204.00 from the FTC; and $10,000 settlement)
       The issue not taken care of was
the loss of my investment for the home
itself (approximately $39,000.00), except for the
cash received at settlement and the moving assistance.
I thought I would have more equity than nothing.

Wells Fargo TCPA Settlement.   Page 7   November 20, 2016

My investment in the home that had debt was approximately $39,000.00. What was owed on the loan upon vacating the property was $57,585.03. I thought (probably from advice from my parents), that I should receive more moving assistance than $3000.00 (I received $2850.00), and I requested more in my hardship letter to Wells Fargo. My request was denied. The amount of assistance received should be weighed against what was spent for the home. I had read on the Freddie Mac website that the moving assistance was $3000.00 as was offered to me. However, I also read on the internet that Bank of America mortgage loan customers would receive $15,000.00 in moving assistance and Chase Bank customers would receive $20,000.00 in moving assistance. Later, I had read in the Real Estate Book, that a realtor in the Central Florida area was advertising $10,000.00 in moving assistance for short sales sold through their real estate company. This was after I had vacated the premises or around that time; and it is very hard to know what is being offered at the time a home is in foreclosure. With me, I thought the ads on the internet were very confusing; and then one has to think about the loss of their investment, hardship, homelessness, etc. There are a number of things making it difficult to determine the outcome for the person involved with foreclosure.
They also knows bought a farm and land, why I was indebted.

Wells Fargo TCPA Settlement    Page 8 November 20, — 2016

I had a home constructed in January 2000 -
June 2000 that cost a considerable amount
about $38,200.00 plus additional landscaping
costs paid in cash by check from my savings
account. What I received was a new home
with structural defects and sub-contractor
defects. I explained these defects to Wells
Fargo Inspection Fee Settlement c/o Garden City
Group, LLC, Po Box 10106, Dublin, OH 43017-3106
in March 2016. I explained defects in the
cinder block construction and canned Vienna
sausage grease on the ceilings nail heads done
by the plasterer. Also a contractor eating Teddy Grahams
while polishing the concrete, Coca Cola or Pepsi on a
steel stud, someone cracking the concrete in the
garage and making it dirty. These complaints are disgusting.
    One complaint the homeowner probably has in
foreclosure is the home price being set by the bank
for a low price such as with a Deed-in-Lieu or a
Short Sale. My previous home was sold for $15,000.00.
    In my case the BPO didn't give any equity
back to the homeowner, which from reading on the
internet seems to be the situation. However, I did
read that with legal assistance the homeowner
could reach a more agreeable outcome, better settlement, etc.
    As in the case of one of the BPO's (Brokers
Price Opinion) in my file the BPO of Pamela Heneghan
of Burner and Associates Realty, Real Estate Agency for
Burner Realty, LLC, 4988 SW 31st St., Ocala, Fl
34474, the BPO was $55,000.00. This wasn't used
except to obtain the Release of Mortgage recorded 2/12/14.
I am not really sure it was used at all except illegally, for
other reasons.

Wells Fargo TCPA Settlement   Page 9   November 20, 2016

There was also another BPO (Brokers Price Opinion) done by Mr. Dale Jackson of All Marion Realty, LLC, 8783 SE 59th Ave., Ocala, FL 34472 (352) 245-6839. I spoke to him at (352) 804-8601. He said he does BPO's only. He gave his report to a Mortgage Logic, 9151 Blvd 26, Suite 400, North Richland Hills, Tx 76180, (817) 581-2900. The contact person was Holly Parsons. She was not willing or could not provide any information such as a charge for the BPO or a copy of the report. The copy of the report was not given to me from Wells Fargo when I requested copies of documents in my file from Mr. Jason Cantaloupe; but this request was made before March 2016. This document could be missing from the file for Loan # 0207176777. I think I have heard of the realtor before, when I was living in an apartment and had not yet started saving for a home.

I contacted the foreclosure clerk at Levy County Court House in Bronson, FL (352) 486-5266, open Monday - Friday 8:30 AM - 4:30 PM and someone there could probably provide information as to the How, when and where the home was sold after the Deed-in-Lieu was completed. When I spoke to Hope, she said the bank sets the price for the property and these types of properties are sold every Monday at 11:00 AM in the Board of County Commissioners Room. When I spoke to Deanna, she said the property was not sold through the Clerk's office.

After I vacated the premises, I moved to English.

Wells Fargo TCPA Settlement Page 10 November 20, - 2016

I moved to the Village Pines Campground in Angel's, AZ where the manager caused damage to my camper. His son had access to the Wells Fargo answering system, as one day, before I vacated the premises, I had called Wells Fargo and he answered the phone and whatever question I had. I don't know how they obtained my phone number for that. It was a few weeks before I left the home.

About the damage to my camper, I thought that maybe the owner of the campground and others, were defending the manager when I was there in December 2013 - October 2014. He wasn't the only person who caused damage to my camper. I thought one of the movers had also caused damage to my camper; but maybe got access through the manager. I don't know who has a key; but I know someone has accessed the camper on my current premises because some items are missing. There also has been damage done to the roof of the camper to make dents all over the roof, only I don't know who has done the damage. This damage was done as soon as I bought the camper, right afterward, when I stored it in my garage. I don't know of the estimate of the damage to the roof. I have been told that it looked like hail damage. I estimate the lost or stolen items to be valued from $100.00 - $500.00 (retail value) if not more. The mover purchased my two sheds, and an aluminum pull behind trailer, steel mesh trailer, etc. The sheds had wasps; and the trailer had one bad tire; but I had cleared the sheds out very well; but wasps are a problem.

Wells Fargo TCPA Settlement   Page 11   November 20, 2016

I wasn't sure how or what I would do with these items that the mover offered to buy. I didn't even want to sell them at the time; but I needed to sell them because I had no place for them. I thought maybe with this camper damage, I would receive an offer for the camper because of needing the camper to live in. I received an offer from the insurance company; but I declined the offer. When the damage had been done, I first filed a police report; and then an insurance representative had to estimate the amount of damages that were done. I needed the funds for the damaged camper, so I received $4000.00 for the damaged camper. I only received damages for the camper. For an additional $1000.00 compensation to me, I would not have had a camper anymore. The insurance company, Nationwide Insurance, would have taken it. I thought the claim was not handled to my satisfaction because of my funds being limited; and I paid over $10,000.00 for the camper; and then I received their offers.
    I didn't know that some of the people in the Village Pines Campground had anything to do with my foreclosure file.
    I thought I had seen someone there that looked like Delores Murillo's father. She was the Home Preservation Specialist Supervisor from Boca Raton, Fl.
    I found out that my file was something they knew about, after I moved into the campground. Also the people renting at Village Pines don't mind paying the manager at Village Pines the rent. He might have called the contractor for the cinder block construction, which was a defect.

Wells Fargo TCPA Settlement   Page 12 November 20, 2016

There has been unauthorized activity into my loan with Wells Fargo, my bank accounts, credit cards, phone calls, internet activity, etc. Some of the activity is still going on. There are people looking into my accounts, trespassing on my premises, stealing items, doing damage, etc.

By writing what has occurred to me with this objection, I am trying to give you an idea of what has occurred because of my indebtedness with the home (Wells Fargo Loan #0207176777); and because of knowing these other individuals. I don't know if everything has been handled properly. I just know my investment was not used wisely for purchasing the home; and everyone would like me to lose my investment.

I know that being in debt with the bank was a serious issue; and with foreclosure, deed-in-lieu and short sale, exceptions cannot be made at the time, except if you have legal assistance. I did not have any legal assistance.

Please take my objection into consideration as here are people who will not; and might even look into it further, to stop my efforts to obtain any assistance I can. I said, I had purchased a German made land.

Under the proposed Settlement, Wells Fargo has agreed to establish a Settlement Fund of $16,417,496.70 to pay Class Members who make valid and timely claims; pay service awards of no more than $20,000 each to the three class representatives and pay attorneys' fees and costs awarded by the Court.

Wells Fargo TCPA Settlement    Page 13    November 20, 2016

Plaintiffs will ask the Court to award fees and costs
of up to 30% of the Settlement Fund or $4,925,249.01;
and pay settlement notice and administration costs.
Any remaining monies from uncashed settlement checks
may be redistributed or paid to a non-profit charity;
the parties have proposed Habitat for Humanity.
       I am requesting funds from the settlement as
I am also capable of being established as a
non-profit charity.
       My parents have renovated at least six homes
(row homes) in the Allentown, PA area more than forty
years ago; and their time, money and labor was
spent to renovate these homes. they also renovated
a single home in the South Allentown, PA area and
constructed two new beautiful town houses with a
shared wall (duplex town houses). these homes were
all eventually sold; but the time, labor and
money spent was for the rehabilitation of the homes
as they needed to have new bathrooms and kitchens
installed, new flooring, linoleum, light fixtures
new wiring, appliances, paint, wallpaper removed,
clean up done, roof repair completed, doors and
windows, etc., also the heating systems repaired
if not in working order.
       No one else is going to help me with my
situation and there is proof. there are people
trying to be compensated further for their hard work.
       Before I left my premises, some one had left
out a stampede of horses and they galloped down
SE 135th Ct., Dunnellon FL 34431 toward Pensacola Rd.
with no signs of stopping. They cannot read stop signs.

Wells Fargo TCPA Settlement    Page 14    November 20, 2016

they could have ran into a car and injured someone. I know these horses were let loose because of something involving a Wells Fargo example. Someone like this can cause harm and tried to cause someone injury.

I don't want to be held responsible for any phone call I made to a friend or her father and hanging up either. This happened in the early 1980's.

I would have been better off also maybe not knowing some people. Unfortunately, some of these people are being reimbursed for their everyday goings on and they have the worst characters. They don't understand legal representation in the proper way. They are always causing trouble and problems. I unfortunately am having money problems.

I wanted also to show an example of the bank's oversight? When people buy and sell homes, the seller gets paid at settlement with funds from the buyer has arranged, (either cash or a loan if a loan had to be approved through a financial institution). If a loan was approved the seller is still being paid up front before the buyer has even paid anything back in some instances. The seller would receive everything (the seller's proceeds); and the buyer of the home actually receives the home and all of the payments need yet to be paid. With my Deed-in-Lieu, they had strict requirements (or I am saying a better agreement can be reached) where the previous home owner practically gets nothing. I only received $2850.00 of the $3000.00 moving assistance. I was not sure I could move forward. Also, how do I know all of the others pay back their loans?

Wells Fargo TCPA Settlement  Page 15  November 20, 2016

I consider this type of situation very serious
and deserving of more consideration for compensation
for damages, etc. I need to find out if others
are doing better with a Deed-in-Lieu arrangement
and getting cash out with bills paid etc. at the
time of settlement for obtaining the loan and
then later when foreclosure is their option.

They tried to give others something my parents
deserve; and I don't get anything either. One or
more of my former employers have tried very
hard to see that I do not prosper or have
enough to live on. They also are guilty of
having affairs and not wanting to do
legitimate work. They would rather cause problems
and keep comparing rather than getting on with
their lives. The other people I am talking about that
seem to be doing better than they otherwise should
have are people I went to grade school, high
school and college with. This includes a former
spouse and his family and friends.

I already had a property settlement with
my divorce decree in April 1979 (April 30, 1979). I
was not married very long (August 6, 1977 -
marriage date) before a divorce was requested.
I did not contest the request; and I wanted
a divorce also. I am not re-considering anything
now either. This has been a ploy to ruin my
life and make money from me. There are others
doing this also.

They have already received enough help
and do not deserve any more assistance concerning me.

Wells Fargo TCPA Settlement Page 16 November 20, 2016

When I was married, getting a divorce, etc. my brother was placed in an institution. I don't exactly know of the circumstances that allow the ex-spouse to obtain information about someone; but the usually does. I don't know if he obtained information about my brother; but it could be that he has had several affairs or he wanted to move back home instead of renting an apartment. I think he even answered the phone for Wells Fargo Home Mortgage when I called one time. Please don't give anyone else my information. These people have been paid triple damages already for some of the things they have complained about. They know more information about certain things then I do: and they continue to use my phone calls and internet searches to get information. Others do this too; and I need this investigated as an injunction is now being requested and is needed. They find out things illegally.

I am the one who is being broken in to; and I don't have access to a toilet or shower on my premises. The camper I have is being used as storage. I was left by these Wells Fargo employees with examples such as these with no hope of receiving one dollar in assistance. The Moneygram Class Action settlement was not their settlement, they did not help and it was handled by the Smith Law Office in Chiefland, FL. (Shannon B. Smith Law Firm, LLC, 322 E Park Ave., Chiefland, FL 32626)

Wells Fargo TCPA Settlement   Page 17   November 20, 2016

I would like to explain a few more things that are deserving for a complaint to be made. I recently, about a week ago, had my 2003 Chrysler Pt Cruiser serviced at Chrysler Dodge Jeep in Chiefland, FL (2771 N. Young Blvd., Chiefland, FL 32626); and now the car is broken down. It cannot be driven, I need the transportation to get around. I am having problems making insurance payments and other people who are looking into my finances are complaining too. They hired to evict me from my former premises in one year that I stopped making payments. These are the Wells Fargo employees and others. I was forced to be fired from Driveline Retail Merchandising, the reason given, cleaning the shelves too much. Now, I would be trespassing on the Walmart, Chiefland, FL property because of a scuffle such as pushing the shoulder of the person in charge on duty with Driveline Retail. My former employer, (Muscle Medical Products) supervisor's son works with Driveline. I thought that some one was going to help me; but now this happened. I don't know if her son is the ex-husband too. They each might have had many affairs. Anyway, I do not work for Driveline Retail anymore; and I need to file a complaint also with another agency.

It doesn't look like anyone is going to help or hire me; and my circumstances are being considered. Even if I were hired, it might not be for very long or the proper consideration given among other individuals will not be given. (My former employer's son is picture son the  Driveline Retail website).

Wells Fargo TCA Settlement Page 18  November 20, 2016

She was a supervisor at Market Medical Products, not the owner.

What I had wanted to say about Chiefland Chrysler Dodge is maybe they are responsible for the damage to my car, as it now can't be driven; and they hired some personnel that are related to my ex-husband (sister's son and brother-in-law's brother, etc.)

I don't think my former employer (Market Medical Products) will be helping me unless I have a chance to sue them. They should have been more helpful and given better help than they did.

There is also a police officer and his wife from Levy County, who have been looking into my parents and my finances probably since my parents moved to Allentown, PA from Souderton, PA. I am including a police officer's standards of conduct copy, because I am not sure if this would help my case. I don't think everything they do is ethical; and they want to say the same about me.

The former president (come 1/20/17) knows about my situation, yet has done nothing that I know of in the form of legislation or Social Security COLA in order to help someone,

I am trying to mention all that can be mentioned because nothing was attempted to be done to help me in my situation and their knowledge of my situation could prove to be illegal.

If my parents are to blame, perhaps they are.

Wells Fargo TCPA Settlement   Page 19   November 20, 2016

However, I have a heartfelt example of how my brother is no longer with me or my family, and people are too concerned about my business; and not helpful enough with my example.

I was worried about my brother's health, so I asked our parish priest at St. Ann's Church, Emmaus, PA to give my brother last rites. I thought the priest was only going to go there to pray for him because I thought he needed prayers and help. Unfortunately, I don't know what happened either, but he died a few short weeks (days) later. I am not sure that the priest was to do anything besides pray for him, I wasn't there.

Anyway, my brother was in a state institution in Allentown, Pa (Allentown State Hospital); and he didn't even have his own home or residence to live in or the basic living necessities. He needed help with living skills, help with getting dressed and bathed and showered and also help getting nourishing meals while he was there (1978-1983). I didn't get to speak to any of the staff about how he was doing. I really was and still am very concerned about him. I did not know for sure that he was in an institution until I moved home after my bills were becoming too much for me; and I could not pay the rent.

While I was in the apartment, I thought that he could have been used for observation or experimentally to father someone or to be videotaped without someone's consent. I only had an idea then that he might have been in the hospital; but I didn't know for sure. I tried calling there one time; but I didn't talk to the correct person or something. I didn't know what to do. When I moved home again, I visited with my dad sometimes.

Wells Fargo TCPA Settlement   Page 20   November 20, 2016

the point is, Eric has taken some abuse and they even try to make the residents smoke at the institution. When I visited Eric at the hospital with my dad, one day he looked really good. Some other visits just OK. As I said before he needed assistance with various things such as eating, bathing, showering, going to the bathroom, getting dressed, etc. He always needed his pants to be pulled up at home. He behaves when he is being washed; but I know how he behaves when he can do whatever he wants.

What I am trying to say, if appropriate is, using a child to father someone (especially at someone else's suggestion) is illegal. I think the people responsible for this are getting away with something (someone is constantly seeming to send a law suit my way, they are the ex-spouse, friends I went to school with, previous and future employers, debt collectors, police officers, clerk of the court and others). Someone at the Allentown State Hospital must have told someone else about Eric's behavior. I think even the future president of the United States knows about him.

There are people I know using my family and examples on a daily basis to help them with their employment, etc.; and I am being turned away. I think someone is always discussing my life and problems; and it also happens with Eric. I do not think of someone else when I think of him. I have a brain and I can think and come to conclusions that I want. Eric had problems in the hospital, he had problems with his prostate. I wanted him to move back home again. I think someone there tried to tell my previous in-laws something.

Wells Fargo TCPA Settlement     Page 21     November 20, 2016

Before I even went to college, someone tried the idea of making a motion picture (I think they tried to use me for the Eric Theatre). I think I was matched with a roommate in college that was filmed in a motion picture (Batman vs. Superman); and I was also set up for a blind date because of others (maybe he was in the motion picture too). I had a friendship which eventually led to marriage; but I broke it off when the divorce was requested. I still do not and will not ever want to reconcile that marriage. I have been pressured enough concerning that. I don't think that relationship was compatible enough with me. I just don't want to be used by them or anyone else from that college either.

I would need to get my money back for my mortgage and the education that I received from Bloomsburg State College. Bloomsburg is a Business College and one that specialized in Special Education. All those students I attended school with are probably familiar with my file and think nothing of it.

I need the people doing the actual infringing and infringing in general to leave me alone. The infringements are not just those people I went to school with. I need to help myself become more of a success.

I have found out that another movie has been made (Bad Moms), which looks like the ex-spouses sisters daughter starred in that film. She also starred in a 10:00 PM TV series with Ted Danson. They might be good movies or tv programs; but I am not being helped if it is someone else's movie or TV show.

I said I was being infringed upon and that is my answer.

I have experienced extreme hardship and humiliation because of how my family (mom, dad, sister and brother) are being thought of.

My damages such as those experienced by my brother by individuals are in excess of $250,000.00 — $1,000,000.00. These problems concerning my place to live purchases for real estate (which were sub-contractor defects in the home) and loan terms unable to be kept up with caused me to lose my investment completely with my home being in foreclosure. I should be a little contented with the Deed-in-Lieu, but I thought there were options available for me to recover. I hope this would be possible.

I had also attended high school with some people that have now earned success in motion pictures, magazine photography, etc. I think they took into consideration what Eric is capable of through his background. I think the facts about what I have told you are hidden. It is up to me to make a complaint.

I am receiving more than my fair share of attempts made by people to become famous. I think I went to Bloomsburg State College and someone in my dormitory was a member of President Bush's family.

My life is important too; and I know I am not being assisted well enough in the proper way. I am trying to seek the best possible outcome for myself. My contact information is on this letter with phone (352)256-3077.

Sincerely,

Marianne Kapitaen
Marianne Kapitaen (Marianne Kapitaen)

OMB Approval No. 2502-0265

| A. Settlement Statement | | | B. Type of Loan | |
|---|---|---|---|---|
| | | | 1-5. Loan Type Conv. Unins. | |
| **First American Title Insurance Company National Lenders Advantage** **Final Statement** | | | 6. File Number 51870790 | |
| | | | 7. Loan Number 304595-88376541 | |
| | | | 8. Mortgage Insurance Case Number | |

C. **Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D. **Name of Borrower: Marianne Kapitsen**
11111 SE 135TH CT., DUNNELLON, FL 34431

E. **Name of Seller:**

F. **Name of Lender: AMERISAVE MORTGAGE CORPORATION**
3525 Piedmont Rd.Bldg 6, Ste 710
ATLANTA, GA 30305

G. **Property Location: 11111 SE 135TH CT., DUNNELLON, FL 34431**

| H. Settlement Agent: First American Title Insurance Company National Lenders Advantage Address: 1591 Galbraith Avenue, Suite 200, Grand Rapids, MI 49546 | I. Settlement Date: 01/14/2008 |
|---|---|
| Place of Settlement Address: 1591 Galbraith Avenue, Suite 200, Grand Rapids, MI 49546 | Print Date: 01/11/2008, 4:32 PM |
| | Disbursement Date: 01/18/2008 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 52,510.05 | 403. Total Deposits | |
| 104. Tax Installment: Amount to LEVY COUNTY TAX | 249.74 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109 | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due From Borrower | 52,759.79 | 420. Gross Amount Due To Seller | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 65,000.00 | 502. Settlement charges (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. APPLICATION FEE REFUND from AMERISAVE | 595.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513 | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 65,595.00 | 520. Total Reduction Amount Due Seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 52,759.79 | 601. Gross amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 65,595.00 | 602. Less reductions in amounts due to Seller (line 520) | |
| 303. Cash ( From) (To) Borrower | 12,835.21 | 603. | |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.
Settlement Agent:                                                                                                          Date 01-81-08

File No. 518707in

| L. Settlement Charges | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | |
| Division of Commission (line 700) as follows | | |
| 701. | | |
| 702. | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| 800. Items Payable in Connection with Loan | | |
| 801. Loan Origination Fee | | |
| 802. Loan Discount | | |
| 803. Appraisal Fee - AMERISAVE MORTGAGE CORPORATION | 350.00 | |
| 804. Credit Report - AMERISAVE MORTGAGE CORPORATION | 8.01 | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Premium | | |
| 807. Assumption Fee | | |
| 808. APPLICATION FEE - AMERISAVE MORTGAGE CORPORATION           POC-B $395.00 | | |
| 809. AMERISAVE SUREFEE - AMERISAVE MORTGAGE CORPORATION | 3,898.15 | |
| 810. | | |
| 811. | | |
| 812. | | |
| 813. | | |
| 814. | | |
| Supplemental Summary | | |
| 900. Items Required by Lender to be Paid in Advance | | |
| 901. Interest 01/18/08 to 02/01/08 @$9.34930/day - AMERISAVE MORTGAGE CORPORATION | 130.89 | |
| 902. | | |
| 903. Hazard Insurance Premium for | | |
| 904. | | |
| 905. | | |
| Supplemental Summary | | |
| 1000. Reserves Deposited with Lender | | |
| 1001. Hazard Insurance | | |
| 1002. Mortgage Insurance | | |
| 1003. City Property Taxes | | |
| 1004. County Property Taxes | | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment | | |
| 1100. Title Charges | | |
| 1101. Settlement or closing fee - First American Title Insurance Company National Lenders Advantage | 375.00 | |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title Insurance Binder | | |
| 1105. Document Fee | | |
| 1106. Notary Fee | | |
| 1107. Attorney Fee | | |
| (includes above item numbers: ) | | |
| 1108. Title Insurance - See supplemental page for breakdown of individual fees and payees | | |
| (includes above item numbers: ) | | |
| 1109. Lender's coverage $95,000.00 | | |
| 1110. Owner's coverage $0.00 | | |
| 1111. Doc Reproduction - First American Title Insurance Company National Lenders Advantage | 35.00 | |
| 1112. Title Search Fee - First American Title Insurance Company National Lenders Advantage | 75.00 | |
| 1113. 8.1 Endorsement (Promulgated Premium $25) - First American Title Insurance Company National Lenders Advantage | 8.00 | |
| 1114. Courier Service - First American Title Insurance Company National Lenders Advantage | 35.00 | |
| 1115. Title Insurance (Promulgated Premium $373.75) - First American Title Insurance Company National Lenders Advantage | 350.00 | |
| 1116. FF9 Endorsement (Promulgated Premium $37.38) - First American Title Insurance Company National Lenders Advantage | 35.00 | |
| 1117. | | |
| 1200. Government Recording and Transfer Charges | | |
| 1201. Recording fees: | | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps: | | |
| 1204. Mortgage Recording Service - First American Title Insurance Company National Lenders Advantage | 137.50 | |
| 1205. Intangible Tax - First American Title Insurance Company National Lenders Advantage | 150.00 | |
| 1206. Document Stamp Tax-Mortgages - First American Title Insurance Company National Lenders Advantage | 227.50 | |
| 1300. Additional Settlement Charges | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. Courtesy Payment to SOVEREIGN BANK and Marianne Kapit, | 19,121.00 | |
| 1304. Courtesy Payment to CITI and Marianne Kapitsen | 7,480.00 | |
| 1305. Courtesy Payment to DISCOVER FIN SVCS LLC and Marianne Kapitsen | 6,626.00 | |
| 1306. Courtesy Payment to BANK OF AMERICA and Marianne Kapitsen | 4,479.00 | |
| 1307. Courtesy Payment to CAPITAL 1 BK and Marianne Kapitsen | 3,666.00 | |
| 1308. Courtesy Payment to WASH MUTUAL/PROVIDIAN and Marianne Kapitsen | 2,925.00 | |
| 1309. Courtesy Payment to AMEX and Marianne Kapitsen | 1,892.00 | |
| 1310. Courtesy Payment to FNB OMAHA and Marianne Kapitsen | 495.00 | |
| 1311. Courtesy Payment to CHASE and Marianne Kapitsen | 34.00 | |
| 1312. Courtesy Payment to HSBC NV and Marianne Kapitsen | 5.00 | |
| 1313. | | |
| 1314. | | |
| Supplemental Summary | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | 52,910.05 | |

¹ See Supplemental Page for details.

| | |
|---|---|
| **Supplemental Page**<br>HUD-1 Settlement Statement | Loan No.<br>5187079n |
| **First American Title Insurance Company National Lenders**<br>**Advantage**<br>**Final Statement** | Loan No.<br>304505-50370841 |
| | Settlement Date:<br>01/14/2008 |

Borrower Name & Address:  Marianne Kapitaen
11111 SE 138TH CT., DUNNELLON, FL 34431

Seller Name & Address:

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S):

*Marianne Kapitaen*
Marianne Kapitaen

MIN: 100277210003045050          **NOTE**          Loan Number: 304505-50370B41

JANUARY 14, 2008                    ATLANTA                                GEORGIA
    [Date]                                          [City]                                    [State]

11111 SE 135TH CT., DUNNELLON, FLORIDA 34431
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $65,000.00      (this amount is
called "Principal"), plus interest, to the order of the Lender. The Lender is AMERISAVE MORTGAGE
CORPORATION, A GEORGIA CORPORATION                                                .

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and
who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest
at a yearly rate of 5.250      %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st   day of each month beginning on MARCH 1           ,
2008    . I will make these payments every month until I have paid all of the principal and interest and any other
charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled
due date and will be applied to interest before Principal. If, on FEBRUARY 1, 2028      , I still owe
amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3525 PIEDMONT ROAD, 6 PIEDMONT CENTER
STE 710, ATLANTA, GEORGIA 30305

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $438.00                      .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only
is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.
I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder
will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder
may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my
Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in
the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the
interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits,
then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

FLORIDA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3210 1/01                                     Page 1 of 3                        DocMagic &copy; *msm nun* 1162
    www.docmagic.com

M.K.

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  7 5 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be
        5.000      % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

FLORIDA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3210 1/01
                                                    Page 2 of 3
                                                    ℳ.ĸ.

DocMagic ℰℱ੭ᵣᵤ੭ᵤᵤ 800-649-1362
                            www.docmagic.com

15210.mi

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**
The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MARIANNE KARZTAEN              -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

*[Sign Original Only]*

FLORIDA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3210 1/01                    Page 3 of 3

DocMagic℮Ϝℎℯⅽⅿⅼ 800-649-1362
www.docmagic.com

FI3210.md

**HOME MORTGAGE**



## Customer Account Activity Statement
### Loan # 708 - 020117677
### KAPITAEN

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Amount Applied to Optional | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/2008 | | Mar-08 | | -$85,000.00 | | | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | Beginning Totals/Balances |
| 01/2008 | | Mar-08 | $220.00 | | | | | $220.00 | | | $85,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | New Loan Balance |
| 02/15/08 | 02/15/08 | | $220.00 | | | | | $220.00 | | | $85,000.00 | $0.00 | $220.00 | $0.00 | $0.00 | |
| 02/2008 | | Mar-08 | $220.00 | $153.52 | $284.36 | | | -$438.00 | | | $84,846.38 | $0.00 | $440.00 | $0.00 | $0.00 | Unapplied Funds to Monthly Payment(s) |
| 02/2008 | 02/26/08 | | | $2.00 | | | | -$2.00 | | | $84,844.38 | $0.00 | $2.00 | $0.00 | $0.00 | Unapplied Funds to Principal Balance |
| 04/01/08 | 04/01/08 | | $438.00 | $154.31 | $283.59 | | | | | | $84,690.07 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 04/01/08 | 04/01/08 | | $2.00 | $2.00 | | | | | | | $84,688.07 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 05/01/08 | 05/01/08 | May-08 | $438.00 | $154.99 | $283.01 | | | | | | $84,533.08 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 05/01/08 | 06/01/08 | | $2.00 | $2.00 | | | | | | | $84,531.08 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 06/2008 | 06/02/08 | Jun-08 | $438.00 | $155.68 | $282.32 | | | | | | $84,375.40 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 06/2008 | 06/02/08 | | $2.00 | $2.00 | | | | | | | $84,373.40 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 06/2008 | | | $438.00 | $188.37 | $281.63 | | | | | | $84,217.03 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 07/01/08 | 07/01/08 | Jul-08 | $2.00 | $2.00 | | | | | | | $84,215.03 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 07/01/08 | 07/01/08 | | $445.92 | $157.06 | $280.94 | | $7.92 | | | | $84,057.97 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 08/01/08 | 08/01/08 | Aug-08 | $445.92 | $157.75 | $280.25 | | $7.92 | | | | $83,900.22 | $0.00 | $0.00 | $0.00 | $0.00 | Principal Payment |
| 09/02/08 | 09/02/08 | Sep-08 | $445.92 | $159.44 | $279.56 | | $7.92 | | | | $83,741.78 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 10/01/08 | 10/01/08 | Oct-08 | $445.45 | $159.13 | $278.87 | | $31.45 | | | | $83,582.65 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 11/03/08 | 11/03/08 | Nov-08 | $445.45 | $159.83 | $278.17 | | $31.45 | | | | $83,422.82 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12/01/08 | 12/01/08 | Dec-08 | $445.45 | $180.53 | $277.47 | | $31.45 | | | | $83,262.29 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 01/02/09 | 01/02/09 | Jan-09 | $445.45 | $181.23 | $276.77 | | $31.45 | | | | $83,081.26 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 02/02/09 | 02/02/09 | Feb-09 | $445.45 | $180.85 | $276.07 | | $31.45 | | | | $82,900.31 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 03/02/09 | 03/02/09 | Mar-09 | $445.45 | $181.95 | $275.38 | | $31.45 | | | | $82,919.13 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 04/01/09 | 04/01/09 | Apr-09 | $494.40 | $182.54 | $274.65 | | $31.45 | | | | $82,778.49 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 05/01/09 | 05/01/09 | May-09 | $494.40 | $183.35 | $274.85 | | $35.40 | | | | $82,613.14 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 06/01/09 | 06/01/09 | Jun-09 | $524.35 | $184.07 | $273.93 | | $86.35 | | | | $82,449.07 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 07/01/09 | 07/01/09 | Jul-09 | $524.35 | | | | $111.25 | | | | $82,284.28 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 08/03/09 | 08/03/09 | Aug-09 | $542.25 | $194.17 | $273.21 | | | $480.43 | | | $82,284.28 | $0.00 | $480.43 | $0.00 | $0.00 | |
| 08/03/09 | 08/03/09 | Aug-09 | $480.43 | $194.78 | $272.49 | | | -$461.53 | | | $82,118.77 | $0.00 | $18.90 | $0.00 | $0.00 | Unapplied Funds to Monthly Payment(s) |
| 08/04/09 | | Aug-09 | | $195.51 | | | $23.53 | -$18.90 | | | $82,099.87 | $0.00 | $0.00 | $0.00 | $0.00 | Unapplied Funds to Principal Balance |

Customer Account Activity Statement
Loan # 708 - 020f178777
KAPITAEN

Page 2 of 4

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied/Disbursed | Amount Applied to Deferred | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Amount Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance/Escrow Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/09 | 09/01/09 | Sep-09 | $451.33 | $166.31 | $271.89 | | $23.33 | | | | $91,933.58 | $0.00 | | $0.00 | $0.00 | |
| 10/01/09 | 10/01/09 | Oct-09 | $451.33 | $167.04 | $270.96 | | $23.33 | | | | $91,766.52 | $0.00 | | $0.00 | $0.00 | |
| 11/02/09 | 11/02/09 | Nov-09 | $491.48 | $167.77 | $270.33 | | $53.48 | | | | $91,598.75 | $0.00 | | $0.00 | $0.00 | |
| 12/01/09 | 12/01/09 | Dec-09 | $499.96 | $168.51 | $229.49 | | $53.98 | | | | $91,430.24 | $0.00 | | $0.00 | $0.00 | |
| 01/04/10 | 01/04/10 | Jan-10 | $491.48 | $169.24 | $229.78 | | $53.48 | | | | $91,261.00 | $0.00 | | $0.00 | $0.00 | |
| 02/01/10 | 02/01/10 | Feb-10 | $491.48 | $169.98 | $226.02 | | $53.48 | | | | $91,091.02 | $0.00 | | $0.00 | $0.00 | |
| 03/01/10 | 03/01/10 | Mar-10 | $491.48 | $170.73 | $267.27 | | $53.48 | | | | $90,920.29 | $0.00 | | $0.00 | $0.00 | |
| 04/01/10 | 04/01/10 | Apr-10 | $491.48 | $171.47 | $266.53 | | $53.48 | | | | $90,748.82 | $0.00 | | $0.00 | $0.00 | |
| 04/02/10 | | | | | | | | | -$10.00 | | $90,748.82 | $0.00 | | $10.00 | $0.00 | Fee: Fee |
| 05/03/10 | 06/03/10 | May-10 | $501.43 | $172.22 | $265.78 | | $63.43 | | | | $90,576.60 | $0.00 | | $10.00 | $0.00 | |
| 06/01/10 | 06/01/10 | Jun-10 | $491.48 | $172.96 | $265.02 | | $53.48 | | | | $90,403.52 | $0.00 | | $10.00 | $0.00 | |
| 07/15/10 | 07/15/10 | Jul-10 | $491.48 | $173.73 | $264.27 | | $53.48 | | | | $90,229.89 | $0.00 | | $10.00 | $0.00 | |
| 08/16/10 | 08/16/10 | Aug-10 | $491.48 | $174.48 | $263.51 | | $53.48 | | | | $90,055.40 | $0.00 | | $10.00 | $0.00 | |
| 08/16/10 | | | | | | | | | -$21.90 | | $90,055.40 | $0.00 | | $31.90 | $0.00 | Late Charge Assessment |
| 09/20/10 | | | | | | | | | $21.90 | | $90,055.40 | $0.00 | | $10.00 | $0.00 | Late Charge Waived |
| 10/18/10 | | | | | | | | | -$21.90 | | $90,055.40 | $0.00 | | $31.90 | $0.00 | Late Charge Assessment |
| 11/16/10 | | | | | | | | | -$20.00 | | $90,055.40 | $0.00 | | $51.90 | $0.00 | Property Inspection Fee |
| 11/16/10 | | | | | | | | | -$21.90 | | $90,055.40 | $0.00 | | $73.80 | $0.00 | Late Charge Assessment |
| 12/02/10 | | | | | | | | | -$20.00 | | $90,055.40 | $0.00 | | $93.80 | $0.00 | Property Inspection Fee |
| 12/10/10 | | | | | | | | | -$21.90 | | $90,055.40 | $0.00 | | $115.70 | $0.00 | Late Charge Assessment |
| 01/04/11 | | | | | | | | | -$20.00 | | $90,055.40 | $0.00 | | $135.70 | $0.00 | Property Inspection Fee |
| 01/18/11 | | | | | | | | | -$21.90 | | $90,055.40 | $0.00 | | $157.60 | $0.00 | Late Charge Assessment |
| 02/08/11 | | | | | | | | | -$20.00 | | $90,055.40 | $0.00 | | $177.60 | $0.00 | Property Inspection Fee |
| 02/17/11 | 02/17/11 | | | | | | | $331.87 | $331.87 | | $90,055.40 | $0.00 | $331.87 | $177.60 | $0.00 | |
| 03/01/11 | 03/17/11 | | $331.87 | | | | $331.87 | | | | $90,055.40 | $0.00 | $663.74 | $177.60 | $0.00 | |
| 03/01/11 | | | | | | | | -$505.17 | | | $89,880.14 | $0.00 | $158.57 | $177.60 | $0.00 | Unapplied Funds to Monthly Payment(s) |
| 03/17/11 | Sep-10 | | $175.30 | $262.74 | $97.17 | | | | | | $89,880.14 | $0.00 | $490.44 | $177.60 | $0.00 | |
| 04/04/11 | 04/04/11 | | $331.87 | | | | $331.87 | | | | $89,880.14 | $0.00 | $490.44 | $177.60 | $0.00 | Property Inspection Fee |
| 04/26/11 | | | | | | | | -$20.00 | | | $89,880.14 | $0.00 | $490.44 | $197.60 | $0.00 | Property Inspection Fee |
| 05/26/11 | | | | | | | | $87.80 | | | $89,880.14 | $0.00 | $490.44 | $110.00 | $0.00 | Late Charge Waived |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.

Customer Account Activity Statement
Loan # FOR: KOETHKEN

Page 3 of 4

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Escrow | Amount applied to Optional | Applied to Unapplied Funds | Fees | Corporate Advance Balance | Principal Balance | Escrow Balance | Unapplied Funds Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/08/11 | | | $327.76 | | $400.44 | | $327.76 | $100.00 | $89,686.12 | $89.17 | $400.44 | $0.00 | $0.00 | Property Inspection Fees Waived |
| 02/25/11 | | | | | | | | $10.00 | $89,686.14 | $89.17 | $400.44 | $0.00 | $0.00 | Flat Fee Waived |
| 02/28/11 | Jan-11 | | -$1,606.40 | | $400.44 | -$486.44 | | | $91,485.54 | $89.17 | $400.44 | $0.00 | $0.00 | Loan Modification |
| 05/20/11 | | | $400.44 | | | | -$400.44 | | $91,485.54 | $89.17 | $0.00 | $0.00 | $0.00 | Unapplied Funds to Interest Due |
| 06/08/11 | Jun-11 | $327.78 | $186.13 | $162.48 | $71.55 | | -$327.78 | | $90,185.42 | $195.35 | $0.00 | $0.00 | $0.00 | |
| 06/13/11 | Jan-11 | $94.49 | $186.13 | $102.48 | $71.55 | | | | $90,062.23 | $245.62 | $0.00 | $0.00 | $0.00 | Unapplied Funds to Monthly Payment(s) |
| 07/12/11 | Jul-11 | $332.26 | $186.40 | $102.21 | $71.55 | | | | $90,532.77 | $497.07 | $0.00 | $0.00 | $0.00 | |
| 08/12/11 | Aug-11 | $332.26 | $185.80 | $96.30 | $71.95 | | | | $90,532.77 | $196.96 | $0.00 | $0.00 | $0.00 | |
| 09/12/11 | Sep-11 | $332.26 | $189.93 | $91.95 | $71.95 | | | | $90,332.77 | $258.61 | $0.00 | $0.00 | $0.00 | |
| 10/12/11 | Oct-11 | $332.26 | $186.10 | $101.42 | $71.26 | | | | $90,373.05 | $330.36 | $0.00 | $0.00 | $0.00 | |
| 11/13/11 | Nov-11 | $332.26 | $186.46 | $101.15 | $71.95 | | | | $90,213.96 | -$26.74 | $0.00 | $0.00 | $0.00 | County Taxes Paid |
| 11/10/11 | | | | | -$310.11 | | | | $90,332.77 | $42.91 | $0.00 | $0.00 | $0.00 | |
| 12/12/11 | Dec-11 | $332.26 | $189.72 | $100.00 | $71.55 | | | | $90,052.61 | $119.83 | $0.00 | $0.00 | $0.00 | |
| 01/12/12 | Jan-12 | $332.26 | $189.95 | $100.00 | $71.85 | | | | $90,052.28 | $119.83 | $0.00 | $0.00 | $0.00 | |
| 01/10/12 | | | | | -$589.00 | | | | $90,213.96 | -$26.74 | $0.00 | $0.00 | $0.00 | Homeowners Insurance Paid |
| 02/12/12 | Feb-12 | $332.26 | $160.25 | $100.39 | $71.85 | | | | $90,052.61 | $42.91 | $0.00 | $0.00 | $0.00 | |
| 03/12/12 | Mar-12 | $337.33 | $190.52 | $100.00 | $79.72 | | | | $59,992.26 | $119.83 | $0.00 | $0.00 | $0.00 | |
| 03/29/12 | | | $1,000.00 | $1,000.00 | | | | | $58,992.26 | $119.83 | $0.00 | $0.00 | $0.00 | HAMP Incentive Principal Payment |
| 04/12/12 | Apr-12 | $337.33 | $162.46 | $86.15 | $78.72 | | | | $59,726.83 | $196.35 | $0.00 | $0.00 | $0.00 | |
| 05/13/12 | May-12 | $337.33 | $162.73 | $97.88 | $78.72 | | | | $58,967.10 | $273.07 | $0.00 | $0.00 | $0.00 | |
| 06/12/12 | Jun-12 | $337.33 | $160.00 | $97.61 | $78.72 | | | | $59,404.10 | $348.79 | $0.00 | $0.00 | $0.00 | |
| 07/12/12 | Jul-12 | $337.33 | $159.27 | $97.34 | $78.72 | | | | $59,240.83 | $426.51 | $0.00 | $0.00 | $0.00 | |
| 08/12/12 | Aug-12 | $337.33 | $160.54 | $97.07 | $78.72 | | | | $59,077.26 | $503.23 | $0.00 | $0.00 | $0.00 | |
| 09/12/12 | Sep-12 | $337.33 | $160.81 | $96.80 | $78.72 | | | | $57,913.48 | $579.95 | $0.00 | $13.03 | $0.00 | |
| 10/10/12 | | | | | -$13.03 | | | | $57,913.48 | $579.95 | $0.00 | $13.03 | $0.00 | Late Charge Assessment |
| 11/08/12 | Oct-12 | $867.86 | $184.09 | $96.52 | $78.72 | $337.33 | $13.03 | | $57,749.39 | $666.67 | $337.33 | $0.00 | $0.00 | |
| 11/08/12 | Nov-12 | | $184.36 | $96.25 | $78.72 | -$337.33 | | | $57,585.03 | $743.39 | $0.00 | $0.00 | $0.00 | Unapplied Funds to Monthly Payment(s) |
| 11/19/12 | | | | | -$371.58 | | | | $57,585.03 | $361.81 | $0.00 | $0.00 | $0.00 | County Taxes Paid |
| 01/08/13 | | | -$380.00 | | | | | | $57,585.03 | -$18.19 | $0.00 | $0.00 | $0.00 | Homeowners Insurance Paid |

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of this loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.

HOME MORTGAGE

## Customer Account Activity Statement
### Loan # 708 - 020717677?
### KAPITAEN

v1.04

| Date Received | Effective Date | Due Date | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Escrow Applied / Disbursed | Amount Applied to Optional | Unapplied Funds | Fees Assessed or Recovered | Corporate Advance Fees Assessed or Recovered | Principal Balance | Escrow Balance | Unapplied Balance | Outstanding Fee Balance | Outstanding Corporate Advance Fee Balance | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/24/13 | | | | | | | | | | | $57,585.03 | $0.00 | $0.00 | $0.00 | $0.00 | Escrow Deposit |
| 02/15/13 | | | $18.18 | | | $18.18 | | | -$15.00 | | $57,585.03 | $0.00 | $0.00 | $15.00 | $0.00 | Property Inspection Fee |
| 02/15/13 | | | | | | | | | -$15.00 | | $57,585.03 | $0.00 | $0.00 | $30.00 | $0.00 | Property Inspection Fee |
| 03/13/13 | | | | | | | | | | -$15.00 | $57,585.03 | $0.00 | $0.00 | $30.00 | $0.00 | Property Inspection Fee |
| 05/08/13 | | | | | | | | | | -$15.00 | $57,585.03 | $0.00 | $0.00 | $30.00 | $15.00 | Property Inspection Fee |
| 10/02/13 | | | | | | | | | | -$827.50 | $57,585.03 | $0.00 | $0.00 | $30.00 | $842.50 | Attorney Fees |
| 10/02/13 | | | | | | | | | | -$325.00 | $57,585.03 | $0.00 | $0.00 | $30.00 | $1,297.50 | Title Policy Cost |
| 11/20/13 | | | | | | -$987.89 | | | | | $57,585.03 | -$987.89 | $0.00 | $30.00 | $1,397.50 | County Taxes Paid |
| 12/03/13 | | | | | | | | | | -$622.50 | $57,585.03 | -$987.89 | $0.00 | $30.00 | $2,020.00 | Attorney Fees |
| 12/19/13 | | | | | | | | | | | $57,585.03 | -$987.89 | $0.00 | $0.00 | $2,020.00 | Deed-in-Lieu Completed |

This manually prepared Customer Account Activity Statement is prepared outside of the regular course of business to provide a streamlined form of the loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business

This Customer Account Activity Statement is manually prepared outside of the regular course of business to provide a streamlined form of the loan payment history. It is not a record kept by Wells Fargo in the course of regularly conducted business.



## Freddie Mac

We make home possible℠

**BROKER'S PRICE OPINION**

| | | |
|---|---|---|
| Exterior /Curb Side ☒ | Inspection Date 02/19/2010 | Freddie Mac Loan # 493616772 |
| Interior ☐ | | Servicer Loan # 11111 |
| Interior Access Denied ☐ Reason | | BPO # 41151520 |

| BPO Firm Name | Broker | Phone |
|---|---|---|
| BURNER REALTY LLC | PAMELA HENEGHAN | (352) 867-8673 |

### SUBJECT PROPERTY DESCRIPTION

| | | | |
|---|---|---|---|
| Property Address 11111 SE 135TH CT | | | Unit # |
| City DUNNELLON | County LEVY | State FL | Zip 34431 |
| Is property currently listed for sale with a real estate firm? ☐ Yes ☒ No | Name of Listing Broker, Salesperson or Firm | | Phone |
| Property Type: SFD | | | Condo Fee $ 0 |

Occupant: ☒ Owner ☐ Tenant ☐ Vacant

### Estimate of repairs needed for subject property

| Interior: | | Exterior: | |
|---|---|---|---|
| Painting | $ 0 | Painting | $ 0 |
| Structural | $ 0 | Structural | $ 0 |
| Appliances | $ 0 | Landscaping | $ 0 |
| Utilities | $ 0 | Roof | $ 0 |
| Carpet/Floors | $ 0 | Windows | $ 0 |
| Other | $ 0 | Other | $ 0 |
| Cleaning/Trash Removal | $ 0 | Do you recommend repairs? ☐ Yes ☒ No | |

Repairs Total: $ 0.00

| | |
|---|---|
| Overall Property Condition: ☐ Excellent ☒ Good ☐ Fair ☐ Poor | |
| Are there any items that require IMMEDIATE attention/action? ☐ Yes ☒ No | |
| Title/Legal Issues? ☐ Yes ☒ No | |
| Do any environmental issues affect the value of the property? ☐ Yes ☒ No | |
| If yes to any of the above, please explain: | |

THERE WERE NO APPARENT UPGRADES TO THE SUBJECT PROPERTY VISIBLE DURING THE EXTERIOR INSPECTION.

### NEIGHBORHOOD

| | | | | | |
|---|---|---|---|---|---|
| Property Values: ☐ Increasing | ☐ Stable | ☒ Declining | Predominant Occupancy ☒ Owner | | ☐ Tenant |
| Marketing Time: ☐ Under 3 Mos. ☒ 3-6 Mos. ☐ Over 6 Mos. | | Vacancy Rate ☒ 0-5% ☐ 5-10% ☐ 10-20% ☐ 20%+ | | | |
| No. of Active Listings in Neighborhood: 34 | | Price Range of Active Listings in Neighborhood:$ 29000 to $ 275000 | | | |

COMMENTS THE SUBJEC PROPERTY IS LOCATED IN A RURAL NEIGHBORHOOD OF OTHER SITE BUILT HOMES. THE PROPERTY VALUES ARE STILL DECLINING BUT AT A SLOWER RATE. THERE IS AN OVERSUPPLY OF HOMES LISTED ON THE MARKET IN THE SUBJECT'S AREA.

### VALUE ESTIMATION

| Probable Sale Price | 90-Day Marketing Time | 120-Day Marketing Time | 180-Day Marketing Time |
|---|---|---|---|
| As Is | 55000 | 50000 | 45000 |
| As Repaired | 55000 | 50000 | 45000 |

Property should be listed: As Is ☒ As Repaired: ☐
Anticipated Seller-Paid Financing Costs: $ 0

COMMENTS: (Describe your marketing strategy and reasons for As Is/As Repaired recommendations)

THE MARKET VALUE AS OF TODAY IS $55000. THE TYPICAL MARKETING TIME IS 120 DAYS.

| | |
|---|---|
| PREPARED BY: PAMELA HENEGHAN | |
| Signature | Date 02/22/2010 |

## COMPETITIVE LISTINGS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|------|---------|------------------|---|------------------|---|------------------|---|
| Address | 11111 SE 135TH CT | 19635 SW EAGLE DR | | 1890 W J WILLIAMS LN | | 3671 SW IDLEWILD ST | |
| Proximity to Subject | | 5+ Miles | | 5+ Miles | | 2-5 Miles | |
| Current List Price | $ | $ 59900 | | $ 65000 | | $ 59900 | |
| Current List Date | | 02/10/2010 | | 03/16/2009 | | 01/12/2010 | |
| Original List Price | $ | $ 79900 | | $ 65000 | | $ 59900 | |
| Original List Date | | 09/06/2008 | | 03/16/2009 | | 01/12/2010 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 4 Bdrm 2 Baths 1 | Total # of Rooms 4 Bdrm 2 Baths 1 | | Total # of Rooms 5 Bdrm 3 Baths 1 | | Total # of Rooms 4 Bdrm 2 Baths 1 | |
| Gross Living Area | Sq Ft 625 | Sq Ft 960 | Code | Sq Ft 880 | Code | Sq Ft 783 | Code |
| Location | GOOD | GOOD | E | GOOD | E | GOOD | E |
| Site/Lot Size | 1AC | 0.5AC | I | 0.3AC | I | 0.3AC | I |
| Design and Appeal | SFD | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 10 | 28 | I | 55 | I | 25 | I |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 1 Attached | None | I | None | I | 1 Attached | E |
| Porch, Patio Deck, Pool, Fence | NONE | NONE | E | NONE | E | NONE | E |
| Overall Rating/Est.$ Value of Adjustments | | 2500 | I | 5000 | I | 2000 | I |
| Indicate Property Most Comparable to Subject (Check One) | | ☐ | | ☐ | | ☒ | |

COMMENTS: 1)SIMILAR IN STYLE AND NEIGHBORHOOD 2)SIMILAR IN STYLE AN NEIGHBORHOOD 3)SIMILAR IN STYLE AND NEIGHBORHOOD.

## CLOSED SALES

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|------|---------|------------------|---|------------------|---|------------------|---|
| Address | 11111 SE 135TH CT | 21104 SW RAINTREE S | | 9335 N ELLIOT WAY | | 20135 SW BEACH BLV | |
| Proximity to Subject | | 2-5 Miles | | 5+ Miles | | 5+ Miles | |
| Original List Price | $ | $ 58900 | | $ 64700 | | $ 30900 | |
| List Price When Sold | $ | $ 48000 | | $ 59900 | | $ 30900 | |
| Sales Price | $ | $ 47000 | | $ 59900 | | $ 33000 | |
| Sales Date | | 10/13/2009 | | 12/04/2009 | | 10/30/2009 | |
| Days on Market | | 56 | | 37 | | 9 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 4 Bdrm 2 Baths 1 | Total # of Rooms 4 Bdrm 2 Baths 1 | | Total # of Rooms 4 Bdrm 2 Baths 1 | | Total # of Rooms4 Bdrm 2 Baths 1 | |
| Gross Living Area | Sq Ft 625 | Sq Ft 945 | Code | Sq Ft 844 | Code | Sq Ft 936 | Code |
| Sales or Financing Concessions | | 0 | E | 0 | E | 0 | E |
| Location | GOOD | GOOD | E | GOOD | E | GOOD | E |
| Site/Lot Size | 1AC | 0.2AC | I | 0.2AC | I | 0.2AC | I |
| Landscaping | Good | Good | E | Good | E | Good | E |
| Design and Appeal | SFD | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 10 | 30 | I | 33 | I | 45 | I |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 1 Attached | 1 Attached | E | None | I | 1 Attached | E |
| Porch, Patio Deck, Pool, Fence | NONE | NONE | E | NONE | E | NONE | E |
| Overall Rating/Est.$ Value of Adjustments | | 3000 | I | 4000 | I | 4000 | I |
| Indicate Property Most Comparable to Subject (Check One) | | ☒ | | ☐ | | ☐ | |

COMMENTS: 1)SIMILAR IN STYLE AND NEIGHBORHOOD TO THE SUBJECT 2)SIMILAR IN STYLE WRONG PROXIMITY W/IN 5 MILES 3)SIMILAR IN STYLE AND NEIGHBORHOOD.



**BPO Project Addendum**

BPO Direct Order #: 41151520       **Project Code:**

FM Loan Number: 435516777      **GS Loan Number: 11111**

Property Address: 11111 SE ___ CT     , DUNNELLON    FL, 344

**Comments:**

THE SUBJECT PROPERTY IS MAINTAINED IN AVERAGE TO GOOD CONDITION. IT IS LOCATED IN A RURAL AREA WITH BOTH SITE BUILT AND MANUFACTURED HOMES. THE SUBJECT CONFORMS TO THE NEIGHBORHOOD AND HAS GOOD APPEAL. THERE IS AN OVERSUPPLY OF HOMES CURRENTLY LISTED ON THE MARKET AND PRICING THE PROPERTY COMPETITIVELY IS IMPORTANT. THE SUBJECT PROPERTY IS A HOME THAT IS SMALLER THAN OTHER HOMES IN THE AREA. COMPARABLE SALE AND LISTINGS ARE OF HOMES IN SIMILAR NEIGHBORHOODS. THEY ARE THE CLOSEST IN SQUARE FOOTAGE AVAILABLE IN THE AREA.

Recording Requested By:
WELLS FARGO HOME MORTGAGE

When Recorded Return To:

LIEN RELEASE DEPT
WELLS FARGO HOME MORTGAGE
MAC X0501-022
P.O. BOX 50005
SAN BERNARDINO, CA 92412

Instrument # 585760
OR BK 1315 Pages 942-1pg(s)
RECORDED 02/12/2014 at 09:53 AM
Danny J. Shipp, Levy County Clerk, Florida

DEPUTY CLERK CC

## RELEASE OF MORTGAGE

WFHM - CLIENT 708 #:0207178777 "KAPITAEN" Lender ID:751830/493615772  Levy, Florida
KNOW ALL MEN BY THESE PRESENTS that Wells Fargo Bank, N.A. whose address is MAC# X0501-022, 1003 E.
BRIER DRIVE, SAN BERNARDINO, CA 92408 holder of a certain Mortgage, whose parties, dates and recording
information are below, does hereby acknowledge that the beneficial owner has received full payment and
satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: MARIANNE KAPITAEN
Original Mortgagee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
Dated: 01/14/2008 Recorded: 01/31/2008 in Book/Reel/Liber: OR 1110 Page/Folio: 931 as Instrument No.: 505510
in the County of Levy State of Florida

Property Address: 11111 SE 135TH CT., DUNNELLON, FL 34431

IN WITNESS WHEREOF, Wells Fargo Bank, N.A. by the officers duly authorized, has duly executed the foregoing
instrument.

Wells Fargo Bank, N.A.
On December 23rd, 2013

By: _____
PATRICIA RODNEY-DAVIS, Vice
President Loan Documentation

STATE OF California
COUNTY OF San Bernardino

On December 23rd, 2013 before me, LAURA LEVARIO, Notary Public, personally appeared PATRICIA
RODNEY-DAVIS , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true
and correct.

WITNESS my hand and official seal,

_____
LAURA LEVARIO
Notary Expires: 08/09/2014  #1898865

LAURA LEVARIO
COMM. #1898865
NOTARY PUBLIC - CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires Aug. 9, 2014

(This area for notarial seal)

Prepared By:
Barbara Dazalle, WELLS FARGO HOME MORTGAGE X0501-022, 1003 E BRIER DR, San Bernardino, CA 92408 800-572-3358

*BO*BD1WFMB*12/23/2013 08:52:06 AM* WFMC04NTBM00000000000000000105937* FLLEVV* 0207178777 FLSTATE_MORT_REL *BD1WFMB*



ALDRIDGE & CONNORS
3575 PIEDMONT ROAD N.E.
STE 500
ATLANTA, GA 30305

Florida Department of Law Enforcement

Law Enforcement Officer Ethical Standards of Conduct

Purpose
This policy defines conduct unbecoming a police officer. This policy supplements the ethical standards contained in the International Association of Chiefs of Police's Law Enforcement Code of Ethics, a copy of which has been included following this policy.
Policy
Law enforcement effectiveness depends upon community respect and confidence. Conduct which detracts from this respect and confidence is detrimental to the public interest and should be prohibited. The policy of this Department is to investigate circumstances suggesting an officer has engaged in unbecoming conduct, and impose disciplinary action when appropriate.
Scope
This policy applies to all officers of this agency engaged in official duties, whether within or outside of the territorial jurisdiction of this agency. Unless otherwise noted, this policy also applies to off duty conduct as well. Conduct not mentioned under a specific rule, but which violates a general principle is prohibited. This policy is organized into eight principles governing conduct unbecoming an officer. The rationale explaining the principle and a set of rules follow each principle.

Principle One
Police officers shall conduct themselves, whether on or off duty, in accordance with the Constitution of the United States, the Florida Constitution, and all applicable laws, ordinances and rules enacted or established pursuant to legal authority.
Rationale
Police officers conduct their duties pursuant to a grant of limited authority from the community. Therefore, officers must understand the laws defining the scope of their enforcement powers. Police officers may only act in accordance with the powers granted to them.

Rules
1.1 Police officers shall not knowingly exceed their authority in the enforcement of the law. 1.2 Police officers shall not knowingly disobey the law or rules of criminal procedure in such areas as interrogation, arrest, detention, searches, seizures, use of informants and preservation of evidence. 1.3 Police officers shall not knowingly restrict the freedom of individuals, whether by arrest of detention, in violation of the Constitutions and laws of the United States and the State of Florida. 1.4 Police officers, whether on or off duty, shall not knowingly commit any criminal offense under any laws of the United States or any state of local jurisdiction in which the officer is present, except where permitted in the performance of duty under proper authority.

Principle Two
Police officers shall refrain from any conduct in an official capacity that detracts from the public's faith in the integrity of the criminal justice system.
Rationale
Community cooperation with the police is a product of its trust that officers will act honestly and with impartiality. The police officer, as the public's initial contact with the criminal justice system, must act in a manner that instills such trust.

Rules
2.1 Police officers shall carry out their duties with integrity, fairness and impartiality. 2.2 Police officers shall not knowingly make false accusations of any criminal ordinance, traffic or other law violation. This provision shall not prohibit the use of deception during criminal investigations or interrogations as permitted under law. 2.3 Police officers shall truthfully, completely and impartially report, testify and present evidence, including exculpatory evidence, in all matters of an official nature. 2.4 Police officers shall take no action knowing it will violate the constitutional rights of any person. 2.5 Police officers must obey lawful orders, but must refuse to obey any orders the officer knows would require the officer to commit an illegal act. If in doubt as to the clarity of an order, the officer shall, if feasible, request the issuing officer to clarify the order. An officer refusing to obey an order shall be required to justify his or her actions. 2.6 Police officers learning of conduct or observing conduct which is in violation of any law or policy of this Department shall take necessary action and report the incident to the officer's immediate supervisor, who shall forward the information to the
Chief of Police. If the misconduct is committed by the officer's immediate supervisor, the officer shall report the incident to the immediate supervisor's supervisor.

Principle Three
Police officers shall perform their duties and apply the law impartially and without prejudice or discrimination.
Rationale
Law enforcement effectiveness requires public trust and confidence. Diverse communities must have faith in the fairness and impartiality of their police. Police officers must refrain from fostering disharmony in their communities based upon diversity, and perform their duties without regard to race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation or age.

### Rules

3.1 Police officers shall provide every person in our society with professional, effective and efficient law enforcement services. 3.2 Police officers shall not express, whether by act, omission or statement, prejudice concerning race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation or age. 3.3 Police officers shall not allow their law enforcement decisions to be influenced by race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation or age.

### Principle Four

Police officers shall not, whether on or off duty, exhibit any conduct which discredits themselves or their Department or otherwise impairs their ability or that of other officers or the Department to provide law enforcement services to the community.
**Rationale**
A police officer's ability to perform his or her duties is dependent upon the respect and confidence communities have for the officer and law enforcement officers in general. Police officers must conduct themselves in a manner consistent with the integrity and trustworthiness expected of them by the public.

### Rules

4.1 Police officers shall not consume alcoholic beverages or chemical substances, while on duty, except as permitted in the performance of official duties, and under no circumstances while in uniform, except as provided for in Rule 4.3 below. 4.2 Police officers shall not consume alcoholic beverages to the extent the officer would be rendered unfit for the officer's next scheduled shift. A police officer shall not report for work with the odor of an alcoholic beverage on the officer's breath. 4.3 Police officers shall not use narcotics, hallucinogens, or other controlled substances except when legally prescribed. When medications are prescribed, the officer shall inquire of the prescribing physician whether the medication will impair the officer in the performance off the officer's duties. The officer shall immediately notify the officer's supervisor if a prescribed medication is likely to impair the officer's performance during the officer's next scheduled shift. 4.4 Police officers, while on duty, shall not commit any act which, as defined under Florida law, constitutes sexual harassment, including but not limited to, making unwelcome sexual advances, requesting sexual favors, engaging in sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature. 4.5 Police officers, while off duty, shall not engage in any conduct which the officer knows, or reasonably should know, constitutes an unwelcome sexual advance or request for sexual favor, or unwelcome sexually motivated physical contact or other unwelcome verbal or physical conduct or communication of a sexual nature. 4.6 Police officers shall not commit any acts which, as defined under Florida law, constitute sexual assault or indecent exposure. Sexual assault does not include a frisk or other search done in accordance with proper police procedures. 4.7 Police officers shall not commit any acts which, as defined under Florida law, constitute (1) domestic violence and/or stalking, or (2) the violation of a court order restraining the officer from committing an act of domestic violence, having contact with the petitioner, or excluding the police officer from the petitioner's home or workplace. 4.8 Police officers shall not, in the course of performing their duties, engage in any sexual contact or conduct constituting lewd behavior, including but not imited to, showering or receiving a massage in the nude, exposing themselves or otherwise making physical contact with the nude or partially nude body of any person, except as pursuant to a written policy of the Department. 4.9 Police officers shall avoid regular personal associations with persons who are known to engage in criminal activity where such associations will undermine the public trust and confidence in the officer or Department. This rule does not prohibit those associations that are necessary to the performance of official duties, or where such associations are unavoidable because of the officer's personal or family relationships.

### Principle Five

Police officers shall treat all members of the public courteously and with respect.
**Rationale**
Police officers are the most visible form of local government. Therefore, police officers must make a positive impression when interacting with the public and each other.

### Rules

5.1 Police officers shall exercise reasonable courtesy in their dealings with the public, fellow officers, superiors and subordinates. 5.2 No police officer shall ridicule, mock, deride, taunt, belittle, willfully embarrass, humiliate, or shame any person to do anything reasonably calculated to incite a person to violence. 5.3 Police officers shall promptly advise any inquiring citizen of the Department's complaint procedure, and shall follow the established departmental policy for processing complaints.

### Principle Six

Police officers shall not compromise their integrity, nor that of their Department or profession, by accepting, giving or soliciting any gratuity which could be reasonably interpreted as capable of influencing their official acts or judgments, or by using their status as a police officer for personal, commercial, or political gain.
**Rationale**
For a community to have faith in its police officers, officers must avoid conduct that does or could cast doubt upon the impartiality of the individual officer or the Department.

### Rules

6.1 Police officers shall not use their official position, identification cards or badges: (1) for personal or financial gain, for themselves or another person; (2) for obtaining privileges not otherwise available to them except in the performance of duty; and (3) for avoiding consequences of unlawful or prohibited actions. 6.2 Police officers shall not lend to another person their

Page 3 of 4

identification cards or badges or permit these items to be photographed or reproduced without approval of the Chief of Police. 6.3 Police officers shall refuse favors or gratuities which could be reasonably interpreted as capable of influencing official acts or judgments. 6.4 Unless required for the performance of official duties, police officers shall not, while on duty, be present at establishments that have the primary purpose of providing sexually oriented adult entertainment. This rule does not prohibit officers from conducting walk-throughs of such establishments as part of regular assigned duties. 6.5 Police officers shall: (a) not authorize the use of their names, photographs or titles in a manner that identifies the officer as an employee of their Department in connection with advertisements for any product, commodity or commercial enterprise; (b) maintain a neutral position with regard to the merits of any labor dispute, political protest, or other public demonstration while acting in an official capacity; not make endorsements of political candidates, while on duty, or while wearing the Department's official uniform. This section does not prohibit officers from expressing their views on existing, proposed or pending criminal justice legislation in their official capacity. None of these rules shall prevent officers from engaging in the free expression of political speech in their capacities as private citizens, or the rights of police fraternal or labor organizations to endorse political candidates or express views on political issues or other matters of public concern.

### Principle Seven

Police officers shall not compromise their integrity, not that of their Department or profession, by taking or attempting to influence actions when a conflict of interest exists.

### Rationale

For the public to maintain its faith in the integrity and impartiality of police officers and their Departments, officers must avoid taking or influencing official actions where the officer's actions would or could conflict with the officer's appropriate responsibilities.

### Rules

7.1 Police officers shall, unless required by law or policy, refrain from becoming involved in official matters, or influencing actions of other police officers in official matters, impacting the officer's immediate family, relatives, or persons with whom the officer has or has had a significant personal relationship. 7.2 Police officers shall, unless required by law or policy, refrain from acting or influencing official actions of other police officers in official matters impacting persons with whom the officer has or has had a business or employment relationship. 7.3 Police officers shall not use the authority of their position as police officers, or information available to them due to their status as police officers, for any purpose of personal gain including, but not limited to, initiating or furthering personal and/or intimate interactions of any kind with persons with whom the officer has had contact while on duty.7.4 Police officers shall not engage in any off duty employment if the position compromises or would reasonably tend to compromise the officer's ability to impartially perform the officer's official duties.

### Principle Eight

Police officers shall observe the confidentiality of information available to them due to their status as police officers.

### Rationale

Police officers are entrusted with vast amounts of private and personal information, or access thereto. Police officers must maintain the confidentiality of such information to protect the privacy of the subjects of that information, and to maintain public faith in the officer's and Department's commitment to preserving such confidences.

### Rules

8.1 Police officers shall not knowingly violate any legal restriction for the release or dissemination of information. 8.2 Police officers shall not, except in the course of official duties or as required by law, publicly disclose information likely to endanger or embarrass victims, witnesses or complainants. 8.3 Police officers shall not divulge the identity of persons giving confidential information except as required by law or Department policy.

International Association of Chiefs of Police Law Enforcement Code of Ethics

AS A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I WILL keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement.

*Political Advertisement paid for and approved by Fred S. Martin, candidate for Suwannee County Sheriff.*     Page 4 of 4

# BEST DAYS TO HUNT & FISH

**NOV.**

| | | EXCELLENT TIMES for fishing & hunting | | Good Times for fishing & hunting | |
|---|---|---|---|---|---|
| | | A.M. | P.M. | A.M. | P.M. |
| THURS. | 3 | 2:30 | 3:00 | 8:40 | 9:10 |
| FRI. | 4 | 3:30 | 3:50 | 9:35 | 10:10 |
| SAT. | 5 | 4:20 | 4:40 | 10:25 | 11:00 |
| SUN. | 6 | 4:10 | 4:30 | 10:20 | 10:50 |
| MON. | 7 | 5:00 | 5:30 | 11:10 | 11:40 |
| TUES. | 8 | | | | |
| WED. | 9 | | | | |
| THURS. | 10 | | | | |
| FRI. | 11 | | | | |
| SAT. | 12 | | | | |
| SUN. | 13 | | | | |
| MON. | 14 | | | | |
| TUES. | 15 | | | | |
| WED. | 16 | | | | |
| THURS. | 17 | | | | |

*Happy Hunting or Fishing and Good Luck... Whatever your choice.*

St. Marks River Entrance Florida • New Tide Predictions (High & Low Water)

| Day | | Time | Ht. | Time | Ht. | Time | Ht. | Time | Ht. |
|---|---|---|---|---|---|---|---|---|---|
| THURS. | 3 | 3:55amH | 3.5 | 10:56amL | 0.1 | 5:22pmH | 3.3 | 10:44pmL | 1.4 |
| FRI. | 4 | 4:26amH | 3.5 | 11:34amL | 0.2 | 6:08pmH | 3.2 | 11:25pmL | 1.5 |
| SAT. | 5 | 5:02amH | 3.3 | 12:10pmL | 0.3 | 6:58pmH | 3.1 | | |
| SUN. | 6 | | | | | | | | |
| MON. | 7 | | | | | | | | |
| TUES. | 8 | | | | | | | | |
| WED. | 9 | | | | | | | | |
| THURS. | 10 | | | | | | | | |
| FRI. | 11 | | | | | | | | |
| SAT. | 12 | | | | | | | | |
| SUN. | 13 | | | | | | | | |
| MON. | 14 | | | | | | | | |
| TUES. | 15 | | | | | | | | |
| WED. | 16 | | | | | | | | |
| THURS. | 17 | | | | | | | | |

# THE SWAPPER

## 2016 Schedule

| *DEADLINE* | *PUBLICATION DATE* |
|---|---|
| November 11 | November 17 |
| November 23 *(Wed)* | December 1 |
| December 9 | December 15 |

| P | R | O | F | | G | O | L | F | | C | O | D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R | A | R | E | | L | A | I | R | | A | W | E |
| O | P | E | N | | A | R | E | A | | P | E | W |
| | | | C | A | D | S | | N | E | E | D | Y |
| L | A | S | E | R | | | I | C | Y | | | |
| A | C | T | | C | H | A | R | | E | M | I | T |
| D | R | A | M | | E | L | K | | R | O | D | E |
| Y | E | T | I | | R | A | S | P | | P | E | N |
| | | | D | A | D | | | A | H | E | A | D |
| A | T | T | I | C | | M | E | R | E | | | |
| B | A | A | | R | A | I | L | | A | W | L | S |
| E | L | M | | I | L | L | S | | V | E | E | P |
| D | E | E | | D | E | L | E | | E | D | G | Y |

---



115 S.E. Madison Avenue
P.O. Box 422 ~ Madison, FL 32341.

*The* **SWAPPER**

*Tel: 850-973-6653 ~ Fax: 850-973-1269*
*e mail address- ads@madisonswapper.com*
*madisonswapper.com*

The Swapper November 3, 2016 is published every other Thursday. We cover TEN North Florida Counties: they are Madison, Taylor, Jefferson, Hamilton, Lafayette, Gilchrist, Dixie, Levy, Suwannee and Columbia. We also serve five South Georgia counties: Lowndes, Brooks, Echols, Lanier & Berrien. We have a circulation of approximately 7,500 copies per issue which sell for 50¢ per copy in most Supermarkets, Jiffy Stores, Tackle Shops, Restaurants, Country Stores, Auto Parts Stores, Drug Stores, Sporting Goods, Minit Markets, etc.

*MOST CLASSIFIED ADS ARE FREE!*
There is a '5.00 charge for (30 Words or less): Real Estate, Homes, Mobile Homes, Registered Animals, RVs/Campers/Travel Trailers over $5,000, and Business/Service Ads. CALL FOR DISPLAY AD PRICES!

We are the **MOST EFFECTIVE ADVERTISING** in **NORTH FLORIDA** and **SOUTH GEORGIA.** We have the **BEST RATES** for the **COVERAGE** that you can receive in our area.

**Pauline Strickland**
**Owner-Sales**

**Chrystal Barrs** **Rickie Strickland** **Missy Pulliam**
850-973-6653 850-464-1655 **Office Manager**

FOR ALL YOUR ADVERTISING NEEDS

# PUBLIC NOTICE...

Neither the publishers nor the advertisers will be held responsible or liable for misinformation, misprints, typographical errors, etc. contained herein. All rights reserved. No part of this publication may be copied or reproduced in any form, or by any means, without permission from the publisher or the advertiser.

The Swapper has the right to edit or approve anything before it is printed in the publication. We print no beer, liquor, pornographic-adult video, astrology or fortune telling ads. All ads must be approved by owner.

**WE HAVE LAND/HOME PACKAGES AVAILABLE FOR SALE.** Call 386-362-4948 JC

**COME CHECK OUT OUR SELECTION OF** replacement windows, doors & skirting or give us a call 386-362-4061 Bring this ad in on Saturday to receive a 10% discount on these items!! RC

**WE PAY TOP DOLLAR FOR USED MOBILE HOMES** Call 386-362 4948 JC

**LEAKY WINDOWS OR DOORS GIVE US A CALL** Corbett's Mobile Home Center 386-362-4061. RC

**Wells Fargo Mortgage and Home Equity Line of Credit TCPA Settlement Claim Form**

THIS CLAIM FORM MUST BE POSTMARKED BY DECEMBER 22, 2016 AND MUST BE FULLY COMPLETED.
You may also submit your claim online at WWW.MARKOSWELLSFARGOTCPA.COM or by calling 1-866-562-0143.

Full Name:
MARIANNE KAP TAEN

Address:
6276 NW 11 AVE.

City: State: Zip: Zip 4 (optional):
BELL FL 32619-4389

Contact Phone Number: Cell Phone Number On Which You Received A Call:
(352) 256-3077 (352) 682-4128

(Your cell phone number must be listed in our records as one of the phone numbers that was called by Wells Fargo Bank, N.A. and included as part of the settlement. If you are not certain which of your cell phone numbers may have been called, you may submit each of them separately.)

**SELECTION OF CLAIM TYPE:**

✓ **Subclass One:** I used or subscribed to a cellular phone number to which Wells Fargo made or initiated one or more calls or texts in connection with a Residential Mortgage Loan.

**Subclass Two:** I used or subscribed to a cellular phone number to which Wells Fargo made or initiated one or more calls or texts in connection with a Home Equity Loan.

**Both Subclass One and Subclass Two** ___ I don't know which Subclass I am in.

**CERTIFICATION**
By submitting this Claim Form, I certify that I received a call or text in connection with a Wells Fargo residential mortgage loan and/or a home equity loan without my prior express consent.
This process takes time, please be patient.

Para ver este aviso en español, visite WWW.MARKOSWELLSFARGOTCPA.COM;
For more information, visit WWW.MARKOSWELLSFARGOTCPA.COM

---

*Markos, et al. v. Wells Fargo Bank, N.A., Case No. 1:15-cv-01156-LMM (N.D.Ga.)* **You might get a payment from this Settlement. Summary of the Settlement:** Under the proposed Settlement, Wells Fargo has agreed to establish a Settlement Fund of $16,417,496.70 to pay Class Members who make valid and timely claims; pay service awards of no more than $20,000 each to the three class representatives; pay attorneys' fees and costs awarded by the Court (plaintiffs will ask the Court to award fees and costs of up to 30% of the Settlement Fund, or $4,925,249.01); and pay settlement notice and administration costs. Any remaining monies from uncashed settlement checks may be redistributed or paid to a non-profit charity; the parties have proposed Habitat for Humanity. This is a summary notice only and additional details of the Settlement terms can be found at www.MarkosWellsFargoTCPA.com or by calling 1-866-562-0143. **Can I Get Money from the Settlement?** Yes, each Class Member who submits a valid and timely Settlement Claim will receive a cash award. How much each Class Member receives depends on how many people make approved claims. Class Counsel estimates that the amount of the cash award may be within the range of $25 to $75. **How Do I Make A Settlement Claim?** You can make a claim by either: 1) calling 1-866-562-0143; 2) submitting one online at www.MarkosWellsFargoTCPA.com; or 3) mailing a completed Claim Form downloaded from the Settlement website to the GCG address below. **Do I Have a Lawyer?** Yes. The Court has appointed lawyers from the following firms to represent Class Members: Lieff Cabraser Heimann & Bernstein, LLP and Burke Law Offices, LLC have been appointed co-lead counsel, and Meyer Wilson Co. LPA, Skaar & Feagle, LLP; Greenwald Davidson Radbil PLLC; Keogh Law Ltd.; Kazerouni Law Group, APC; Law Offices of Douglas J. Campion, APC; and Hyde & Swigart have been designated as additional class counsel. The lawyers will be paid from the Settlement Fund. You may enter an appearance through your own attorney if you so desire. **What Should I Do?** Class Members have four options: (1) Submit a Claim to the Settlement Administrator for a share of the Settlement Fund by December 22, 2016. If the settlement is approved, you will be bound by the Court's decisions in the lawsuit. You will not have the right to sue separately about the issues in the lawsuit. (2) Remain a Class Member but object to the Settlement. Instructions for objecting are available at www.MarkosWellsFargoTCPA.com. Objections and supporting documents must be sent to Class Counsel, defense counsel, and the Court and be postmarked by November 22, 2016. You may choose to pay for and be represented by a lawyer who may send the objection for you. (3) Exclude yourself from the Settlement by mailing a request form to the Settlement Administrator (not the Court). You must state in writing your name, address, and telephone number and state that you want to be excluded from the settlement. Exclusions must be postmarked no later than November 22, 2016. (4) Do Nothing: if you do nothing, you will remain part of the Settlement Class and will release your claims against the released parties, but you will not receive any money from this settlement. **Scheduled Hearing:** The judge scheduled a hearing for January 17, 2017, at 9:00 am in Courtroom 2107 of the U.S. District Court, Northern District of Georgia, 75 Ted Turner Drive, SW, Atlanta, GA 30303, regarding whether to give final approval to the Settlement, including the amounts of any attorneys' fees, costs and class representative awards. The hearing may be changed without notice. **For more information,** contact the Settlement Administrator: Visit: www.MarkosWellsFargoTCPA.com Call: 1-866-562-0143 Or Write: Markos Wells Fargo TCPA Settlement Claims Administrator, c/o GCG, P.O. Box 10301, Dublin, OH 43017-5901.

Claim ID: 01681805
Confirmation No: 1187677266

Wells Fargo Mortgage and Home Equity Line of Credit TCPA Settlement Claim Form
THIS CLAIM FORM MUST BE **POSTMARKED** BY **DECEMBER 22, 2016** AND **MUST BE FULLY COMPLETED.**
You may also submit your claim online at **WWW.MARKOSWELLSFARGOTCPA.COM** or by calling 1-866-682-0143.

*Markos, et al. v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-01156-LMM (N.D.Ga.) You might get a payment from this Settlement.
**Summary of the Settlement:** Under the proposed Settlement, Wells Fargo has agreed to establish a Settlement Fund of $30,417,408.70 to:
pay Class Members who make valid and timely claims; pay service awards of no more than $20,000 each to the three class representatives;
pay attorneys' fees and costs awarded by the Court (plaintiffs will ask the Court to award fees and costs of up to 30% of the Settlement Fund,
or $4,925,249.01); and pay settlement notice and administration costs. Any remaining monies from uncashed settlement checks may be
redistributed or paid to a non-profit charity; the parties have proposed Habitat for Humanity. This is a summary notice only and additional
details of the Settlement terms can be found at www.MarkosWellsFargoTCPA.com or by calling 1-866-682-0143. **Can I Get Money from the
Settlement?** Yes, each Class Member who submits a valid and timely Settlement Claim will receive a cash award. How much each Class
Member receives depends on how many people make approved claims. Class Counsel estimates that the amount of the cash award may be
within the range of $25 to $75. **How Do I Make A Settlement Claim?** You can make a claim by either: 1) calling 1-866-682-0143; 2)
submitting one online at www.MarkosWellsFargoTCPA.com; or 3) mailing a completed Claim Form downloaded from the Settlement website
to the SCG address below. **Do I Have a Lawyer?** Yes. The Court has appointed lawyers from the following firms to represent Class Members:
Lieff Cabraser Heimann & Bernstein, LLP and Skaar Law Offices, LLC have been appointed co-lead counsel, and Meyer Wilson Co., LPA;
Skaar & Feagle, LLP; Greenwald Davidson Radbil PLLC; Hough Law Ltd.; Kazerouni Law Group, APC; Law Offices of Douglas J. Campion,
APC; and Hyde & Swigart have been designated as additional class counsel. The lawyers will be paid from the Settlement Fund. You may
enter an appearance through your own attorney if you so desire. **What Should I Do?** Class Members have four options: (1) Submit a Claim to
the Settlement Administrator for a share of the Settlement Fund by November 22, 2016. If the settlement is approved, you will be bound by the
Court's decisions in the lawsuit. You will not have the right to separately about the issues in the lawsuit. (2) Remain a Class Member but
object to the Settlement. Instructions for objecting are available at www.MarkosWellsFargoTCPA.com. Objections and supporting documents
must be sent to Class Counsel, defense counsel, and the Court and postmarked by November 22, 2016. You may choose to pay for and be
represented by a lawyer who may assist you. (3) Exclude yourself from the Settlement by mailing a request form to the
Settlement Administrator by the Court. You should your name, address, and telephone number and state that you want to be
excluded from the settlement. Exclusions must be postmarked by November 22, 2016. (4) **Do Nothing:** If you do nothing, you will
remain part of the Settlement Class and will not be subject to the released parties, but you will not receive any money from this
settlement. **Scheduled Hearing:** The judge will hold a hearing on 17, 2017, at 9:00 am in Courtroom 2107 at the U.S. District
Court, Northern District of Georgia, regarding whether to give final approval to the Settlement,
including the amounts of any attorneys' fees and costs awarded. The hearing may be changed without notice. For more
information, contact the Settlement Administrator at www.MarkosWellsFargoTCPA.com. Call: 1-866-682-0143 Or Write: Markos Wells Fargo
TCPA Settlement Claims Administrator

1736632



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 76    DUBLIN, OH

POSTAGE WILL BE PAID BY ADDRESSEE

WELLS FARGO TCPA SETTLEMENT
C/O GCG
P.O. BOX 10538
DUBLIN OH 43017-0538