# EXHIBIT A

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| STEVEN L. MARKOS, TIFFANY DAVIS, AND GREGORY PAGE, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | § § § § § | |
| Plaintiffs, | § § | CASE NO. 1:15-cv-01156-LMM |
| VS. | § § | |
| WELLS FARGO BANK, N.A., | § § | |
| Defendant. | § | |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

WANDA YDE

JANUARY 14, 2017

*********************************************************

　　　　ORAL AND VIDEOTAPED DEPOSITION of WANDA YDE, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on January 14, 2017, from 10:19 a.m. to 1:58 p.m., before Molly Carter, Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand, at the offices of Huseman & Stewart, 615 North Upper Broadway, Suite 2000, Corpus Christi, Nueces County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

3

1              A P P E A R A N C E S
2

3   FOR THE PLAINTIFF(S):
4        MR. DANIEL M. HUTCHINSON
         Lieff Cabraser Heimann & Bernstein, LLP
5        275 Battery Street, 29th Floor
         San Francisco, California 94111-3339
6        Phone:  (415) 956-1000
         Fax:    (415) 956-1008
7        dhutchinson@lchb.com
8        MR. AARON D. RADBIL
         Greenwald Davison Radbil, PLLC
9        106 East Sixth Street, Suite 913
         Austin, Texas 78701
10       Phone:  (512) 322-3912
         Fax:    (561) 961-5684
11       aradbil@gdrlawfirm.com
12       MR. ALEXANDER H. BURKE (by phone)
         Burke Law LLC
13       155 North Michigan Avenue, Suite 9020
         Chicago, Illinois 60601
14       Phone:  (312) 729-5288
         Fax:    (312) 729-5289
15       aburke@burkelawllc.com
16
17   FOR THE DEFENDANT(S):
18       MR. JOHN C. LYNCH (by phone)
         Troutman Sanders LLP
19       222 Central Park Avenue, Suite 2000
         Virginia Beach, Virginia 23462
20       Phone:  (757) 687-7500
         Fax:    (757) 687-7510
21       john.lynch@troutmansanders.com
22
23
24
25

**4**

APPEARANCES:   (Continued)


FOR THE OBJECTOR:

        MR. JOHN P. SWALLOW
        Huseman & Stewart, PLLC
        615 North Upper Broadway, Suite 2000
        Corpus Christi, TX 78401
        Phone:   (361) 883-3563
        Fax:     (361) 883-0210
        jswallow@husemanstewart.com


ALSO PRESENT:

        MR. GARY McCLUSKEY, VIDEOGRAPHER

5

I N D E X

Appearances ........................................   2

WANDA YDE

      Examination by Mr. Hutchinson .................   6

Reporter's Certificate ........................... 130

EXHIBITS

NUMBER          DESCRIPTION                           PAGE

Exhibit 1   Class Action Objector Fee Agreement .....   71

Exhibit 2   Objection of Wanda Yde .................   92

Exhibit 3   Offer of Judgment ...................... 100

Exhibit 4   Notice of Deposition of Wanda Yde ....... 115

1      THE VIDEOGRAPHER:  All right.  It's Saturday,

2  January the 14th, 2017.  It's 10:19 in the morning and

3  we're on the record.

4      THE REPORTER:  At this time the deposition of

5  Wanda Yde, a witness produced by Defendants, is being

6  taken in Cause Number 1:15-cv-01156-LMM, Markos et al.

7  versus Wells Fargo Bank, commencing at 10:20 a.m. on

8  Saturday, the 14th day of January, 2017, at the offices

9  of Huseman & Stewart, located at 615 North Upper

10  Broadway, Suite 2000, in Corpus Christi, Nueces County,

11  Texas.

12      The court reporter taking this deposition is

13  Molly Carter.  The videographer is Gary McCluskey.

14      Will Counsel please state their appearances for

15  the record?

16      MR. HUTCHINSON:  Daniel Hutchinson of Lieff

17  Cabraser Heimann & Bernstein for the Plaintiffs and the

18  Class.

19      MR. RADBIL:  Aaron Radbil on behalf of the

20  Class as well.

21      MR. SWALLOW:  John Swallow, Huseman -- sorry,

22  Alex -- John Swallow of Huseman & Stewart, on behalf of

23  Objector Wanda Yde, and I'm present here in the --

24      MR. BURKE:  Alex -- Alex Burke for Plaintiff.

25      MR. LYNCH:  John Lynch at Troutman Sanders for

7

1  the Defendant Wells Fargo Bank.

2                          WANDA YDE,

3  having been first duly sworn, testified as follows:

4                   E X A M I N A T I O N

5  BY MR. HUTCHINSON:

6       Q    Good morning, Ms. Yde.

7       A    Good morning.

8       Q    I am Daniel Hutchinson.  We met off the record

9  before.  I am one of the attorneys who the Court

10 appointed to represent a class of people, including you,

11 in litigation against Wells Fargo Bank.  I'm just going

12 to go over a few ground rules so that we're both on the

13 same page before we start.

14      I'm going to ask you a series of questions, and it's

15 your job to answer them as truthfully as you can.  The

16 oath that you took today is the same oath that you would

17 take if you testify in a court of law.

18      It's important that you answer questions audibly,

19 with a yes or a no, as opposed to a shake of the head.

20 While the nonverbal answers may be clear to everyone in

21 the room, the court reporter is not going to be able to

22 take them down so well in the written transcript that's

23 here.

24      It is also important that you wait until my question

25 is completely finished before you begin to answer so the

**8**

1  court reporter can take down what we say.  The court

2  reporter cannot record our words if we talk over each

3  other.

4       I will try to be as clear as I can in my questions.

5  If you think that there is something about my question

6  that's unclear, please ask me to rephrase it or to

7  clarify it in some fashion.  If you answer the question,

8  I will assume you understand the question.

9       The attorney seated next to you may object from time

10  to time.  Unless he instructs you not to answer a

11  question, you can go ahead and answer the question if you

12  understand it.  You should not guess or speculate when

13  you answer a question, but you should give your best

14  answer.

15       If you need a break, just let me know and I can

16  accommodate you.  I only ask that we not take a break

17  between a question and answer.  Is that agreeable to you?

18       A    Yes, sir.

19       Q    Okay.  And can you state your full name for the

20  record, please?

21       A    Wanda Yde.

22       Q    Have you ever been known by any, any other

23  name?

24       A    Wanda Petrus, my maiden name.

25       Q    Any other name besides that?

**9**

1     A    No.

2     Q    And what's your current address?

3     A    434 South Whitney, Aransas Pass, Texas, 78336.

4     Q    What's your current telephone number?

5     A    361-717-2059.

6     Q    Is that a cell phone number?

7     A    Yes.

8     Q    And how long have you had that number for?

9     A    About four months, five months maybe.

10     Q    What was your cell phone number before that?

11     A    530-736-6448.

12     Q    How long did you have that number for?

13     A    Years.

14     Q    Can you give an estimate of when you first got

15 that number?

16     A    Ten, ten years at least.

17     Q    Have you ever been a Plaintiff in a lawsuit

18 before?

19     A    No.

20     Q    Have you ever been deposed before?

21     A    Deposed?

22     Q    Have you ever been in a deposition like the one

23 today before?

24     A    No, I have not.

25     Q    Have you ever filed for bankruptcy?

1     A     No, I have not.

2     Q     Do you have any criminal convictions?

3     A     No.

4     Q     Are you taking any medications that might

5  affect your ability to tell the truth today?

6     A     No, I'm not.

7     Q     What's your current occupation, Ms. Yde?

8     A     I am a child care worker/teacher at a day care.

9     Q     How long have you had that position?

10    A     I just started there in November.

11    Q     Oh, great.  What did you do before that?

12    A     I was a paraprofessional working at the

13  Ingleside High School with life skill students.

14    Q     And how long did you do that for?

15    A     Two years.

16    Q     Have you ever worked at a law firm?

17    A     No, sir.  Um --

18          MR. SWALLOW:  Go ahead and answer.

19          THE WITNESS:  Okay.  I, well, I have helped do

20  some, like filing with my mother.

21    Q     (By Mr. Hutchinson) All right.  And who's your

22  mother?

23    A     Jan Petrus.

24    Q     And when did you do that?

25    A     It's -- the last time I think I helped her do

1  that was in May.

2       Q    May of this past year --

3       A    Yes.

4       Q    -- 2006?

5       A    '16.

6       Q    Did you work for your mother before then, too?

7       A    I've done filing a couple of times.  I can't, I

8  can't be accurate on dates or when.  It's just

9  spontaneous.

10      Q    Do you know the types of cases you did filings

11 for?

12      A    No, not really.

13      Q    What would you do when you did those filings

14 for her?

15           MR. SWALLOW:  I'm going to object to, I think,

16 getting into some attorney work product areas here.  I

17 think she's working at a law firm.  If you're talking

18 about specifically what they did or what cases she worked

19 on, I think we're getting into privileged areas there.

20           MR. HUTCHINSON:  So are you instructing her not

21 to answer that?

22           MR. SWALLOW:  I think on the -- can you repeat

23 the question?  Could you read back the question for me?

24           MR. HUTCHINSON:  I just want to make sure the

25 record's clear, just so --

1            MR. SWALLOW:  Yeah, I know, and --

2            MR. HUTCHINSON:  You can make your objections,

3    but --

4            MR. SWALLOW:  Yeah, yeah.  I may be --

5            MR. HUTCHINSON:  Sure.

6            MR. SWALLOW:  Basically, I'm saying I think

7    we're getting close.  We'll see where we are on this.

8            MR. HUTCHINSON:  I don't want you to divulge

9    anything that would --

10           MR. SWALLOW:  Yeah.

11           MR. HUTCHINSON:  -- you know, have the

12    confidence or is information for some client of a law

13    firm.

14           THE WITNESS:  Okay.

15           MR. HUTCHINSON:  I'm just trying to understand

16    what you did.

17           THE WITNESS:  I can't answer that without

18    giving --

19           MR. SWALLOW:  Why don't we read back the

20    question --

21           MR. HUTCHINSON:  Sure.

22           MR. SWALLOW:  -- and see where we're at.

23           MR. HUTCHINSON:  Sure.

24           MR. SWALLOW:  And then if you can answer

25    without giving any particulars regarding any specific

**13**

1    cases or --

2              THE WITNESS:  Okay.

3              MR. SWALLOW:  -- details on the cases, I think

4    we may be able to, yeah.

5         (Court reporter read back question.)

6              THE WITNESS:  Okay.  Her -- my mom's secretary

7    would take them and put them into two different folders.

8    I don't really understand the folders.  I just know one

9    folder goes in one drawer and one folder goes in the

10   other drawer, and I basically just put them in ABC order.

11   They already had folders with their names on them.  I

12   just had to take the papers from the folders she had

13   separated and put them in the folders in the drawer.

14        Q    (By Mr. Hutchinson) So the filings you would be

15   doing would be internal to the office that you were

16   working at?

17        A    Yes.

18        Q    Did you have to ever do any filings that went

19   someplace else, to a court or any place else?

20        A    No, sir.

21        Q    And when you worked for this law firm with your

22   mother, what was the law firm you were working for?

23        A    Chris Bandas.

24        Q    Have you worked for any other law firm besides

25   Mr. Bandas' law firm?

**14**

1    A    No, I have not.

2    Q    When was the first time that you started

working for Mr. Bandas' law firm?

4    A    In 2016 sometime.  Hmm, no.  I did do some, I

believe, in November of 2015 for the first time.

6    Q    So is it fair to say that you worked for the

Bandas Law Firm over the course of about a year?  Is that

correct?

9    A    Yes.  I've only done it maybe about four or

five times.

11   Q    And did you get paid for that work?

12   A    Yes, sir.

13   Q    Have you done anything to prepare for today's

deposition?

15   A    Yes.  I met with my attorneys.

16   Q    And who are your attorneys who you met with?

17   A    Chris Bandas, Eric and John.  I did just meet

Eric and John, so I don't really know what their last

names are.  I know John's is Swallow.

20        MR. SWALLOW:  Eric Stewart and John Swallow.

21   Q    (By Mr. Hutchinson) And when did you meet with

them to prepare for the deposition?

23   A    Wednesday evening.

24   Q    Where was that meeting?

25   A    Right here.

**15**

1    Q    Here in Mr. Swallow's office?

2    A    (Nodding head.)

3    Q    How long did you meet with them for?

4    A    Just a few hours.

5    Q    Had you met Mr. John Swallow before that

6    evening?

7    A    I had never met John.

8    Q    And had you met Mr. Eric Stewart before that?

9    A    I had never met Eric.

10   Q    Presumably you had met Mr. Bandas before?

11   A    Kind of.  Not really.  I've seen him in

12   passing, but when I've gone and done the work, I usually

13   go after I get off work, and my mom just gives me the key

14   and I go in and do it.  Nobody's usually there.  It's

15   just me.

16   Q    But you're familiar with Mr. Bandas.  You would

17   recognize him if you saw him on the street?

18   A    Yes.

19   Q    Was there anyone else present at this meeting

20   on Wednesday?

21   A    No, there was not.

22   Q    Did you review any documents during that

23   meeting?

24   A    We went over my objection, my contract.

25   Q    Besides the objection and the contract, did you

1    review any other documents?

2        A    I don't believe so.

3        Q    Besides meeting with those attorneys for a few

4    hours, did you do anything else to prepare for today's

5    deposition?

6        A    No, sir.

7        Q    Is that a no?

8        A    Sorry.  I'm sorry.

9        Q    I just want to remind you, you have to speak up

10   so that the court reporter can take down what you're

11   saying.  Thank you.

12       Did you look over any other documents before today

13   to help you prepare for the deposition?

14       A    No, sir.

15       Q    Did you look over any e-mail or other written

16   correspondence to help you prepare?

17       A    I did not.

18       Q    Did you look over any other personal files to

19   help you prepare today?

20       A    I did not.

21       Q    Did you talk to anyone else about this

22   deposition before you came here today?

23       A    My mother, Jan Petrus.

24       Q    When did you talk to your mother about this

25   deposition?

1    A    I talked to my mother about this deposition

2 last night.  And now, she is Chris Bandas' legal

3 assistant, so she was, you know, it's like talking to the

4 firm.

5    Q    Okay.  So did you -- were you talking to her in

6 her capacity as Chris Bandas' legal assistant or as her

7 capacity as your mom?

8    A    As her legal assistant -- his legal assistant.

9    Q    How long did you talk to her about this

10 deposition?

11    A    Five minutes.

12    Q    Did you review any documents with Ms. Petrus?

13    A    No, I did not.

14    Q    Before last night, did you talk to her at all

15 about this deposition?

16    A    Basically, all of my talking has been with Jan.

17    Q    So when was the last time before last night

18 that you talked to Jan about this deposition?

19    A    When I got served the papers.

20    Q    Do you remember when that was?

21    A    Just sometime at the end of December.

22    Q    Did you talk to her about this deposition

23 between last night and December when you got served with

24 the papers?

25    A    Yes, just on whether or not I was going to

**18**

1  actually have to appear in court on the 4th, and the fact

2  that that was going to be really hard for me, considering

3  I had just started a new job and we didn't, you know, we

4  had all the holidays, and then we went back to work on

5  the 3rd, and then I'm supposed to ask for the 4th off,

6  wasn't a great idea.

7      Q    So how many times did you talk to Jan Petrus

8  about this deposition, between when you were served with

9  the papers in December and last night?

10      A    Not really at all.  Twice maybe.

11      Q    How long did those conversations last?

12      A    Not long.  Just like I said, just basically

13  whether or not I had to appear in court.  I had never

14  been served papers before, so it kind of freaked me out.

15      Q    And besides those people we discussed already,

16  the attorneys on Wednesday night and Ms. Petrus, did you

17  talk to anyone else about this deposition?

18      A    No, I did not.

19      Q    Do you have a mortgage with Wells Fargo?

20      A    I did.

21      Q    When did you take out that mortgage?

22      A    In October 2008.  Actually, what do you mean

23  when did I take out?  Like when did I get it?  When did I

24  get my house?  Or when did it foreclose?

25      Q    When did you get your house?

**19**

1      A      Okay.  October 2008.

2      Q      And so it sounds like you don't have a Wells

3  Fargo mortgage any more then; is that right?

4      A      No, I do not.

5      Q      When, when did that end?

6      A      I -- the house foreclosed in 2012 or 2013.  I

7  can't really be sure, but I think -- I'm pretty sure it

8  was 2012.

9      Q      So about four years; is that correct?

10      A      Yes.

11      Q      Do you ever recall receiving -- I'm sorry,

12  strike that.

13      Do you ever recall receiving a call from Wells Fargo

14  regarding that mortgage?

15      A      Yes, I do.

16      Q      When did you receive that call?

17      A      The automated calls or an actual person?

18      Q      So any calls that you recall receiving, when do

19  you recall receiving those calls?

20      A      I, well, I -- from January 2009 for about two

21  and a half years after that, I was basically trying to

22  get things changed about my mortgage to adjust the

23  payments that I would have.  I had ended up losing my job

24  in December of 2008, and they gave me a specialist that I

25  had to talk to, and I could never get ahold of her.

1    She called me back twice in the period of two and a

2  half years' span, and during that time, I also received

3  some automated calls.  In the beginning, they would say

4  that they were, you know, this is Wells Fargo, blah,

5  blah, blah, blah.

6    But to be honest, I didn't listen to them.  I'm not

7  trying to talk to a machine.  I'm trying to talk to the

8  specialist that they're telling me I have to talk to.

9    Q    So about how many calls do you estimate you got

10  from Wells Fargo?

11    A    I can't honestly answer that.  I know she only

12  called me twice.  And I know once was about two and a

13  half years later, because I was in labor with my

14  daughter.

15    Q    I'm sure that was a memorable call then.  And

16  these two calls from the representative, you said those

17  were from a real person?

18    A    Just those, yes.

19    Q    Do you recall what the person said in those

20  calls?

21    A    The first call was to talk about the paperwork

22  that she would need to send me that I would need to fill

23  out to adjust the loan.  The second time when she called

24  when I was in labor with my daughter, I did not talk to

25  her.  We informed her I'm in labor and it was a bad time,

**21**

1  so we didn't talk.

2      Q    Did any of the calls that you received from

3  Wells Fargo use an artificial or pre-recorded voice?

4      A    Yes -- well, yes.  Those were the automated

5  calls, right?

6      Q    And how do you know that they had an artificial

7  or pre-recorded voice?

8      A    Because they're machines.  They're like --

9      Q    Any other --

10      A    Like robot sounding.

11      Q    Any other reason you knew that?

12      A    No, they just sounded like robots.

13      Q    Were any of the calls made with an automatic

14  telephone dialing system?

15      A    I don't know.

16      Q    What did you think about these calls?

17      A    They -- well, they pissed me off.

18      Q    Have you suffered any damages from those calls?

19      A    Well, my house ended up foreclosing.

20      Q    Is that because of the calls?

21      A    I feel that if the specialist that they made me

22  have to only deal with would have actually called me

23  back, then things could have been done differently.  I

24  don't feel that you -- I mean, I don't know about you,

25  but whenever a machine calls me, I don't listen to it.

1    It's just -- I'm going to -- I'm not -- I just hung up.

2    So, I mean, I'm trying to talk to a person and get

3    something settled.  I didn't feel like a machine could

4    help me.

5         Q    And do you feel that those calls damaged you?

6         A    What do you mean?

7         Q    I'm just trying to understand if you feel like

8    you suffered any damages from the calls.

9         A    Not physically.  I was extremely stressed out.

10   I had just had my first baby.  I'm trying to save my

11   house.  I'm, you know, so --

12        Q    Do you believe that you were harmed by these

13   calls at all?

14        A    Not physically.

15        Q    Do you believe you were harmed in any other way

16   by these calls?

17             MR. SWALLOW:  I think, objection, asked and

18   answered.

19        Q    (By Mr. Hutchinson) You can answer.

20             MR. SWALLOW:  Yeah, I'm not -- you can answer.

21   I think you've already answered, but --

22             MR. HUTCHINSON:  Don't coach the witness.

23             MR. SWALLOW:  Yeah.

24             THE WITNESS:  Well, I don't know how to answer

25   that question again, like, I do --

1    Q   (By Mr. Hutchinson) It's not, it's not a

2  different question.  Please don't listen to the

3  objections.

4          MR. HUTCHINSON:  You're not allowed to coach

5  the witness.

6          MR. SWALLOW:  Okay.

7          MR. HUTCHINSON:  There's a standing order on

8  this.

9          MR. SWALLOW:  I understand.

10          MR. HUTCHINSON:  So if you have an objection --

11          MR. SWALLOW:  I've made the objection, asked

12  and answered.

13          MR. HUTCHINSON:  -- if you just make the

14  objection, you can object to form and go from there.

15          Can you re-read the question, please?

16      (Court reporter read back question.)

17          THE WITNESS:  Okay.  Again, not physically.

18    Q   (By Mr. Hutchinson) Okay.  Besides physically,

19  do you believe you were harmed in any other way?

20          MR. SWALLOW:  Objection, asked and answered.

21          THE WITNESS:  I think it caused me a lot of

22  stress.

23    Q   (By Mr. Hutchinson) Besides the stress, do you

24  believe you were harmed in any other way?

25          MR. SWALLOW:  Objection, asked and answered.

1    THE WITNESS:  Yeah, I don't know how else to

2  answer that.  Like that's the same question.

3    MR. HUTCHINSON:  Let's go off the record,

4  please.

5    THE VIDEOGRAPHER:  One moment, please.  It's

6  10:41.  We're off the record.

7    (Recess from 10:41 a.m. to 10:42 a.m.)

8    THE VIDEOGRAPHER:  One moment.

9    MR. SWALLOW:  I know it's your deposition, but

10  why don't we have the court reporter re-read the

11  question.

12    MR. HUTCHINSON:  Yeah, let's re-read the

13  question.

14    MR. SWALLOW:  And then can I make my objection?

15    THE VIDEOGRAPHER:  All right.  It's 10:42.

16  We're back on the record.

17    MR. SWALLOW:  And if it's, if it's not --

18  sorry.  Yeah, if it's not any different --

19    MR. HUTCHINSON:  I would suggest you object as

20  to form, given the Court's standing order.  You can do

21  what you want, but if you are doing something --

22    MR. SWALLOW:  I do have the order.

23    MR. HUTCHINSON:  -- that's in contravention of

24  a standing order --

25    MR. SWALLOW:  Yeah.

1          MR. HUTCHINSON:  -- and you're making a

2  speaking objection --

3          MR. SWALLOW:  And I apologize --

4          MR. HUTCHINSON:  -- that's coaching the

5  witness --

6          MR. SWALLOW:  Sure.

7          MR. HUTCHINSON:  -- then it's not going to be

8  proper, and --

9          MR. SWALLOW:  Yeah.

10          MR. HUTCHINSON:  -- I don't think the Court's

11  going to appreciate it.  That's why I did you the

12  courtesy --

13          MR. SWALLOW:  Yeah.

14          MR. HUTCHINSON:  -- of going off the record so

15  we could --

16          MR. SWALLOW:  Sure.

17          MR. HUTCHINSON:  -- talk about it --

18          MR. SWALLOW:  And I apologize.

19          MR. HUTCHINSON:  -- and not have it in the

20  transcript.

21          MR. SWALLOW:  I have the -- "brief, clear and

22  simple."  And in federal court, my understanding is that

23  I need to make an objection, not just as to form, but as

24  to the, as to the specific objection.  And that's

25  different from state court, Texas state court anyway.

**26**

1      So in -- and I think it says "brief, clear and

2 simple" so that you have the opportunity to correct the

3 question if there's a problem, instead of just saying,

4 "Objection, form."  And I think that's from the Court's

5 standing order.

6      But do you want to have the court reporter --

7 I'm sorry -- go ahead and read it back to us?

8      MR. HUTCHINSON:  Let's re-read the --

9      MR. SWALLOW:  Sure.

10      MR. HUTCHINSON:  -- question.

11      MR. SWALLOW:  Okay.

12      MR. HUTCHINSON:  But I just want to counsel

13 you --

14      MR. SWALLOW:  Yeah.

15      MR. HUTCHINSON:  -- we're not going to have

16 speaking objections today.

17      MR. SWALLOW:  No, there will be no speaking

18 objections.

19      MR. HUTCHINSON:  Particularly speaking

20 objections that coach the witness --

21      MR. SWALLOW:  Sure.

22      MR. HUTCHINSON:  -- and affect her answer.

23      MR. SWALLOW:  Sure.

24      MR. HUTCHINSON:  And if we do, we're going to

25 stop the deposition --

1  MR. SWALLOW:  Of course.

2  MR. HUTCHINSON:  -- and we're going to call the

3  Judge.

4  MR. SWALLOW:  Sure.

5  MR. HUTCHINSON:  Because this is not --

6  COURT REPORTER:  Excuse me.

7  MR. HUTCHINSON:  -- what we signed up for.

8  COURT REPORTER:  Y'all are talking at the

9  same -- if you could wait till he's done, and then --

10  MR. SWALLOW:  Sorry.

11  COURT REPORTER:  Because I can't, I can't get

12  both at the same time.  I'm sorry.

13  MR. HUTCHINSON:  So let's re-read the question,

14  and we can go forward from there.

15  (Court reporter read back question.)

16  MR. SWALLOW:  I object.  I believe that was

17  asked and answered.

18  THE WITNESS:  No.  I just stayed stressed out

19  for at least two and a half years.

20  Q    (By Mr. Hutchinson) And do you believe you

21  suffered any injury from these calls?

22  A    You've already asked me that.  That's the same

23  thing as asking if I suffered any harm.

24  Q    You're required to answer the question,

25  Ms. Yde.

**28**

1    A    Not physically.

2    Q    Besides physically, do you believe you were

3 injured in any other way?

4    A    Just mentally.

5    Q    And besides mentally, do you believe you were

6 injured in any other way?

7    A    I was -- never mind.  I -- no.

8    Q    Did you ever give Wells Fargo your cell phone

9 number?

10    A    Yes, I did.

11    Q    When did you give that to them?

12    A    Well, I had to give them the number when I was

13 filling out all the paperwork for the mortgage.  I can't

14 be specific on dates.

15    Q    So you provided that cell phone number when you

16 filled out your initial mortgage application?

17    A    I did provide that number.

18    Q    Did you ever tell Wells Fargo they should not

19 call your cell phone number?

20    A    I did not.  It was the only phone I had.

21    Q    Do you believe Wells Fargo should be held

22 accountable for making those calls?

23    A    The automated ones?

24    Q    Yes.

25    A    Yes.

1    Q    So is it fair to say that you are glad somebody

2  brought a lawsuit against Wells Fargo to try to hold it

3  accountable?

4    A    It is fair to say.

5    Q    What is your understanding of what this class

6  action lawsuit is about?

7    A    It -- well, it's -- people were receiving text

8  messages and automated phone calls from Wells Fargo about

9  their mortgages.  And I'm not -- I can't, I'm not an

10  attorney.  I don't know the actual terms.  But I believe

11  there's some sort of fairness act or something that says

12  that they cannot do that, that an actual person needs to

13  be addressing the situation.

14    Q    And how did you first learn about the case?

15    A    I got a postcard in the mail.

16    Q    Prior to receiving that postcard, had you ever

17  heard anything about this case at all?

18    A    I had not.

19    Q    Prior to receiving that postcard, had you ever

20  heard anything about the Telephone Consumer Protection

21  Act?

22    A    I had not heard anything about the Telephone

23  Consumer Act.

24    Q    What did you do after you first received that

25  postcard?

1      A    I called my mother, Jan Petrus.

2      Q    And do you recall when you received that

3  postcard?

4      A    It was the end of October.  I'm not, I'm not --

5  I can't be specific on dates, but I know it was the very

6  end because it was right before my daughter's birthday,

7  which is October 28th.

8      Q    And did you call your mother right after you

9  got that postcard?

10     A    I did.  I didn't understand what the postcard

11  was, and her being a legal assistant --

12     Q    Did you call her in her capacity as your mom or

13  her capacity as a legal assistant?

14     A    As a legal assistant.  I needed understanding

15  of a legal document.

16     Q    How long did you talk to your mom for in that

17  initial conversation?

18     A    I just -- I had gotten the postcard in the

19  mail, and I said, "I don't know what this is.  Can you

20  look at it for me?"  And she said that she would take it

21  and she would show it to Chris and see if there was

22  anything that I needed to be concerned about.

23     Q    Did she say anything else to you?

24     A    No, not at that time.

25     Q    Did you say anything else to her?

1    A    Not at that time.

2    Q    Did you do anything else after you got that

3 postcard?

4    A    Not at that time.

5    Q    Did you hear back from your mom at some point

6 after you talked to her about that postcard?

7    A    I did hear back from her.

8    Q    When did you hear back from her?

9    A    Probably, maybe about a week later.

10    Q    And was that by, by phone or e-mail or some

11 other way?

12    A    It was by phone.

13    Q    About how long did you talk to her when she

14 called you back?

15    A    Just long enough for her to explain, Chris had

16 looked up what --

17        MR. SWALLOW:  And I'm, I'm going to object,

18 potentially getting into privileged area as far as what

19 was said.

20        MR. HUTCHINSON:  Yeah, if she --

21        MR. SWALLOW:  Ms. Petrus is, is an employee of

22 the law firm.

23    Q    (By Mr. Hutchinson) Sure, yeah.  I don't want

24 you to divulge any attorney-client communications.  So if

25 there are communications that she gave to you in her

**32**

1  capacity as an employee of Mr. Bandas' law firm, you

2  shouldn't divulge the content of that.  But if she was

3  sharing information with you as your mom, you can, you

4  can share that.

5      A    No, any time I was talking to my mother about

6  this case -- as soon as we found out what the case was,

7  that's when I decided to have Chris' firm help me with

8  it.

9      Q    Okay.  So you had a conversation with your,

10 your mom about a week later.  And how long did that last

11 for?

12     A    Not long.

13     Q    Okay.  You think it's fair to say a few

14 minutes?  That long?

15     A    Five, ten minutes.

16     Q    And what's the next conversation you had with

17 your mom about this case after that?

18     A    Paperwork online that I would need to sign to

19 object.

20         MR. SWALLOW:  Again, I think we're getting into

21 privileged areas here potentially, if this is something

22 that she was telling you as part -- as an employee of the

23 law firm.

24         MR. HUTCHINSON:  I'm just asking you when the

25 last -- the next time you talked to her.

1    MR. SWALLOW:  "When" is fine, yes.

2    Q    (By Mr. Hutchinson) Okay.

3    A    I -- I can't really answer that, just because I

4    don't really know on dates.

5    Q    About how many times have you talked to Ms. Jan

6    Petrus about this case?

7    A    I have talked to Jan about four or five times

8    about this case.

9    Q    So there's one time when you first got the

10   notice; is that right?

11   A    Yes, sir.

12   Q    There's one time about a week later?

13   A    (Nodding head.)

14   Q    There's one time yesterday for the deposition?

15   A    (Nodding head.)

16   Q    So you talked to her one or two other times

17   besides that; is that right?

18   A    Yes, I did.

19   Q    Do you recall, besides the ones I just

20   mentioned, any other times that you talked to your mom

21   about this case?

22   A    No, I don't.

23   Q    Besides talking over the telephone, did you

24   have any e-mail correspondence with your mom about this

25   case?

**34**

1    A    Yes, she e-mailed me the sites that I needed to

2  go onto to object.

3    Q    So she e-mailed you a website address?

4    A    Yes.  She e-mailed me, she e-mailed me a

5  website address.

6    Q    Besides that website address, did she send any

7  other e-mails to you about this case?

8    A    Yes, she did.

9    Q    How many other e-mails did she send you?

10    A    I think I have five or six e-mails from her.

11    Q    And did you send e-mails back to her?

12    A    Yes, responding to her questions.

13    Q    So how many e-mails did you send back to her?

14    A    The same amount that she sent to me.

15    Q    Five to six?

16    A    Yes, sir.

17    Q    Besides e-mail, did you correspond with your

18  mother, Jan Petrus, about this case by any other method?

19    A    We did have some text messages, but I don't

20  have that phone anymore.

21    Q    About how many text messages did you exchange

22  with your mother regarding this case?

23    A    Two, three.

24    Q    Are you on Facebook?

25    A    I am on Facebook.

1    Q    Are you on Instagram or Snapchat or any other

2  social media?

3    A    I'm not on any other social media.

4    Q    Have you exchanged messages with your mother

5  about this case on Facebook?

6    A    No, I have not exchanged any messages on

7  Facebook.

8    Q    Have you exchanged messages about this case

9  with your mother on any other social media?

10   A    No, I have not.

11   Q    Have you ever visited the website for this

12 case?

13   A    To be honest, I'm really not sure what I was

14 looking at.  But like I said, I had already had Chris and

15 my mother helping me, and so they would e-mail me things

16 and let me know where I needed, you know, to sign and

17 read over things.

18   Q    Do you ever recall reading any "Frequently

19 Asked Questions" about this case on the case website?

20   A    I do not remember reading anything.

21   Q    Have you read the long form notice on the

22 website?

23   A    I don't know what that is.

24   Q    Have you read the settlement agreement in this

25 case?

36

1   A   Yes, I -- well, it's in my objection, and it

2   was explained to me by the firm.

3   Q   And you read it yourself?

4   A   The objection?

5   Q   The settlement agreement in this case.

6   A   The, the 16 million or -- is that what you're

7   talking about?

8   Q   There's a settlement agreement between the

9   Plaintiffs in this case and Wells Fargo.  Have you read

10  that settlement agreement?

11  A   I don't know what a settlement agreement is.  I

12  do -- if that's what you're talking about, basically what

13  the attorneys are going to receive for it, what Wells

14  Fargo has settled to give to all of, I guess we're

15  Plaintiffs, then, you know, yes, I have read over some of

16  that stuff.

17  Q   The stuff that you read over, where did you

18  read it?

19  A   Online when I had to go in and check boxes.  I

20  believe it talks about it in my objection.

21  Q   Do you recall reading anything called a

22  settlement agreement when you looked online?

23  A   I do not recall reading anything called a

24  settlement agreement.

25  Q   Have you ever read the final approval brief

**37**

1   filed by Plaintiffs in this case?

2       A    I don't know.

3       Q    Have you ever read the application for

4   attorney's fees submitted by Class Counsel in this case?

5       A    I have not.  For y'all's fees?  Or for like the

6   way Chris gets paid?

7       Q    For the attorneys who represent the Class.  So

8   that, including myself and other attorneys who represent

9   the Class.

10      A    I've kind of skimmed over it, but I'm not --

11  and I'm not an attorney.  I just, I don't understand half

12  the stuff they say in any of this.  It, I've had to have

13  it explained to me.

14      Q    Who explained it to you?

15      A    Chris Bandas' law firm.

16      Q    Is that Ms. Jan Petrus who explained it to you?

17      A    Yes, Ms. Jan Petrus.

18      Q    Is there anyone else who explained it to you?

19      A    No, nobody else.

20      Q    Have you read the class action complaint filed

21  by Plaintiffs?

22      A    I don't know.

23      Q    Did you do any independent research about this

24  case?

25      A    Not really, no.

1    Q    Do you have any objections to the settlement in

2  this case?

3    A    I do.

4    Q    What are your objections to the settlement in

5  this case?

6    A    I believe that the people who were actually at

7  a loss here are barely getting anything, while there

8  might have been a little bit more that y'all could have

9  done to get people more stuff.  I don't, I don't really

10  know that I think there was a lot of time put into it,

11  and I think $60,000 is a lot on y'all's behalf.

12    Q    Besides what you said, do you have any other

13  objections to the settlement in this case?

14    A    Not really, no.

15    Q    What do you know about the settlement in this

16  case?

17    A    I know that the, I believe it's called the

18  TCPA, would usually only pay out about, you would get 20

19  to 25 percent, and that y'all are asking for 30 percent,

20  when you really haven't shown the time that you put into

21  it.  There's, you know, a certain amount of hours that

22  you're supposed to put into it to get over the 25

23  percent.  It's very rare that any attorneys get over the

24  25 percent.

25    Q    And where did you get this understanding about

1  the settlement in the case?

2       A    Talking with my attorneys.

3       Q    With which attorneys?

4       A    I'm sorry, I couldn't hear you.

5       Q    I'm sorry.  With which attorneys?

6       A    With, well, Jan.  And then again Wednesday, to

7  make sure I understood, with Chris, John and Eric.

8       Q    Did you get that understanding from any other

9  source besides your attorneys and Ms. Jan Petrus?

10      A    Just reading through the objection that Chris

11 drew up for me.

12      Q    Did you get that understanding from any other

13 place?

14      A    I did not get it from any other place.

15      Q    Do you know what people are getting from the

16 settlement?

17      A    Maybe about seven -- well, like in total?  Or

18 apiece?

19      Q    Just, do you know anything about what people

20 are getting from the settlement?

21      A    In total?  Or apiece, like each person -- like

22 if I got something for the settlement, how much my check

23 would be for, or how much Wells Fargo's paying out in

24 general?

25      Q    I'm asking, anything you know.  So you can say

**40**

1    in total or individually, anything you know about what

2    people are getting from the settlement.

3         A    The way I understand it is that the people

4    might get about 70 bucks apiece.

5         Q    Do you know anything else about what people are

6    getting from the settlement?

7         A    I do not.

8         Q    What do you think class members should get from

9    this settlement?

10             MR. SWALLOW:  Objection, calls for speculation.

11             THE WITNESS:  I honestly don't know enough

12   about these kinds of things to give an honest answer on

13   that.  I'm just very angry at Wells Fargo.

14             COURT REPORTER:  You're very what?  I'm sorry.

15             THE WITNESS:  Angry at Wells Fargo.  I had a

16   nice house that I brought my first baby home to --

17        Q    (By Mr. Hutchinson) Yeah.

18        A    -- and couldn't get any help to try to save it.

19        Q    And understandably so, from my perspective.

20   I'm one of the attorneys who is suing them.

21        So is it fair to say that you relied upon Ms. Jan

22   Petrus to understand what the Class members should or

23   shouldn't get out of the settlement?

24             MR. SWALLOW:  Objection -- objection, leading.

25             THE WITNESS:  Well, I did trust my attorney's

**41**

1  firm to make the correct decisions.

2      Q    (By Mr. Hutchinson) And your attorney's firm is

3  also your mom's firm, correct?

4      A    Yes, sir.

5      Q    So it's fair to say you trust your mom?

6      A    Oh, absolutely.

7      Q    Do you know how many people filed claims to

8  participate in this settlement?

9      A    I would have to read back through my objection

10  to be accurate with that.

11      Q    Do you have any idea how many people filed

12  claims to participate in the settlement?

13      A    A lot.

14      Q    So is it fair to say there's a lot of people

15  who felt like yourself who were interested in holding

16  Wells Fargo accountable?

17      A    Yes.

18          MR. SWALLOW:  Objection, leading.

19          THE WITNESS:  Yes, there are a lot of people.

20      Q    (By Mr. Hutchinson) Did you personally file a

21  claim in this settlement?

22      A    That's the postcard that came in the mail,

23  right?

24      Q    Yes, those cards are one way to --

25      A    Then yes, I did.

**42**

1    Q    And did you fill that out yourself?

2    A    I did.

3    Q    Do you recall whether you completed the claim

4  form?

5    A    Is that the form I had to have turned in by

6  December?  Or is that the objection, to object had to be

7  done by December something, right?  I don't know what's

8  what, as far as the paperwork that I was -- you know,

9  again, that's why I'm talking to a legal assistant and an

10  attorney, because I don't understand all of that stuff.

11    Q    So if I told you that the claim form is the

12  form that you fill out to participate in the settlement

13  and if the settlement's approved get money back, with

14  that understanding, can I ask you why you filed the claim

15  form?

16          MR. SWALLOW:  Objection.  It's a vague question

17  and potentially an incomplete hypothetical.

18          THE WITNESS:  I am mad at Wells Fargo, and

19  anything I can do to make them have to pay out a little

20  bit since I lost seems fair to me.

21    Q    (By Mr. Hutchinson) Have you ever objected to a

22  class action settlement?

23    A    I have never objected to a class action

24  settlement.

25    Q    Have you seen any objection filed in this case?

**43**

1     A    I'm not sure.

2     Q    Do you know what an objection to a class action

3  settlement is?

4     A    I do.

5     Q    And what is your understanding of what that is?

6     A    I'm objecting to the way that it was -- I'm

7  trying to think of how to say it.  I guess I'm objecting

8  to the way that it's divvied out.

9     Q    So aside from your -- it sounds like you're

10  describing your objection.

11     A    Yes.

12     Q    So my question is, do you understand what an

13  objection is, generally, in a class action lawsuit?

14     A    Saying you don't agree with it.

15     Q    And are you objecting to this case?

16     A    Clarify.

17     Q    Are you objecting to the settlement in this,

18  this case against Wells Fargo?

19     A    I am objecting to that.

20     Q    Do you know whether there was an objection

21  filed with your name on it in this case?

22     A    Yes, there was an objection filed with my name

23  on it.

24     Q    When did you first see that objection?

25     A    Can I see my objection?  I believe the date's

**44**

on it.

Q    I'm just asking if you have an independent recollection.

A    November.

Q    Do you know whether you saw it before or after it was filed?

A    I saw it before it was filed.

Q    Whose idea was it to file an objection in this case?

A    After it was explained to me what was going on, it was my idea.

Q    Did you read the objection?

A    I did.

Q    How many times did you read it?

A    I have read it four times.

Q    Did you read it before it was filed?

A    Yes, I did.

Q    How many times did you read it before it was filed?

A    I read it once before it was filed.

Q    Did you write the objection?

A    Chris Bandas, I believe, wrote the objection.

Q    Did anyone else assist in writing it?

A    I'm not aware of what they actually do at the firm.  I just trust them to make the right choices.

**45**

1    Q    Did you assist in writing it?

2    A    I did not assist in writing it.

3    Q    Did you ask any questions about the objection?

4    A    I did ask questions.

5    Q    How many questions did you ask about it?

6    A    Not many.  Again, I'm not an attorney, so a lot

7  of the stuff in it doesn't make a lot of sense to me, but

8  I get the gist of what is going on.  I know what I'm

9  objecting to.

10   Q    How was it sent to you?

11   A    My -- it was brought to me in person.

12   Q    Who brought it to you in person?

13   A    Jan Petrus.

14   Q    Do you recall when she brought it to you?

15   A    November.

16   Q    And where were you when she brought it to you?

17   A    At work.

18   Q    And what time of day was it at work?

19   A    8:00 o'clock in the morning.

20   Q    Okay.  And did she bring it to you to sign it?

21   A    She brought it to me to read over and sign it,

22  yes.

23   Q    And did you read over it?

24   A    I did.

25   Q    How long did you take to read over it?

**46**

1     A    Fifteen, twenty minutes.

2     Q    You said you brought it to her -- she brought

it to you around 8:00 a.m.  What time does your work

start?

5     A    I get there at 8:00, and she was on her way to

work, so she passes right by where I work at in

Ingleside.

8     Q    So did you take a break from your work to, to

read over it?

10     A    Kind of.  That early in the morning, all my

kids aren't there yet.  I only have five at that time to

take care of, and I maybe had two kids and they were

eating breakfast, so I had the opportunity to stand and

read.

15     Q    And you signed it then?

16     A    I did.

17     Q    Did you make any changes to it at all?

18     A    I did not.

19     Q    Did you write any notes on the objection?

20     A    I did not.

21     Q    And did Ms. Jan Petrus take it back to

Mr. Bandas' office from there?

23     A    I can't say what Jan did when she left me.

24     Q    After you signed it, did you do anything else

with the objection at all?

1    A    No, I did not.

2    Q    Do you know whether the objection was filed

3  with the Court in this case?

4    A    Yes, it was filed with the Court.

5    Q    Do you know how it got to be filed with the

6  Court?

7    A    I don't know how all that works, no.

8    Q    But you didn't send it in to file it; is that

9  right?

10   A    I sent in some -- I did send in some things,

11 but I'm not quite sure what exactly they were.  My mom

12 would get ahold of me and say, "Okay, we need to get this

13 in by this deadline," you know, and basically ask, "Do

14 you still want to do this?"  And then because I started

15 out kind of, kind of doing it by myself and just asking

16 Chris' firm for like advice.  And then so, but I'm not, I

17 can't really say exactly what it was that I was always

18 sending in.  But I, I think that I did send in the, the

19 objection.

20   Q    Did you mail the objection to the Court?

21   A    I believe so.

22   Q    But you're not sure?

23   A    I'm really not sure.

24   Q    Is there another document that you may have

25 sent, mailed in at some point?

1       A    I'm really not sure.  Yeah, I think I mailed

2  two or three different things.  And then there were the

3  online things that you had to go in that, you know, so

4  I'm really not sure what, which was which.  Again, that's

5  why I was talking to an attorney's office, because --

6       Q    But the objection that we just talked about,

7  after you signed it, did Ms. Jan Petrus take that signed

8  copy with her?

9       A    She took it with her, but it got brought back.

10      Q    When did it get brought back?

11      A    The next day.

12      Q    What happened once it got brought back the next

13 day?

14      A    I had -- she put it in a big envelope for me

15 and I took it and put it in the post office, I believe,

16 if that's the same thing.

17      Q    How come Mr. Bandas' firm didn't mail it in?

18           MR. SWALLOW:  Objection, calls for speculation.

19           THE WITNESS:  I think because I'm pro se.  I

20 was pro se.

21      Q    (By Mr. Hutchinson) Do you know what the term

22 "pro se" means?

23      A    Basically, I think I'm doing it on my own, in a

24 sense.

25      Q    Do you think you were doing it on your own?

**49**

1    A    Not completely, no.

2    Q    Is it correct that you didn't draft the

3  objection at all?

4    A    Write it?

5    Q    Yeah.

6    A    Yeah, I did not write the objection.

7    Q    So you didn't do that part on your own?

8    A    I did not write it on my own.

9    Q    Did you write any part of the objection on your

10  own?

11    A    I signed it.  I read it.

12    Q    Besides signing it, did you do any part of the

13  objection on your own?

14    A    Well, I said things to the firm like "This is

15  ridiculous.  How can, you know, how can this go on this

16  way?"

17    Q    How can what go on this way?

18    A    "Why do they get so much, when the people" --

19         MR. SWALLOW:  I'm going to object.  I think

20  we're getting into attorney-client communications here.

21    Q    (By Mr. Hutchinson) Yeah, I mean, you

22  understand that if you've had communications between an

23  attorney who's representing you --

24         MR. SWALLOW:  Those are privileged.

25    Q    (By Mr. Hutchinson) -- those are privileged.

50

1   But you said you were working on your own, so you're not,

2   you weren't working with an attorney.

3        A    Oh, I was.

4             MR. SWALLOW:  I'm going to object.  Misquotes

5   her.

6        Q    (By Mr. Hutchinson) So the attorney was

7   representing you?

8        A    The attorney has been representing me ever

9   since I got that card in the mail.  As soon as I started

10  having to ask questions.

11       Q    So I'm trying to understand, if the attorney's

12  been representing you since you got that initial postcard

13  notice in the mail, how are you pro se?  How are you

14  doing things on your own?

15       A    I don't really understand all that.

16       Q    When did you first hear the term "pro se"?

17       A    Wednesday.

18       Q    So Wednesday is that meeting you had with the

19  attorneys, Mr. Bandas and Mr. Swallow and Mr. Stewart?

20       A    Yes.

21       Q    And before that, you had never heard of the

22  word "pro se" at all before?

23       A    I'm sure I've heard it.  It wasn't something I

24  had to pay attention to.  My sister is also an attorney,

25  so there's legal talk around me all the time.  It doesn't

**51**

1  mean I understand it.

2      Q     Besides what you discussed already, is there

3  any way in which you were doing any part of the objection

4  on your own?

5      A     Again, I went online and did things on

6  websites.  I'm not quite clear as to what was what.  I

7  just was advised by the law firm, "If you want to go

8  ahead with this and you want to do this, you need to do

9  this by this deadline."

10     Q     So that was done at the advice of the Bandas

11  Law Firm?

12     A     Yes, it was.

13     Q     So that wasn't on your own, since they

14  instructed you to do it?

15     A     It was not on my own.

16     Q     Besides what we talked about, any other way

17  that this objection was pro se on your own?

18         MR. SWALLOW:  Objection, asked and answered.

19         THE WITNESS:  I think I answered that.

20     Q     (By Mr. Hutchinson) Is there any other way?  Is

21  the answer no then?

22     A     No.

23     Q     I'm told the tape's going to end shortly, so we

24  should take a break.

25     A     I would like to take a break.

52

1      THE VIDEOGRAPHER:  Thank you.  It's 11:18.

2  We're off the record.

3      (Recess from 11:18 a.m. to 11:49 a.m.)

4      THE VIDEOGRAPHER:  All right.  It's 11:49.

5  We're back on the record.

6      Q    (By Mr. Hutchinson) All right.  So we took

7  about a half an hour break, Ms. Yde.  Did you talk to

8  your Counsel during the break?

9      A    I did talk to my Counsel, and I would like to

10 clarify something.  When we were talking about the

11 objection, again, like I had said, I'm not an attorney

12 and I don't quite understand everything that I'm always

13 reading.  The 60,000 that I was talking about, apparently

14 it's just the incentive pay that y'all would receive, so

15 now I'm even realizing that there is a lot more pay

16 that's going towards the counsel, rather than the people.

17     So basically, I just wanted to, you know -- well, to

18 put it in layman's terms, the money, for what money is

19 being awarded, there is a lot going to the attorneys,

20 rather than the people.  There, if so much money is

21 awarded, then why should y'all get so much of it, rather

22 than the people receiving more when they could receive

23 more, if y'all weren't receiving such a high pay?

24     Q    Are you making this correction based on your

25 conversation with your attorney?

1      A    We went a little more over the objections to

2  make sure that I was explaining it, or I was

3  understanding it correctly, yes.

4      Q    So you talked about your testimony with your

5  attorney during the break?

6      A    I did.

7      Q    What else did you talk about during the break?

8      A    Skydiving.

9      Q    Do you think $60,000 would be too much for the

10  attorneys to receive in this case?

11      A    I -- yes.  And $4.6 million is definitely way

12  too much.

13      Q    What do you think would be an appropriate

14  amount for the attorneys to receive for their work in

15  this case?

16          MR. SWALLOW:  Objection, calls for speculation.

17          THE WITNESS:  Yeah, I'm not -- I don't really

18  know enough about this to say that.  I just know that

19  what is at hand seems like a whole lot to me.

20      Q    (By Mr. Hutchinson) But you're certain it's

21  some amount less than $60,000, correct?

22      A    Yes.  And I do realize that 60,000 is just the

23  incentive pay.

24      Q    Do you know how the attorney's fees in this

25  case are going to be paid?

**54**

1   A    I don't understand how all the payment stuff

2  works, no.

3   Q    Do you understand that only the Judge can

4  approve Class Counsel's attorney's fees?

5   A    I do understand that.

6   Q    Do you understand that Class Counsel has

7  requested a payment of 30 percent of the settlement

8  amount?

9   A    I do understand that.

10   Q    Do you know whether Class Counsel have paid

11  out-of-pocket expenses to pursue this case?

12   A    I do not know.

13   Q    Does it matter to you how much Class Counsel

14  spent to pursue this case?

15   A    In a way it does, because --

16   Q    How?

17   A    -- it seems to me y'all spent under a year just

18  trying to wrap this case up.  But that doesn't really

19  seem like a very long time when this is something y'all

20  do on a regular basis.

21   Q    Do you know whether Class Counsel has received

22  any payment for this case so far?

23   A    I do not know.

24   Q    Do you know whether Class Counsel's ability to

25  receive any payment rests solely on whether the Court

1    awards fees?

2         MR. SWALLOW:  Objection, calls for legal

3    opinion.

4         THE WITNESS:  I'm not quite sure what you're

5    asking.

6    Q    (By Mr. Hutchinson) So is it or is it not your

7    understanding that whether or not Class Counsel gets any

8    payment is determined solely by whether the Court awards

9    any payment to the Class Counsel attorneys?

10        MR. SWALLOW:  I just object to the form of the

11   question.  It's ambiguous, calls for speculation --

12        THE WITNESS:  Again, I really don't --

13        MR. SWALLOW:  -- and legal opinion.

14        THE WITNESS:  I'm sorry, I really don't

15   understand completely what you're asking.  But I do

16   believe that's why you're wanting to question me is

17   because, because I have objected.  It's holding up your

18   fees, or your payment.

19   Q    (By Mr. Hutchinson) Do you understand that only

20   the Court can decide whether or not the Class Counsel

21   attorneys receive payment?

22   A    I do understand that.

23   Q    So it's not your objection; it's the Court that

24   decides, correct?

25   A    Yes.

**56**

1          MR. SWALLOW:  Objection, calls for legal

2     opinion.

3          Q    (By Mr. Hutchinson) Do you know the class

4     action consumer protection attorneys who sue big

5     corporations like Wells Fargo only receive payment if

6     they recover money for the Class?

7          MR. SWALLOW:  Objection, calls for speculation.

8          THE WITNESS:  I don't know any of that.

9          Q    (By Mr. Hutchinson) Do you know that if this

10     lawsuit was not successful, Class Counsel would not have

11     received any payment?

12          MR. SWALLOW:  Objection, calls for speculation.

13          THE WITNESS:  I don't -- I'm not an attorney.

14     That's why I'm talking with an attorney.  I don't know.

15          Q    (By Mr. Hutchinson) Do you know whether Class

16     Counsel faced any risks in this case?

17          MR. SWALLOW:  Objection, calls for speculation.

18          THE WITNESS:  I don't know.

19          Q    (By Mr. Hutchinson) Is it fair to say that you

20     have no idea that the risks, of the risks that Class

21     Counsel faced to certify a class in this case?

22          MR. SWALLOW:  Objection, leading.  Calls for

23     speculation.

24          THE WITNESS:  I don't know.

25          Q    (By Mr. Hutchinson) Is it fair to say that you

57

1  don't know what Class Counsel would have had to prove to

2  win this case at trial?

3          MR. SWALLOW:  Objection, leading, calls for

4  speculation.

5          THE WITNESS:  I don't, I don't know.  I don't

6  see that it would be really hard to prove, though, if

7  you've got so many people that are saying they got these

8  phone calls or text messages.  I don't see why that's

9  hard, especially with people who did receive text

10  messages, because they're right there.  You can pull them

11  up.  I'm sure people still have them.  That's not hard to

12  prove when it's on your phone.

13      Q    (By Mr. Hutchinson) Do you know whether any

14  attorneys anywhere have won a class trial in a Telephone

15  Consumer Protection Action case?

16      A    I don't know.

17      Q    Do you know whether there's been any court

18  anywhere in this country where a class action Telephone

19  Consumer Protection Act case has been certified and that

20  there's been a judgment in favor of Plaintiffs at trial?

21      A    I do believe it talks about some in my

22  objection.

23      Q    If I told you --

24      A    Uses some for examples.

25      Q    If I told you that there were no such cases,

**58**

1  that there have never in the history of the Telephone

2  Consumer Protection Act been a case where there's been a

3  robo calls to cell phone case class that has been

4  certified and gone to trial and Plaintiffs have

5  prevailed, would that change your opinion?

6              MR. SWALLOW:  I'm going to object --

7              THE WITNESS:  No.

8              MR. SWALLOW:  -- as leading, calls for

9  speculation, and compound, I believe.

10             MR. HUTCHINSON:  Let's stop the speaking

11  objections.

12             THE WITNESS:  Basically, my --

13             MR. HUTCHINSON:  You know "leading" is not a

14  proper objection.

15             MR. SWALLOW:  I think it is.  It's an

16  objection --

17             MR. HUTCHINSON:  It's not my witness.  No, I

18  think it's not, Counsel.

19             MR. SWALLOW:  Pretty sure.

20             MR. HUTCHINSON:  So you might want to check

21  during the next break.  You can answer.

22             THE WITNESS:  Basically, my whole thing is, I

23  feel like, in a sense, I -- if Wells Fargo would have

24  handled things the way that they should have handled

25  things and they actually returned their call from

1  their -- you know, their specialists actually returned

2  their phone calls like they should have, then things

3  could have been done much differently and a lot more of

4  us may have saved our houses, where we were the ones that

5  lost.

6          I don't really feel like even if you did pay

7  out money out of your pocket or that you've really lost

8  anything, because you chose to take this on and, and help

9  the people, which, you know, I'm sure we all appreciate.

10 But I still think that the amount that y'all are

11 receiving, when it's -- when Wells Fargo is agreeing to

12 pay so much, there could be more going to the people if

13 y'all were not taking so much.

14          So it really doesn't -- some of the questions

15 that you're asking me really don't matter to me because

16 y'all weren't hurt by this.

17     Q    (By Mr. Hutchinson) So it's fair to say you

18 don't care about any risks that Class Counsel face in

19 determining what amount they should or shouldn't get

20 paid?

21          MR. SWALLOW:  Object, misquotes the deponent,

22 calls for speculation.

23          THE WITNESS:  I don't know.  I mean, to say

24 that I completely don't care would be heartless, but I

25 think that it's, what you're getting is extreme.

1    Q    (By Mr. Hutchinson) Is it fair to say that you

2    have no idea of the risks that an adverse decision from

3    the Supreme Court might pose for this case?

4         MR. SWALLOW:  Objection, leading.

5         THE WITNESS:  I don't know.  I don't.  To me

6    you're using like attorney words, and I don't really

7    understand them, which is why you're getting a lot of "I

8    don't know."

9    Q    (By Mr. Hutchinson) Did you know that the FCC

10   issues orders governing the Telephone Consumer Protection

11   Act?

12   A    I do now.

13   Q    What do you know about those orders?

14   A    Is that the TCPA?  Is that the same thing?

15   Q    The TCPA is the Telephone Consumer Protection

16   Act, yes.

17   A    Okay.  Then yes, I realize that generally when

18   these types of cases have come up, it's been, you know,

19   people have been -- the attorneys have been awarded

20   usually 20 to 25 percent maybe.  It's very rare for 30

21   percent to be given, and y'all are asking for 30 percent,

22   when you've spent less than a year's time.  It's -- it's

23   kind of like y'all just were like, "Hey, we can do this."

24   We know we can prove it, and you were just -- I mean yes,

25   you want to help the people, but you're just kind of out

1  for yourselves.

2      Q    Have you heard of the Federal Communications

3  Commission?

4      A    I have not.

5          COURT REPORTER:  Did you say yes or no?  I'm

6  sorry.

7          THE WITNESS:  Right now?

8          COURT REPORTER:  Yes.

9          THE WITNESS:  "I have not."

10     Q    (By Mr. Hutchinson) Did you know that the

11  Federal Communications Commission issues orders that

12  govern the TCPA?

13     A    I don't know.

14     Q    Is it fair to say then that you had no idea of

15  the risks that an adverse decision from the Federal

16  Communications Commission might pose for this case?

17          MR. SWALLOW:  Objection, leading.

18          THE WITNESS:  I think I've already answered

19  that.

20     Q    (By Mr. Hutchinson) And what's your answer?

21     A    I, I don't really feel like that concerns me.

22     Q    So you don't have any idea of the risks that a

23  Federal Communications order might pose for this case?

24     A    (Shaking head.)  No, I don't know what risks.

25     Q    Did you know that President-Elect Trump has

1  been sued under the Telephone Consumer Protection Act?

2      A    I did not know that.

3      Q    Did you know that President-Elect Trump will

4  choose the next Federal Communications Commissioner in

5  2017?

6      A    I do not know that.

7      Q    Did you know that even if Class Counsel

8  prevailed at trial, they would have faced a risk of the

9  Court reducing or eliminating any judgment on due process

10 grounds?

11     A    I don't understand what you're saying.

12     Q    So you don't have any understanding of that at

13 all?

14     A    (Shaking head.)

15     Q    Is it fair to say that you have no

16 understanding of what risks, what the risks of losing

17 were for Class Counsel?

18          MR. SWALLOW:  Objection, leading.

19          THE WITNESS:  I think I've explained why I

20 think -- why I'm objecting to this.  All this other stuff

21 you're asking me about is not something that I really

22 feel I need to know.

23     Q    (By Mr. Hutchinson) Please just answer the

24 question.  Is it fair to say that you have no

25 understanding of what the risks of losing were for Class

1   Counsel?

2          MR. SWALLOW:  Objection, leading.  Asked and

3   answered.

4          THE WITNESS:  I don't know.  I don't feel I

5   need to know.

6   Q    (By Mr. Hutchinson) So you have no idea of

7   whether there was a zero percent chance of losing or a

8   100 percent chance?

9          MR. SWALLOW:  Objection, leading.

10          THE WITNESS:  Well, there's always a zero

11   percent chance of losing and a 100 percent chance of

12   losing.

13   Q    (By Mr. Hutchinson) Why?

14   A    Because things happen.  That's life.  There's a

15   zero percent chance of losing anything, anything you deal

16   with.

17   Q    Do you have an attorney?

18   A    Right now?

19   Q    Yes.

20   A    Yes, I do.

21   Q    Who?

22   A    Chris Bandas is my attorney.  And there is now

23   a new one in Georgia, and I don't really recall his name.

24   He just, I believe, Chris just hired him on, and I

25   believe he's on that phone.

1    Q    Is there someone else on the line?

2    A    Yes.

3    Q    Can you please identify yourself if you're

4    participating by telephone?

5         MR. SWALLOW:  Is anybody still on the line?

6         THE WITNESS:  Shoot.

7         MR. SWALLOW:  Do we need to call them back?

8    Hello?

9         COURT REPORTER:  They were on the line at the

10   break.

11        MR. SWALLOW:  They were on the line at the

12   break?

13        MR. HUTCHINSON:  Let's go off the record to see

14   if we can remedy that.

15        THE VIDEOGRAPHER:  All right.  It's 12:03.

16   We're off the record.

17      (Recess from 12:03 p.m. to 12:05 p.m.)

18        THE VIDEOGRAPHER:  All right.  It's 12:05 and

19   we're back on the record.

20        MR. HUTCHINSON:  So we went briefly off the

21   record.  It appeared that the people participating

22   telephonically had dropped at some undetermined time and

23   perhaps they will join us again.

24   Q    (By Mr. Hutchinson) Besides Mr. Bandas and the

25   attorney in Georgia, is there any other attorney who's

1   representing you in this case?

2       A    I have signed a contract with Chris Bandas.  He

3   has colleagues that he works with, Eric, John.  But the

4   only person I've signed a contract with is Chris Bandas.

5       Q    Do those other attorneys who you mentioned,

6   Eric and John, work for Mr. Bandas or do they work for

7   you?

8       A    I'm not really quite sure their relationship.

9       Q    Do you know whether they work for you?

10      A    They work for Chris, I guess.  I don't know.

11  Like I said, the only contract I've signed is with Chris

12  Bandas.

13      Q    What about the attorney in Georgia, have you

14  signed a contract with him?

15      A    No, just Chris Bandas.

16      Q    Do you know who he works for?

17      A    I believe we've got the attorney in Georgia now

18  because that's where the class action is, and so we

19  needed an attorney in Georgia also.

20      Q    Does he work for you, or does he work for

21  Mr. Bandas?

22      A    I'm not really sure.  He just got hired on.  So

23  I don't, I haven't really had a chance to really talk.

24  This kind of all happened really fast.

25      Q    And is it correct that, as you said before,

1  that Mr. Bandas has been your attorney since you first

2  got the notice in this case?

3      A    Yes.

4      Q    And you mentioned you signed a contract with

5  Mr. Bandas as well?

6      A    Yes, I did.

7      Q    When did you sign that?

8      A    About two weeks ago.  I guess you could say we

9  basically have had a verbal contract from the beginning.

10      Q    Where were you when you signed that contract?

11      A    My house.

12      Q    Who else was there?

13      A    Jan Petrus.

14      Q    Was anyone else there?

15      A    No, there was nobody else there.  Or maybe my

16  kids.  I really don't recall if they were with me or with

17  their father.  But they're seven and five, so --

18      Q    And how, how long was that meeting where you

19  got the contract?

20      A    Just basically long enough for her to explain

21  before I, you know, as I read over the contract, that

22  basically this is not saying that you owe us any money or

23  anything like that, it's just that you're, you are, we

24  are agreeing that we are actually going to be helping you

25  cover the case.

**67**

1    Q    So under ten minutes?

2    A    Yeah.  Short contract.

3    Q    Would it be under five minutes even?

4    A    Maybe.

5    Q    And did you sign that contract at that time,

6    you said?

7    A    I did.

8    Q    Do you know whether Mr. Bandas signed the

9    contract also?

10   A    Yes, he did sign the contract.

11   Q    Did he sign it before or after you signed it?

12   A    I don't recall.  We were more focusing on what

13   the contract was saying than signatures.  She wanted to

14   make sure that I understood that I wasn't going to be

15   paying out any money.

16   Q    Have you ever met with Mr. Bandas in person to

17   talk about this case?

18   A    Wednesday.

19   Q    Besides Wednesday, had you ever met with him in

20   person at any point in time?

21   A    About this case?

22   Q    Yes.

23   A    I had not, no.  I did have a phone call.

24   Q    When was that phone call?

25   A    One was right before the 4th, explaining that I

1  did not have to be, I did not have to appear in that

2  hearing.  And one was afterwards, to arrange coming to

3  make sure I understood what happens in a deposition.

4      Q    Any other times?

5      A    No.

6      Q    Has there been --

7      A    No other times.

8      Q    I'm sorry, we talked over each other.  I

9  apologize.  Has the Bandas Law Firm done any work for you

10 before this case?

11     A    No, they have not done any work for me.

12          COURT REPORTER:  Could you speak up just a

13 little, please?  Thanks.

14     Q    (By Mr. Hutchinson) And is it true that your

15 mother, Jan Petrus, works for Mr. Bandas, correct?

16     A    Yes.

17          MR. SWALLOW:  Objection, leading.

18          THE WITNESS:  My mother works for Chris Bandas.

19     Q    (By Mr. Hutchinson) So he's her boss, correct?

20     A    Yes, he is.

21     Q    Do you know if your mother, Jan Petrus, gets

22 compensation that's in any way based on whether she

23 brings in work for Mr. Bandas?

24     A    I don't know, but that would be irrelevant,

25 because I went to my mother.  She didn't necessarily

1    bring in work.

2        Q    I'm just asking you if you know how she gets

3    compensated.

4        A    I don't know how she gets paid.

5        Q    Does she work full time for Mr. Bandas?

6        A    Absolutely, she does.

7        Q    How long has she worked for Mr. Bandas for?

8        A    At least ten years.

9        Q    And she depends on that money from Mr. Bandas?

10       A    Well, I'm sure she does.

11       Q    Would you say she has a good relationship with

12   Mr. Bandas?

13       A    I'm sure she does.

14       Q    Do you know whether Ms. Jan Petrus has brought

15   in other clients for Mr. Bandas besides yourself?

16           MR. SWALLOW:  Objection, misquotes deponent.

17           THE WITNESS:  I don't -- that's --

18           MR. SWALLOW:  Calls for speculation.

19           THE WITNESS:  I would not be privy to that

20   information.  That would be, you know, I would assume

21   that would be breaking laws.  I know I'm not supposed to

22   assume, but --

23       Q    (By Mr. Hutchinson) I'm sorry, I don't

24   understand.  How so?

25       A    If she was telling me about work that she was

1  doing that didn't pertain to me in the law firm?  That's

2  illegal, isn't it?

3      Q    I can't, I can't testify at all.  But I

4  understand your, your answer.

5      If your mother, Jan Petrus, asked you to do work for

6  Mr. Bandas, again, like you've done in the past, would

7  you accept that work?

8      A    Filing?

9      Q    Yeah.

10     A    Yes, it's nice around the holidays to be able

11  to have extra income.  I work at a daycare.

12     Q    It pays well?

13     A    Well, not --

14          MR. SWALLOW:  Objection, misquotes deponent.

15          THE WITNESS:  -- not really.  No actually.

16  It's just a little bit of extra money.

17     Q    (By Mr. Hutchinson) Okay.

18     A    As a matter of fact, I think it was just

19  minimum wage.

20     Q    But you appreciated receiving that money, you

21  said?

22     A    Yeah, I do.  There's been times when I'll go

23  mow people's yards, so something as simple as filing is a

24  whole lot nicer.

25     Q    Do you think that your mother, Ms. Jan Petrus,

71

1   might get a bonus or a raise from Mr. Bandas if

2   Mr. Bandas made a lot of money from this case?

3           MR. SWALLOW:  Objection, calls for speculation.

4           THE WITNESS:  I would have no way of knowing

5   that.

6       Q    (By Mr. Hutchinson) Did Ms. Petrus promise you

7   anything in exchange for participating in this case?

8       A    Absolutely, no, she did not.

9       Q    Did anyone else ever promise you anything in

10  exchange for objecting in this case?

11      A    Absolutely not.

12      (Exhibit 1 marked for identification.)

13      Q    (By Mr. Hutchinson) I've handed to you what has

14  been marked as Exhibit 1.  It is a four-page document

15  entitled "Class Action Objector Fee Agreement."  Do you

16  recognize this document?

17      A    To be honest, it looks like all of the things

18  that I've kind of looked over.  I would have to go

19  through and read it.

20      Q    You're free to do so.

21      A    (Reviewing document.)  Yes.

22      Q    Have you had a chance to review the document?

23      A    Yes.

24      Q    So having been able to review the document, do

25  you recognize this document?

1    A    Yes.

2    Q    What is it?

3    A    It's my agreement, but it's not the -- is this

4  the same, is this the same -- this isn't my contract,

5  though.  Right?

6    Q    You would be the only one that knows the answer

7  to that question.

8    A    That is not the contract.  The contract was a

9  little shorter.

10        MR. SWALLOW:  I, I can't testify.

11   Q    (By Mr. Hutchinson) He can't answer the

12  question.

13        MR. SWALLOW:  Yeah, I can't really answer for

14  you.

15        THE WITNESS:  Can I see a copy of my contract?

16   Q    (By Mr. Hutchinson) Is this the document you

17  were talking about that you signed two weeks ago?

18   A    Maybe.  But they kind of all end up looking a

19  lot alike to me, because they're -- you know, I don't

20  understand about half of what it says in here, except for

21  basically I'm not responsible to pay anything.

22   Q    Did you sign more than one contract with

23  Mr. Bandas?

24   A    No.  This isn't the contract, though.  This

25  is -- the contract says "Contract" on it.

1    Q    Can you look on the last page of the document?

2    A    Yes.

3    Q    Do you see your signature?

4    A    Yes, I do.

5    Q    Is that your signature and you recognize that

6    as being your own?

7    A    That is my signature.

8    Q    Do you see Mr. Bandas' signature?

9    A    Yes, that's Mr. Bandas' signature.

10   Q    Okay.  Do you think there is another document

11   besides this one that both you and Mr. Bandas signed?

12   A    I can't be certain on that.

13   Q    But you are certain you signed this one?

14   A    Yeah, that's my signature.

15   Q    Did you sign this two weeks ago?

16   A    I already answered that question.

17   Q    Did you sign this document two weeks ago?

18   A    I already answered that question.

19   Q    What's your answer to that?

20   A    That it's hard to tell the difference between

21   everything that I have gone through and signed.  I'm

22   basically going off the advice of my attorneys.  My mom

23   brings me stuff, I read through it.  But again, there's a

24   lot of stuff I don't really understand, even in this.

25   And so it's explained to me so that I can have an

**74**

1  understanding, and then -- and it's my mom, so I know

2  she's not going to lie to me.  So I agree.  And she

3  explained it to me, and I sign where I need to sign.

4      Q    If I told you this was the only contract that

5  your attorneys had provided to us, and they represented

6  to us that this was the only contract, would that change

7  your testimony in any way?

8      A    No, it would not.

9      Q    So you're not sure if there's another contract

10  you signed with Mr. Bandas?

11      A    I know I didn't sign more than one contract

12  with Mr. Bandas.

13      Q    So this must be the one that you signed, if

14  it --

15      A    Yes, this must be the one.

16      Q    And you signed it two weeks ago, correct?

17      A    I don't know.  They all look -- all this stuff

18  looks the same.  But the contract, yes, I signed the

19  contract about two weeks ago.  I actually signed it

20  anyway.  Like I said, earlier there was a verbal contract

21  that was going on, from the minute that I started talking

22  to Chris.

23      Q    What did that verbal contract consist of?

24      A    That I wasn't going to be responsible to pay

25  them anything, that they would help me understand what

1    was going on and help me know where I was supposed to go

2    to file what I needed to file or, you know, what websites

3    I needed to be looking on, just basically stuff like

4    that.

5         Q    What else was in that verbal contract, as you

6    understood it?

7         A    Those are the points that mattered to me, so

8    that's basically what I paid attention to.

9         Q    And why did you believe there was a verbal

10   contract?

11        A    Because as soon as I told my mom, "I'm going to

12   need y'all's help with this, because I don't understand

13   most of this stuff," and she said, "Chris said that he

14   would help you."

15        Q    And was it your understanding that Mr. Bandas

16   agreed to that verbal contract also?

17        A    Yes, it was.

18             MR. SWALLOW:  I'm going to object.  This is

19   getting into privileged stuff, too.  Are you asking --

20             MR. HUTCHINSON:  The contract is, has been

21   produced and is not privileged.

22             MR. SWALLOW:  But with the attorney-client --

23   yeah, no, with regard to the attorney-client

24   communications.

25             MR. HUTCHINSON:  I'm just asking her what her

1    contract was with Mr. Bandas.

2            MR. SWALLOW:  Okay.

3            MR. HUTCHINSON:  That's fine.  You can make the

4    objection.  I didn't mean to -- it's stated for the

5    record.

6        Q    (By Mr. Hutchinson) All right.  Who drafted

7    this document?

8        A    Who wrote it?

9        Q    Do you know who drafted this contract?

10        A    Bandas Law Firm.

11        Q    Did you draft any part of this contract?

12        A    I did not draft any part of it.

13        Q    Did you make any changes to this contract when

14    you reviewed it?

15        A    I did not.

16        Q    Do you believe this is a true and correct copy

17    of your contract with Mr. Bandas?

18        A    Seems to be my contract.  I just, the only

19    thing that threw me is I thought for some reason that the

20    contract actually said "Contract" at the top, not just

21    "Fee Agreement."

22        Q    Did you read this whole document before you

23    signed it?

24        A    Well, I did, but even reading it just now, I

25    don't understand most of what it's saying.  It would have

1  to be like kind of broken down and explained to me.

2      Q    Did you ask any questions about it before you

3  signed it?

4      A    I did.

5      Q    How many questions did you ask?

6      A    I don't know, just basically, "This isn't going

7  to affect me in a negative way, right?"

8      You know, I'm not in a place where I can afford to

9  pay out money if, you know, something happens or it

10  doesn't go through.  And Mom explained, "No, you -- that

11  you are not responsible for any fees."

12      You know, I don't know quite how Chris gets his

13  payment.  I would assume that they're, he wouldn't just

14  be doing this for free.  But I know that that doesn't

15  come from me.

16      Q    Do you know where this case is pending?

17      A    Georgia.

18      Q    And how do you know that?

19      A    Through stuff that I've read.

20      Q    Do you see the Section 1.1, "Attorney's Legal

21  Services"?

22      A    Yes.

23      Q    Do you see it states, "You agree attorneys

24  will:  Prepare and file on your behalf an objection to

25  proposed class action settlements in the following matter

1    and represent you in any appeal there from, parentheses,

2    the Objection, closed parentheses, Case Number

3    1:15-CV-01156, Steven L. Markos, et al., versus Wells

4    Fargo Bank, N.A.; In the United States District Court for

5    the Northern District of Georgia."  Did I read that

6    correctly?

7         A    Yes, you did.

8         Q    Did you agree to that?

9         A    Yes, I did.

10        Q    Do you know whether Mr. Bandas is licensed to

11   practice law in Georgia?

12        A    I do not know.

13        Q    And can I direct your attention to Section 1.1

14   and the final sentence of Section 1.1 that says, "Client

15   authorizes that attorneys prepare any objections for

16   filing with the Court and, if necessary, any appeals

17   therefrom."  Did I read that correctly?

18        A    Yes.

19        Q    Did you agree to that as well?

20        A    Yes.

21        Q    Is it your understanding that Mr. Bandas agreed

22   to that also?

23        A    It is my understanding.

24        Q    Can I direct you to Section 1.4?

25        A    Yes.

1      Q    Which states, "The scope of our representation

2  is limited.  Although we will craft the legal arguments

3  used in your objection and handle the logistics of filing

4  the objection, Bandas Law Firm will not make any

5  appearance -- I'm sorry -- make an appearance in the

6  District Court, and your objection will be submitted

7  without oral argument at the Fairness Hearing.  You

8  understand and agree that this might affect the chances

9  that the District Court will approve a settlement or fee

10  request over your objection.  In the event of adverse

11  decisions that we believe raises meritorious appellate

12  issues, we will file a notice of appeal on your behalf

13  and either make an appearance or retain an attorney to

14  make an appearance in appellate proceedings."

15      A    Yes.

16      Q    Did I read that correctly?

17      A    Yes, you did.

18      Q    Did you agree to that?

19      A    Yes, I did.

20      Q    Is it your understanding that Mr. Bandas agreed

21  to that also?

22      A    Yes, it is.

23      Q    Did you understand that meant that Mr. Bandas

24  would not make any appearance on your behalf in the

25  District Court for the Northern District of Georgia?

1    A    Yes.  But I also think that's why there's now

2    an attorney in Georgia, so that he can make the

3    appearances that he needs to make.

4    Q    Is it your understanding that Mr. Bandas would

5    be breaking your agreement with him if he made an

6    appearance in the District Court for the Northern

7    District of Georgia?

8    A    If Chris made an appearance?

9    Q    Yes.

10   A    Well, yes.

11   Q    Did Mr. Bandas ever tell you he had any

12   intention to appear in court in Georgia?

13   A    No, he did not.

14   Q    Do you know what pro hac vice means?

15   A    Do what?

16        MR. SWALLOW:  I'm going to object, asked and

17   answered.

18   Q    (By Mr. Hutchinson) Do you know what pro hac

19   vice means?

20   A    I don't even know what you're saying.

21        MR. HUTCHINSON:  The objections are a little

22   bit over the top, Mr. Swallow.

23        MR. SWALLOW:  I think I have to make them for

24   the record.  I'm not --

25        MR. HUTCHINSON:  You can't say something's been

1    asked and answered when it hasn't been asked.

2            MR. SWALLOW:  I think it was pro se.  I'm

3    sorry.  You're right.

4            MR. HUTCHINSON:  Please, just cut down on the

5    objections, Mr. Swallow.

6        Q    (By Mr. Hutchinson) Did Mr. Bandas ever tell

7    you he had any intention to file a pro hac vice

8    application?

9        A    No, he didn't.  But I also believe when I hire

10   an attorney, I am trusting him to make the right choices.

11   And I don't have to talk to him about every little

12   detail.  Like he's saying that he will help me with my

13   objections and he will help me with whatever it is that

14   I'm doing.  He doesn't have -- I don't expect him -- I

15   don't want to know everything necessarily that he's going

16   to be doing, because I don't really -- he has that

17   understanding.  I don't.

18       Q    Did Mr. Bandas ever tell you that he intended

19   to associate with a Georgia attorney?

20       A    Yes, he did.

21       Q    When did he tell you that?

22       A    Um --

23       Q    Was that Wednesday?

24       A    Well, he told me Wednesday that the Georgia

25   attorney had been hired.

82

1       Q    Was that the first time you heard about the

2   Georgia attorney?

3       A    Yes.

4       Q    So Wednesday meeting, just a few days ago this

5   week?

6       A    Yes.  But I also didn't ask him about it

7   either.  And like I said, I don't -- he doesn't need to

8   tell me everything, because I wouldn't understand it

9   probably mostly anyway.

10      Q    Did you ever agree to be represented by a

11  Georgia attorney?

12      A    I agree to do whatever Chris thinks that he

13  needs to do to help me with this.  So if he thought that

14  I needed a Georgia attorney -- and I've told him, "You do

15  what you think is best."  So -- well, I've told my mom to

16  tell him, "Do what you think is best," because I don't

17  understand all of this.

18      So that, I think, would be agreeing to hiring a

19  Georgia attorney, yes.

20      Q    Was that Wednesday when you agreed to be hired

21  by a Georgia attorney?

22      A    No, that was --

23           MR. SWALLOW:  And I'm going to object.  I think

24  we're getting into privileged communications again.

25           THE WITNESS:  I'm having a hard time answering

1    without, without telling you actual conversations.

2           COURT REPORTER:  Without telling you actual

3    what?

4           THE WITNESS:  Without telling you actual

5    conversations that we've had.

6       Q    (By Mr. Hutchinson) Do you believe you agreed

7    in this contract to be represented by a Georgia attorney?

8       A    Yes, I do.

9       Q    What makes you believe that?

10      A    Well, because it's -- hold on.  Let me find it.

11   (Reviewing document.)  Because it says in 5.2,

12   "Association of Co-counsel:  Attorneys may associate

13   lawyers apart from those with Bandas Law Firm, P.C. to

14   assist in representing you.  BLF will be responsible for

15   any attorney fees incurred with any other such lawyer.

16   You authorize BLF to retain any other such lawyers on

17   your behalf."

18      Q    And you agreed to that the first time about two

19   weeks ago; is that right?

20      A    Yes, I did.  Well, signature-wise, yes.

21      Q    Is there any other way that you agreed to it

22   before that time period, besides signing this document?

23      A    I think I have agreed to do whatever he thinks

24   is in my best interests, when I have told him, "Do

25   whatever you think is in my best interests, because I

1    don't understand all of this."

2        Q    So is it your understanding that you authorized

3    Mr. Bandas to do whatever he deems appropriate?

4        A    As long as he thinks it's in my best interests,

5    yes.

6        Q    Aside from that limitation of being in your

7    best interests, is there any other limitation on what

8    you've allowed Mr. Bandas to do on your behalf?

9        A    I wouldn't say so, no.  With my mom being his

10   legal assistant, I have complete trust in my mom.  You

11   trust your mom, right?  I mean, she's not going to allow

12   anything to happen that's going to hurt me.  And

13   everything that he's been doing has basically gone to

14   her, because, you know, her being his legal assistant,

15   she brings it and explains it, and she's not going to

16   allow anything to happen that's going to hurt me.

17       Q    Are you aware that earlier this week, the

18   District Court in Georgia agreed to give Mr. Bandas 15

19   minutes at the Fairness Hearing to present your

20   objection?

21            MR. SWALLOW:  Objection, calls for speculation.

22            THE WITNESS:  I don't know.

23       Q    (By Mr. Hutchinson) Do you know whether

24   Mr. Bandas will appear at the District Court in Georgia

25   to argue on your behalf?

1    A    I don't know.

2    Q    Would you be disappointed if he did not show up

3    to argue on your behalf?

4    A    No, I would not.

5    Q    If Mr. -- why not?

6    A    Well, because he's told me that he's not going

7    to be going to the Fairness Hearing.  I already knew to

8    expect that.

9    Q    Do you know why he's not going?

10   A    No, I do not.

11   Q    If Mr. Bandas did not show up to argue on your

12   behalf and your objection was overruled, would you be

13   disappointed?

14   A    Well, I will probably be disappointed, but it

15   wouldn't be with him necessarily, just the situation.

16   Q    Why wouldn't you be disappointed with him?

17   A    It's not a personal thing.  I believe he's

18   honestly doing what's in my best interest.  And I believe

19   that this is pretty much -- I have a good reason to

20   object, and I think the Judge is going to look at it and

21   go, "Okay, yeah, she has a good reason to object."

22   Q    If the Judge overruled your objection and held

23   that the settlement is fair, adequate and reasonable,

24   would you allow Mr. Bandas to file an appeal on your

25   behalf that could delay or stop payment to everyone in

1  the settlement class?

2      A    If he, if he was doing that, it would be

3  because he would be wanting, trying to get everybody more

4  of the payment.  Right?  I'm trying to understand all the

5  legal stuff.  Again, that's why --

6      Q    I can't tell you what his motivations are.

7      A    Okay.  Well, again, that's why -- I have trust

8  in Bandas.  He needs to do what he needs to do, because I

9  don't -- it's like I'm trying to ask you, I don't

10  completely understand this, and he does.  Which is again

11  why I have an attorney.

12      Q    So my question is, to you, is if the Judge

13  overruled your objection and held that the settlement is

14  fair, adequate and reasonable, would you allow Mr. Bandas

15  to file an appeal that could delay or stop payment to

16  everyone in the settlement class for years?

17          MR. SWALLOW:  Objection, asked and answered.

18          THE WITNESS:  I would agree to do anything that

19  Chris Bandas thinks is in my best interest.

20      Q    (By Mr. Hutchinson) Do you think it would be

21  right for Mr. Bandas to file an appeal if he never

22  appeared at the final Fairness Hearing?

23          MR. SWALLOW:  Objection, argumentative.

24          THE WITNESS:  Again, I think that if he thinks

25  that that's what's best, then yes.

1      Q    (By Mr. Hutchinson) If I can direct your

2  attention to Section 2.1, do you see there's a website

3  listed that's underlined?

4      A    Yes.

5      Q    Www.markoswellsfargotcpa.com?

6      A    (Nodding head.)

7      Q    Do you know whether you ever have been to that

8  website?

9      A    I very well may have.  Again, the e-mails that

10  I had with my, with the law firm, I was able to just, for

11  the websites that I needed to go on, I was just able to

12  click on the link and it would take me up to where I

13  needed to go.  So I didn't really read, because you can

14  tell, like even looking at this whole page, that stands

15  out that that's a website.  So I didn't really read

16  exactly what the website was.

17      Q    So do you know whether you've been to this

18  website?

19      A    Yes.  Yes, I believe I have been to this

20  website.

21      Q    When did you visit that website?

22      A    I would think in November, because I think this

23  is where I had to go -- this is one of the ones where I

24  had -- this isn't about the objection.  This is about the

25  actual case that's going on.

1     Q    Where were you when you looked on that website?

2     A    I can't be sure.  I do all my e-mailing and

3 website stuff on my phone, so I could have been anywhere.

4     Q    So it would have been on your phone?

5     A    Well, it would have been through my phone.

6     Q    Are you responsible for paying Mr. Bandas'

7 attorney's fees in this case?

8     A    I am not.

9     Q    Do you know how he would get paid in this case?

10    A    I do not know.

11    Q    Has Mr. Bandas or anyone else told you that you

12 might get any money for objecting in this case?

13    A    They have not.  Well, that I might get money?

14    Q    Yes.

15    A    I have been told that there's a chance I could

16 get some money from this.

17    Q    Who told you that?

18    A    That's in my objection.

19    Q    If I can point you to Section 3.2, "Incentive

20 Award or Payment."  Do you see that?

21    A    I do.

22    Q    And I want to direct you to the third sentence.

23 It is, starts five lines down, which states, "You

24 understand any incentive award or payment sought will

25 never exceed $5,000."

**89**

1    A    Yes.

2    Q    Do you see that?

3    A    I do see that.

4    Q    Did I read that correctly?

5    A    Yes, you did.  And yes, I was aware of that.

6    Q    And you understand this provision applies no

7    matter how much the Court might decide to pay you?

8    A    Yes.

9    Q    Do you understand that this provision applies

10   no matter how much might be offered to settle your

11   objection?

12        MR. SWALLOW:  Objection, leading.

13        THE WITNESS:  Yes.

14   Q    (By Mr. Hutchinson) Do you understand that if

15   the Court were to award you $100,000, you would receive

16   only $5,000?

17        MR. SWALLOW:  Objection, leading, calls for

18   speculation.

19        THE WITNESS:  That's fine.

20   Q    (By Mr. Hutchinson) Is that your understanding?

21   A    Yes.

22   Q    Do you understand that Mr. Bandas would receive

23   the rest?

24        MR. SWALLOW:  Objection, calls for speculation.

25   Leading.

1           THE WITNESS:  That's fine.

2      Q     (By Mr. Hutchinson) So it's correct you

3  understand he would receive --

4      A     Uh-huh.

5      Q     -- the rest of that money?

6           MR. SWALLOW:  Objection, leading.

7      Q     (By Mr. Hutchinson) That's $95,000, correct?

8      A     Okay.

9      Q     That's 95 percent of $100,000, correct?

10     A     Right now, I'm looking at getting like maybe

11  70.  So to me this is all just extra money.  I really

12  don't -- it doesn't matter to me.  And if this objection

13  works, then there's a chance that I could get even more

14  than just 70 something dollars, because more would go to

15  the people.  So I'm really -- this is more, for me this

16  is more a thing, it all begins with really that I'm just

17  really pissed off at Wells Fargo.  But if it's going to

18  come down to it and there is a settlement, I believe the

19  people should be getting a lot more out of what's being

20  given out.

21     Q     Do you understand that if someone offered you

22  $100,000 and you accepted, you would receive only $5,000?

23           MR. SWALLOW:  Objection, leading.

24           THE WITNESS:  I do understand that.

25           MR. SWALLOW:  And speculation.

91

1    Q    (By Mr. Hutchinson) And do you understand that
2  Mr. Bandas would receive the rest?
3         MR. SWALLOW:  Objection, leading, calls for
4  speculation.
5    Q    (By Mr. Hutchinson) Do you understand that?
6    A    I understand that.
7    Q    So in that case he would receive $95,000 again.
8    A    Okay.
9         MR. SWALLOW:  Objection, leading.
10   Q    (By Mr. Hutchinson) Is that, do you understand
11 that?
12   A    I do.
13        MR. SWALLOW:  Objection, leading.
14   Q    (By Mr. Hutchinson) And that would be 95
15 percent of $100,000.
16   A    Okay.
17   Q    Do you know who Jerome J. Froelich is?
18   A    The name sounds familiar.
19   Q    Do you know who Jerry Froelich is?
20   A    Like personally?
21   Q    Do you know, do you recognize that name at all?
22   A    I'm not sure.
23   Q    Do you know who John Swallow is?
24   A    Yes, I do know.
25   Q    Who's that?

1      A     That's John Swallow.

2            MR. HUTCHINSON:  I'm told the tape is ending

3      soon again.  So it might be a good time to take a break.

4            THE VIDEOGRAPHER:  All right, thank you.  It's

5      12:46 and we're off the record.

6            (Recess from 12:46 p.m. to 12:59 p.m.)

7            (Exhibit 2 marked for identification.)

8            THE VIDEOGRAPHER:  All right.  It's 12:59.

9      We're back on the record.

10     Q     (By Mr. Hutchinson) Hello again, Ms. Yde.  Did

11     you speak to Mr. Swallow during the break?

12     A     I spoke with him.

13     Q     Did you talk to him about this case or this

14     deposition?

15     A     Not really.

16     Q     Is that a yes or a no?

17           MR. SWALLOW:  And I'm going to object to

18     privilege if you have to say anything that was --

19     Q     (By Mr. Hutchinson) You can say whether you

20     spoke with him or not.

21     A     Just kind of -- I mean, I've never been in a

22     deposition before, so it's kind of a -- and I'm sitting

23     at the head of a table with a camera shining at me.  So

24     it makes you kind of nervous.  So more just "you're doing

25     fine" type stuff, not really anything pertaining directly

93

1    to anything.

2        Q    So I've handed to you what's been marked as

3    Exhibit 2.

4        A    Uh-huh.

5        Q    It has a title on the front page, "Objection of

6    Wanda Yde."

7        A    Uh-huh.

8        Q    Do you recognize this document?

9        A    I do recognize this document.

10       Q    What is this document?

11       A    This is my objection.

12       Q    If I can point you to Page 20 of the document,

13   is that your signature on the document?

14       A    Yes, sir, it is.

15       Q    And it has a date, November 22nd.  Do you

16   recall whether that was the date that you signed it?

17       A    Yes.

18       Q    Is this the same document we talked about

19   before that Mr. Bandas' law firm drafted?

20       A    Yes, it is.

21       Q    And that your mother, Jan Petrus, provided to

22   you to sign?

23       A    Yes.

24       Q    While you were working?

25       A    Yes, she brought it by my work for me to sign.

1       Q    If I can -- and you're free to read any portion

2  of the document, but I'm going to have some questions on

3  Page 4.

4       A    Okay.

5       Q    So while my questions will be on that page, if

6  you want to look at any other part of the document to

7  help you answer it, please feel free to do so.

8      So the second full paragraph about two-thirds of the

9  way down states, "Objector is represented by and has

10  sought legal advice and assistance in this matter from

11  Christopher Bandas with the Bandas Law Firm, P.C., Corpus

12  Christi, Texas, parentheses, www.bandas" --

13       A    Typo.

14       Q    -- "larvfirm.com, close parentheses, comma, and

15  this document was prepared with the assistance of

16  counsel."  Did I read that correctly?

17       A    Yes, you did.

18       Q    And is that correct?

19       A    Yes, it is.

20       Q    The next statement, or sentence rather, states,

21  "No special favor or treatment is requested, due to the

22  fact that any document is submitted as pro se."  Did I

23  read that correctly?

24       A    Yes, you did.

25       Q    And we talked about the term "pro se" before,

1   as you recall.

2       A    Yes, we did.

3       Q    Was it your understanding that this document

4   was submitted pro se?

5       A    Yes, it was.

6       Q    And is it also correct that you had retained

7   Mr. Bandas prior to the time that this objection was

8   filed?

9       A    Yes, it is.

10      Q    So my question is if you had retained

11  Mr. Bandas prior to filing the objection, why was this

12  filed pro se?

13           MR. SWALLOW:  Calls for speculation.  Sorry,

14  objection.

15           THE WITNESS:  That's -- well, that's what he

16  recommended.  I'm going off his recommendations.

17      Q    (By Mr. Hutchinson) Besides it being

18  Mr. Bandas' recommendation, do you have any understanding

19  of why this was filed pro se, instead of by your

20  attorney, Mr. Bandas?

21      A    I do not.

22      Q    Why did you choose to proceed pro se?

23      A    That was what was recommended to me by

24  Mr. Bandas.

25      Q    And besides Mr. Bandas' recommendation, did you

1   have any other reason for deciding to proceed pro se?

2       A    No, I did not.

3       Q    If I can direct your attention now to Page 5,

4   the first full sentence that starts on the second line

5   states, "Objector does not intend on appearing or

6   testifying at the fairness hearing either in person or

7   through counsel, but asks that this objection be

8   submitted on the papers for ruling at this time."  Did I

9   read that correctly?

10      A    Yes, you did.

11      Q    Whose idea was it to include that language?

12      A    My attorney's.

13      Q    Do you understand why that language is

14  included?

15      A    I do not.  I will, I feel like you're asking me

16  to make assumptions.

17      Q    I'm just asking.  If you have an understanding,

18  you can answer it.  If not, you just answer truthfully.

19      A    I do not.

20      Q    The next sentence states, "Objector will not

21  call any persons to testify at the Final Approval Hearing

22  in support of the objection."  Did I read that correctly?

23      A    Yes, you did.

24      Q    Whose idea was it to include that language?

25      A    The attorney's.

97

1    Q    Do you have any understanding of why that

2    language was included?

3    A    I do not.

4    Q    I want to direct your attention next to Page

5    21?

6    A    Okay.

7    Q    There is a portion of this document that has

8    the title, Certificate of Service.  And it states, "The

9    undersigned certifies that on November 22nd, 2016, she

10   caused to be served via USPS First Class Mail, postage

11   prepaid, a copy of this Objection and associated exhibits

12   upon the following."

13   And you'll see there's some addresses listed, then a

14   date of November 22nd, 2016, and your signature.  Do you

15   see that?

16   A    I did see that.

17   Q    Did you send copies of this objection to the

18   four addresses that are listed here?  Or did someone else

19   send them?

20   A    I don't know.  It could have been the things in

21   the envelopes that I was sending.

22   Q    So you don't have any recollection as to

23   whether you sent your objection to these four addresses?

24   A    If I didn't, my mom did.  I do recognize this

25   page.

1    Q    If I can continue through the document, you'll

2  see there's an Exhibit A.

3    A    Yes.

4    Q    That has the title, "Declaration in Support of

5  Objections to Class Action Settlement."  On Page 2,

6  there's a signature.

7    A    Yes.

8    Q    And it states, "I declare under penalty of

9  perjury of the laws of the United States of America that

10  the foregoing is true and correct."  Is that your

11  signature?

12    A    That is my signature.

13    Q    Then there is an Exhibit A1, and there is a

14  photocopy.

15    A    That's the card I got in the mail.

16    Q    So did you complete the -- strike that.

17    Is the handwriting that appears here your

18  handwriting?

19    A    Yes, it is.

20    Q    Do you understand what this document is?

21    A    It's the class action suit against Wells Fargo

22  for the automated and text messages, basically to say

23  that I wanted to be part of the case.

24    Q    Do you know whether this was sent back to the

25  claims administrator in this case?

99

1    A    Yes.

2    Q    Did you send it back?

3    A    Yes.

4    Q    So seeing that this paper form was filled out,

5    does that refresh your recollection that you sent in a

6    paper claim form, not a claim form through the settlement

7    website?

8             MR. SWALLOW:  Objection, leading.

9             THE WITNESS:  Really, I remember this because

10   this was like the first thing of it all.  Then after

11   that, like I said, everything moved so quick, and there's

12   a lot of really confusing wording and everything that I'm

13   going through, that I'm just trusting in the attorneys to

14   make sure that I'm doing what I'm supposed to be doing.

15   Q    (By Mr. Hutchinson) Do you see there's a

16   section that says, "Selection of Claim Type," and there

17   are four boxes --

18   A    Yes.

19   Q    -- to select?

20   A    Uh-huh.

21   Q    Do you see that there's no box selected on this

22   claim form?

23   A    Yeah, there wasn't on this one.  I believe I

24   had to go in online, and I think it's the first box that

25   I needed to click on.

1    Q    So I'm just trying to understand, does that

2    mean you didn't send in this paper claim form that's

3    copied here?

4    A    I did, but I think I had forgotten to mark the

5    box.  And so I had -- I think that was what I had to go

6    in and maybe do -- yeah, it is.  This is the one that I

7    had to do by December 22nd.  That was the deadline.  So I

8    had to go back in on the website and do it differently.

9    So I actually did mail this in, but then I forgot to do

10   the box, so I had to go in on the website and check the

11   box.

12   Q    So it's now your recollection that you

13   submitted a paper claim form and a --

14   A    Yes.

15   Q    -- electronic claim form also?

16   A    Yes, because -- yeah, the box.  Yeah.  Sorry.

17   Q    So is it your understanding that at the time

18   this objection was filed, Mr. Bandas had not made an

19   appearance in the District Court in Georgia?

20   A    Yes.

21   (Exhibit 3 marked for identification.)

22        MR. SWALLOW:  Thank you.

23        THE WITNESS:  (Reviewing document.)

24   Q    (By Mr. Hutchinson) I see you're taking some

25   time to review the document, so take as much time as you

101

1    need.

2         A    (Reviewing document.)  Okay.

3         Q    So is it correct that you've never seen this

4    document before?

5         A    I don't, I don't know.  I don't think so.

6         Q    You'll see that the document labeled Exhibit 3

7    has a title, "Offer of Judgment."  It has a name,

8    "Gregory Page, on behalf of herself and others similarly

9    situated, Plaintiff, versus Wells Fargo Bank, N.A.,

10   Defendants."  Do you know who Gregory Page is?

11        A    I do not.

12        Q    I can represent to you that Gregory Page is one

13   of the three named Plaintiffs in this lawsuit and

14   settlement with Wells Fargo on behalf of a class of

15   people.  Do you believe that named Plaintiffs in this

16   case should be compensated for their time in pursuing

17   this case?

18        A    Well, I believe they're the ones that are

19   helping -- they're the ones going against Wells Fargo --

20        Q    Yes.

21        A    -- right?  Okay.  Well, yes, I do believe they

22   should get some sort of compensation.  But not 30

23   percent.

24        Q    What do you believe is a reasonable way to

25   determine how much the Plaintiffs in this case should get

1  paid?

2       A    I don't really know.  I'm not a judge.  But --

3       Q    If I can direct you to the document, it states,

4  "Pursuant to Rule 68 of the Federal Rules of Civil

5  Procedure, Defendant Wells Fargo Bank, N.A., parentheses

6  'Wells Fargo,' close parentheses, hereby offers to allow

7  judgment to be entered in this action as follows:

8       "One, Wells Fargo will cause to be paid to Plaintiff

9  the total amount of $46,501.00, parentheses, which sum

10  will include Plaintiff's attorneys' fees and costs, close

11  parentheses, in satisfaction of the individual claims

12  that Plaintiff has asserted in this lawsuit under the

13  Telephone Consumer Protection Act, 47 USC, Section 227,

14  et seq."  Did I read that correctly?

15       A    Yes, you did.

16       Q    Do you see where it says that Wells Fargo

17  agreed to pay Mr. Page $46,501?

18       A    I do see that.

19       Q    Do you know that Mr. Page declined that offer?

20       A    I do not.

21       Q    Do you understand that if the named Plaintiffs

22  in this case had accepted offers of judgment, this class

23  action would have ended and there would be no settlement?

24       MR. SWALLOW:  Objection, leading.  Calls for a

25  legal opinion.

1    THE WITNESS:  I don't know any of this.

2    COURT REPORTER:  I'm sorry, I can't hear you.

3    THE WITNESS:  I don't know any of this.

4    Q    (By Mr. Hutchinson) Do you believe it's fair to

5    compensate Mr. Page for turning down that amount?

6    MR. SWALLOW:  Objection, leading.  Calls for

7    speculation.

8    THE WITNESS:  Yeah, he's trying to get more

9    money than $46,000, right?

10   Q    (By Mr. Hutchinson) He's asking for 20,000.

11   A    For himself?

12   Q    Yes.

13   A    Okay.  So ask your question again.

14   Q    Do you believe it's fair to compensate Mr. Page

15   for turning down $46,501 so that he could pursue a class

16   action on behalf of everyone who was affected by it?

17   MR. SWALLOW:  Objection, leading, calls for

18   speculation.

19   THE WITNESS:  I think I already said that I

20   think the attorneys should be getting compensation.

21   Q    (By Mr. Hutchinson) Mr. Page isn't an attorney.

22   He's a named Plaintiff in the case.

23   A    The main Plaintiff?  So he's the one who

24   brought all this into effect basically?

25   Q    He's one of three people who put himself out

**104**

1   there and sued Wells Fargo and is the reason why this

2   settlement exists.

3       A    Okay.

4       Q    So I'm asking, do you believe it's fair to

5   compensate Mr. Page for turning down $46,000, over

6   $46,000 to pursue this class action on your behalf?

7           MR. SWALLOW:  Objection, leading,

8   argumentative, calls for a legal opinion.

9           THE WITNESS:  I don't really know.

10          MR. SWALLOW:  Calls for speculation.

11      Q    (By Mr. Hutchinson) You don't know whether it's

12  fair for him to receive anything at all for doing that?

13          MR. SWALLOW:  Objection, leading.

14  Argumentative.  Asked and answered.

15          THE WITNESS:  I think if he wanted it, he would

16  have taken it.  I think he knew that if he took more of

17  the money, that that kind of goes against what he's

18  trying to do.  He wasn't -- to me, if he turned down that

19  much and asked for less, then he's trying to make sure

20  that the rest of the people get more money.  So no, I

21  don't think he wants it.

22      Q    (By Mr. Hutchinson) So you don't think he

23  should get anything?

24      A    Well, no.  I mean --

25          MR. SWALLOW:  Objection, misquotes deponent.

1    THE WITNESS:  Doesn't he get the 20,000?

2  Q (By Mr. Hutchinson) Do you think it's fair for

3 him to get 20,000?

4    MR. SWALLOW:  Objection, leading.  Leading.

5    THE WITNESS:  Seems like a lot, but I'm pretty

6 sure since he's -- I don't -- because again, this is -- I

7 don't understand all this attorney stuff.  I've never had

8 to really hire an attorney to do anything.  So -- but I

9 would assume that since he's one of the three that did

10 this, he's already had money come out of his pocket

11 already to make it happen.  I would assume he already had

12 to pay something.  His situation would be a little

13 different than mine.

14  Q (By Mr. Hutchinson) So you do think it's fair

15 for him to get compensated for what he's done on your

16 behalf in this case?

17    MR. SWALLOW:  Objection, leading.

18    THE WITNESS:  I don't look at it as necessarily

19 getting compensated.  I look at it as him getting paid

20 back.  He already has spent his personal money to do

21 things.  He's already probably lost his house, and now

22 he's spent his own money to make this happen.  So it's

23 like, we, the people, are paying him back for doing all

24 this.  We didn't have to lose any money to make it

25 happen.

1    Q     (By Mr. Hutchinson) So you think that's fair

2   for the people --

3    A     For us to pay him back?  Yes.

4          MR. SWALLOW:  Objection, asked and answered.

5    Q     (By Mr. Hutchinson) So knowing that Mr. Page

6   turned down $46,501 to pursue this class action on your

7   behalf, what do you think is a reasonable amount for him

8   to receive for being one of the Plaintiffs --

9    A     I can't answer that.

10   Q     -- who caused the settlement?

11   A     I don't know how much he spent --

12         MR. SWALLOW:  Objection, calls for speculation.

13         THE WITNESS:  -- to make all this happen.  I

14  don't -- there's a lot of things I don't know, so I could

15  not answer that question.

16   Q     (By Mr. Hutchinson) Given that he turned down

17  over $46,000, do you think $20,000 is a reasonable amount

18  for him to receive?

19         MR. SWALLOW:  Objection, argumentative.

20         THE WITNESS:  That's -- I don't, I don't

21  under -- again, I don't know what all he's done.  I don't

22  know -- yes, he's one of the Plaintiffs that came.  But I

23  don't know what he's done.  I don't know what he's gone

24  through.  I don't know -- I don't know.

25   Q     (By Mr. Hutchinson) Are you aware that the

1  other Class representatives, Steven Markos and Tiffany

2  Davis also stood up for the Class and did not accept

3  substantial offers of judgment?

4           MR. SWALLOW:  Objection, calls for speculation.

5           THE WITNESS:  I do not know.

6      Q    (By Mr. Hutchinson) So you weren't aware

7  that that was the case?

8      A    I don't know.

9           MR. SWALLOW:  Objection, leading.

10          THE WITNESS:  I would, I would think that

11  reading through some of the stuff that I was reading

12  about when I was trying to read about the case, their

13  names would be in it.  But I couldn't tell you if I

14  actually remember that name or don't remember that name.

15     Q    (By Mr. Hutchinson) So you may have read it,

16  but you don't remember?

17     A    Yes.

18     Q    Do you understand that if Wells Fargo offered

19  you $46,501 and you accepted, you would only get to keep

20  $5,000 under your agreement with Mr. Bandas?

21     A    Yes.

22          MR. SWALLOW:  Objection, leading,

23  argumentative, calls for speculation.  Asked and

24  answered.

25     Q    (By Mr. Hutchinson) Do you understand that

1  Mr. Bandas would get the rest, 41,000 --

2       A    Yes, I understand this.

3       Q    Let me, let me finish.  Do you understand that

4  Mr. Bandas would get the rest?

5       A    Yes, I understand.

6       Q    Do you understand that that would be $41,501?

7       A    Yes, I understand.

8       Q    You understand that that's almost 90 percent of

9  the amount that Mr. Bandas would receive?

10      A    Yes, I do understand.

11      Q    Do you believe that's fair?

12           MR. SWALLOW:  Objection, calls for speculation.

13           THE WITNESS:  It's what I've agreed upon, so

14  yeah, it's fair, because it's what I've agreed upon.

15      Q    (By Mr. Hutchinson) Do you agree that attorneys

16  should get paid a fair percentage of the amounts that

17  they recover for their clients?

18           MR. SWALLOW:  Objection, calls for speculation,

19  legal opinion, leading.

20           THE WITNESS:  I think they should get

21  compensation.  Ask your question again, please.

22      Q    (By Mr. Hutchinson) Do you agree that attorneys

23  should get paid a fair percentage of the amounts that

24  they recover for their clients?

25           MR. SWALLOW:  Objection, leading.  Calls for

1    speculation.

2             THE WITNESS:  Yes, I do.

3        Q    (By Mr. Hutchinson) How much do you think that

4    Mr. Bandas should receive for his participation in this

5    case?

6        A    I have no idea.

7        Q    If the Court decided that Mr. Page should get

8    $20,000 for his participation in this case, would you

9    personally be okay with that?

10            MR. SWALLOW:  Objection, calls for speculation.

11            THE WITNESS:  I don't know.

12       Q    (By Mr. Hutchinson) Why not?

13       A    Because again, there's a lot of things I don't

14   really know.  I don't know how much -- I know that

15   attorneys are expensive.  I know, you know, I'm guessing

16   that he had to do some investigating himself, and I don't

17   know what he's -- I don't know what time he's put into

18   this.  I don't know how much money he's put into this.

19   There's a lot of information I don't know to make that

20   decision of whether or not --

21       Q    Knowing what you know now, if the Court

22   ordered --

23       A    But I really don't really know anything.

24       Q    Well, you know that he turned down a

25   substantial offer of judgment, and you know that the

**110**

1    other Plaintiffs did so as well; is that correct?

2          A     I do.

3          Q     So knowing what you know -- and you know that

4    he and the other Plaintiffs are the reason why there's a

5    settlement.  If they weren't Plaintiffs in the case,

6    there wouldn't be a settlement.

7          A     I understand that.

8          Q     So knowing those things, and if the Court

9    decided that $20,000 was a fair and adequate and

10   reasonable amount to pay them, I'm just asking you

11   personally if you would be okay with that.

12               MR. SWALLOW:  Objection, asked and answered.

13               THE WITNESS:  Yeah, I've answered that already.

14         Q     (By Mr. Hutchinson) What's your answer?

15         A     That I don't know a lot of information, so I

16   couldn't honestly answer that.

17         Q     So you have no opinion on that one way or the

18   other?

19         A     I do not.

20         Q     So you have no opinion on what an appropriate

21   amount would be for any Plaintiff in this case to receive

22   as an incentive award; is that correct?

23         A     Again, I do not.

24               MR. SWALLOW:  Object, misquotes the deponent.

25               THE WITNESS:  But that's not why I'm objecting.

1   I'm objecting because no matter what the people get, what

2   I'm thinking is that the attorneys getting 30 percent of

3   it is a lot for something that y'all do all the time.

4       Q    (By Mr. Hutchinson) So you don't care about

5   what the named Plaintiffs get.  You care about what the

6   attorneys get; is that correct?

7              MR. SWALLOW:  Objection, argumentative.

8              THE WITNESS:  I don't think -- and also with

9   them turning down getting $46,000, I don't think that

10  they were really in this for the money.  I think that

11  they feel somewhat like I do and they're just pissed off

12  at Wells Fargo and they just want to see them pay for

13  what they've done.

14      Q    (By Mr. Hutchinson) And they've done that,

15  right, by forcing Wells Fargo to pay about $15 million?

16             MR. SWALLOW:  Objection, calls for speculation.

17             THE WITNESS:  Yes.

18      Q    (By Mr. Hutchinson) Don't you think that

19  deserves some --

20      A    I don't think --

21      Q    -- recognition?

22      A    I don't really think that's my decision to

23  make.

24      Q    It's the Court's decision, right?

25      A    It is the Court's decision.

1     Q    So if the Court makes that decision, you would

2  be fine with it, right?

3              MR. SWALLOW:  Objection.

4              THE WITNESS:  I guess I would have to be.

5  Can't do anything to change it.

6     Q    (By Mr. Hutchinson) You wouldn't appeal that if

7  the Court decided to give them $20,000 and hold up the

8  entire settlement for everyone else, would you?

9              MR. SWALLOW:  Objection, calls for speculation.

10  Misquotes deponent.

11             THE WITNESS:  It's not something that I've

12  talked about with my attorney, so I don't really

13  understand this.  I don't, I don't think it's fair to

14  answer questions on something I don't understand.

15    Q    (By Mr. Hutchinson) You, this objection has

16  your name on it.

17    A    Yes.

18    Q    Correct?

19    A    But this is a little different.

20    Q    It doesn't have any attorney's name on it,

21  correct?  Right?

22    A    Right.

23    Q    It's your objection.

24    A    Yes.

25             MR. SWALLOW:  Objection, argumentative.

1    Q    (By Mr. Hutchinson) So I'm asking, this is

2    your, your opinion.  And if the, if the Court decided to

3    give the named Plaintiffs in this case $20,000, would you

4    want to appeal that and stop the settlement for everyone

5    who's a part of the Class because of that?

6         MR. SWALLOW:  Objection, calls for speculation.

7    Asked and answered.

8         THE WITNESS:  I don't really know.

9    Q    (By Mr. Hutchinson) Why not?  Would you have to

10   ask Mr. Bandas to decide?

11   A    No, I wouldn't have to ask Mr. Bandas to

12   decide, but I would want to know more information of what

13   these guys actually put into the case.  I would have

14   questions to ask before I would make a decision on how I

15   felt about it.

16   Q    Is there any information that would satisfy you

17   to make that determination?

18   A    They could have spent $10,000 on attorneys.

19   That's real easy to do real fast.

20   Q    So you would only think it would be appropriate

21   if they spent money out of pocket?

22        MR. SWALLOW:  Objection, calls for speculation.

23        THE WITNESS:  I do think that they should

24   probably get more than everybody else, because they're

25   the ones who have gone through the headache of dealing

**114**

1   with everything that they had to deal with.  I'm sure

2   that they've probably had to pay money out of their own

3   pockets to make this happen, whereas me, I got a card

4   sent to me in the mail.  I checked a box.

5        Q    (By Mr. Hutchinson) Yeah.

6        A    I'm not really in it for the money.  I don't --

7   not -- I don't really have an opinion, I guess, on how

8   much I get or really care.  But I don't -- it's making it

9   hard to think, because I don't, it's confusing to me.

10       Q    If you were a named Plaintiff in a lawsuit,

11  someone offered you $46,000, and you turned it down and

12  went forward in a lawsuit, what do you think would be a

13  fair amount for you to ask for?

14            MR. SWALLOW:  Objection, calls for speculation.

15            THE WITNESS:  I would want back at least what I

16  put into it.

17       Q    (By Mr. Hutchinson) 46,000?

18       A    No.

19            MR. SWALLOW:  Objection, calls for speculation.

20            THE WITNESS:  Just want what I put into it.

21       Q    (By Mr. Hutchinson) You would only want what

22  you paid out of pocket, nothing else?

23       A    Yeah, because I don't -- like I said, I don't

24  think that he's, I don't think that any of them are

25  necessarily doing this because they wanted to get a whole

**115**

1    bunch of money.  Otherwise they would have kept the

2    46,000.  I think that they're like me and they're pissed

3    off at Wells Fargo, and they just wanted to see something

4    happen.  I kind of feel like you're asking me the same

5    questions in multiple different ways.

6         Q    You can put that document aside.

7         (Exhibit 4 marked for identification.)

8         A    (Reviewing document.)  Okay.

9         Q    Have you seen this document before?

10        A    I have not, I don't think.

11        Q    This document, Plaintiffs Exhibit 4 is titled

12   "Notice of Deposition of Wanda Yde."  Let's see, on the

13   second page, it has a date of January 5th, 2007 (sic).

14   You'll see, there's -- towards the end, there's an

15   Exhibit 1, and there's a title "Documents to be Produced"

16   that has four categories of documents.  Do you see those?

17        A    Where are we at?

18        Q    On the last page.

19        A    Okay.

20        Q    Have you ever seen this list of four categories

21   of documents to be produced before?

22        A    I have not.

23        Q    Did anyone ever ask you to look for documents

24   responsive to this list?

25        A    We talked about whether or not I had any of the

**116**

1   text messages or anything like that, yes.

2       Q    But you never saw this list at all before --

3       A    I did not.

4       Q    -- to see the categories?  Were you asked to

5   look for documents in this case?

6       A    Yes.

7       Q    The first category says, "All documents that

8   identify or evidence the date on which you retained

9   Christopher Bandas, John Swallow, John (sic) Froelich or

10  any other attorney acting on your behalf in this

11  litigation."  Do you see that?

12      A    Yes, and I can't produce that because that was

13  a text message with my mother, and I don't have that

14  phone anymore.  I got a new phone since then.

15      Q    So you have text messages that are responsive

16  to this, but you say you don't have the phone anymore?

17      A    I don't have -- yeah, I don't have the phone.

18      Q    Are there any other documents that are

19  responsive to this?  You say you have e-mail

20  communications with your mom also?

21      A    I was going to say, would that include the

22  e-mail to the websites?

23      Q    Did you search e-mails between you and your mom

24  also to respond to this?

25      A    I have.

1    Q    You did search them?

2    A    I have searched them.

3    Q    Did you provide those documents to your

4    attorneys?

5    A    I have provided those to my attorneys.  Wait.

6    Q    Did you provide any other documents?

7    A    Wait, wait, wait.

8         MR. SWALLOW:  You can go ahead.

9         THE WITNESS:  I think -- well, we're --

10   we've -- okay, so we've talked about the e-mails and

11   stuff.  But as far as actually going on and printing them

12   out and putting them in their hands, that has not

13   happened at this point.  But it is happening when this is

14   done here.

15   Q    (By Mr. Hutchinson) So you're going to go back

16   and find those?

17   A    Yeah, I have them.  I just have to give them --

18   we just have to print them out.  And I don't have access

19   to printing them out.

20   Q    But no one ever asked you to look for those

21   communications between yourself and your attorneys

22   before?

23        MR. SWALLOW:  Objection, misquotes deponent.

24   Q    (By Mr. Hutchinson) Before Wednesday?

25   A    Yes.  But I'm sure that because -- if they're

1   between me and my mother, she would -- she knew already.

2   So why would they need to ask me?  She would already be

3   able to answer that question for Chris.

4       Q    I can't answer that question, if you have

5   questions.

6       Category 2, "All documents that identify or evidence

7   the date of the first meeting or discussion between you

8   and Christopher Bandas, John Swallow, Jerome Froelich or

9   any other attorneys acting on your behalf in this

10  litigation."  Did you look for documents in response to

11  this category?

12      A    Yes, but I don't have any documents for that.

13      Q    Category 3, "All documents evidencing any past

14  or future payments by Christopher Bandas, John Swallow,

15  John (sic) Froelich, or any other attorney acting on your

16  behalf in this litigation, to you for or related to this

17  litigation, including all documents reflecting any

18  promises or representations regarding payment or anything

19  of value for objecting in this litigation."  Did you look

20  for documents responsive to this category?

21      A    Is that what -- does that mean like proof of me

22  doing filing for them?

23      Q    I'm asking if you asked for any documents that

24  you believe are responsive to this.

25      A    Well, in order for me to do them, I would just

1   have to go back to my mom -- if that's what it's talking

2   about, I'd have to go back to my mom and be like, "Hey,

3   can you look in your books and pull out the check stubs

4   or whatever from the checks that you paid me?"  So again,

5   I don't think that my mom would have bothered me with

6   that.  She would have just done it and given it to them.

7        Q    So it's correct that there are documents

8   showing payments by Mr. Bandas to you?

9        A    Well, there's paychecks from me doing filing

10  for him.

11       MR. SWALLOW:  And Danny, I'm going to object to

12  mis-, actually misrepresents what's here, sir.  It says

13  "for or related to this litigation."

14       MR. HUTCHINSON:  I'm asking her questions, and

15  she's responding to them.

16       MR. SWALLOW:  Okay.  No, I understand.

17       THE WITNESS:  But I don't understand.  But I'm

18  telling you, I don't understand what's in here.

19       MR. HUTCHINSON:  You can't -- stop.  Wait.  I'm

20  sorry.  I'm sorry.  You can't put words in the witness's

21  mouth and make speaking objections.

22       THE WITNESS:  But I had already said that

23  anyway before he said anything.

24       MR. SWALLOW:  And I'm objecting that you're

25  misquoting, misrepresenting the document.  It's an unfair

1    question for that reason.

2              MR. HUTCHINSON:  Did I say anything incorrect?

3              MR. SWALLOW:  You referenced the document, yes,

4    correct.

5              MR. HUTCHINSON:  I read the entire contents of

6    the document here word for word, Counsel.

7              MR. SWALLOW:  And you did not read that part.

8              THE WITNESS:  And I told you I didn't

9    understand it.

10             MR. HUTCHINSON:  Do you want to go back and

11   look at it yourself?  Do you want, do you want to put

12   that to the test?

13             MR. SWALLOW:  I'm just going to -- I made my

14   objection.  I believe I'm correct.

15             MR. HUTCHINSON:  We can stop and you can read

16   it if you'd like to.  If you're sure, let's go back and

17   read it.

18             MR. SWALLOW:  For what purpose?

19             MR. HUTCHINSON:  Well, for the purpose of not

20   having you make extraneous objections that are slowing us

21   down, that are improper.

22             MR. SWALLOW:  It was a good faith objection.

23             MR. HUTCHINSON:  Can you read the last

24   question?

25             I know you were responding before your Counsel

1    interrupted with objections.

2            COURT REPORTER:  The one where you were reading

3    or --

4            MR. HUTCHINSON:  Whatever the last question

5    was, let's read it, so we can have that.

6        (Court reporter read back question.)

7            COURT REPORTER:  Do you want the answer also?

8            MR. HUTCHINSON:  I don't believe she was done

9    yet, so if you have something more to say --

10           MR. SWALLOW:  That was my objection, that it

11   was --

12           THE WITNESS:  There are payments --

13           MR. HUTCHINSON:  I was --

14           THE WITNESS:  -- that are completely unrelated

15   to this litigation, from when I did filing for his

16   company.

17           MR. HUTCHINSON:  Counsel, I'm just -- I'm going

18   to call the Court if you make another objection like

19   that.  I wasn't quoting anything.  I asked a question.

20   She was in the process of answering it.

21           MR. SWALLOW:  Okay.

22           MR. HUTCHINSON:  You can't do a speaking

23   objection.  And I will call the Court next time if it

24   happens again.

25           MR. SWALLOW:  Okay.

1    MR. HUTCHINSON:  Because it's just not proper.

2    MR. SWALLOW:  Okay.

3    Q    (By Mr. Hutchinson) Are there any other

4  documents that you believe may be responsive to this

5  request that exists?

6    A    No, I do not.

7    Q    The next category states, "Documents sufficient

8  to show any familial, professional or employment

9  relationship between you and Christopher Bandas, John

10  Swallow, Jerome Froelich, or any other attorney acting on

11  your behalf in this litigation."  Did anyone ever ask you

12  to look for this category of documents?

13    A    Nobody -- no.  The only documents I was asked

14  to look and see if I still had was text messages and

15  e-mails.

16    Q    So you never looked for anything in this

17  category of documents; is that correct?

18    MR. SWALLOW:  Object, misquotes deponent.

19  Leading.

20    THE WITNESS:  I don't understand these things.

21    Q    (By Mr. Hutchinson) I'm just asking whether you

22  looked --

23    A    I can't answer --

24    Q    -- for anything --

25    A    -- what I don't understand.

1    Q    I'm just asking you whether you looked for

2    anything that shows a familial, professional or

3    employment relationship between you and Mr. Bandas.

4    A    Okay.  Would "employment relationship to

5    Christopher Bandas" mean his firm, or him personally?  I

6    don't understand these questions.  Because if that's the

7    case, then why would they need to ask?  They know my mom

8    is a part of his employment.  So I don't under- -- I

9    don't feel like I can answer what I don't understand.

10   Q    So Mr. Bandas had all these documents at his

11   disposal.  He could have gotten them easily any time he

12   wanted.  Is that your understanding?

13   A    I don't know, because I don't understand

14   these -- I don't understand this.  I would need to go

15   over this with my attorney and have this explained to me,

16   what it is that it's asking for, because this is just --

17   I don't understand this.

18   Q    But no one's asked you to look for these

19   categories of documents so far?

20        MR. SWALLOW:  Objection, misquotes deponent.

21        THE WITNESS:  I don't know.

22   Q    (By Mr. Hutchinson) You don't know?

23   A    I don't know, because I don't understand this.

24   Q    Have you ever provided to your attorneys any

25   documents showing any familial, professional or

124

1   employment relationship with Mr. Bandas?

2       A    I have not provided any.

3       Q    And as far as you know, your attorneys haven't

4   provided any of those documents to Class Counsel in this

5   case?

6       A    I don't know what they've done with that.

7       Q    Okay.  So you have had employment relationships

8   with the Bandas Law Firm; is that correct?

9       A    Completely unrelated to this litigation, yes.

10      Q    And you received payment from the Bandas Law

11  Firm, correct?

12      A    Completely unrelated to this litigation, yes.

13      Q    And there are documents that show that?

14      A    I'm sure that there are check stubs completely

15  unrelated to this litigation, getting paid for filing,

16  long before any of this even came up.

17      Q    So check stubs?  Do you get a W-2 from the

18  Bandas Law Firm?

19      A    No, because I haven't -- and I don't know if

20  it's the same everywhere, but in the State of Texas, if

21  you're not paid over a certain amount of money, you don't

22  have to pay into taxes.  So I never -- it was only like

23  maybe a total of, in a year, of maybe $600.  Or it

24  wasn't -- there's not -- it wasn't very, it wasn't very

25  much money.  Like I said it was maybe minimum wage that I

1   was paid for filing that took a few hours.

2       Q    Did you get some proof that would go to the

3   government, a W-2 or a 1099, to show proof of payment?

4       A    No, because I was contracted out.  You don't

5   have to get that.

6       Q    So there was no reporting that occurred for

7   your employment with Mr. Bandas to anyone?

8       A    Well, I'm sure that -- I can't tell you what --

9            MR. SWALLOW:  Objection, calls for speculation.

10           THE WITNESS:  Yeah, I can't tell you what

11  Bandas Law Firm does.

12      Q    (By Mr. Hutchinson) There was no reporting --

13      A    I would guess that they reported stuff to their

14  tax people, but I am not a part of that, so I don't know

15  what their tax accountant does.

16      Q    So there was no reporting to you in the form of

17  a W-2 or 1099.  I'm just trying to understand if he

18  reported that money that was paid to you.

19      A    Well, Mom, Mom told me that they were going to

20  have to report their stuff with their taxes, that, and

21  that we weren't going to go, you know, that she could

22  help me out a little bit with, you know, get -- doing

23  birthday stuff and Christmas, that she would give me some

24  work to do with filing, but that we weren't going to go

25  into where if they had to pay -- like if we had to pay

1   taxes or I had to pay taxes.  It was just going to be a

2   little bit of help.

3       Q    Is there anything in your possession at any

4   point in time that showed you were employed by

5   Mr. Bandas?

6       A    I don't know if, in my opinion, I was really

7   employed by Mr. Bandas.  I mean I did filing, but I don't

8   know.  I'm sorry.  I'm not trying to be like --

9       Q    Well, what do you think employment is, Ms. Yde?

10  What's your definition of employment?  So I understand.

11      A    Well, when you fill out --

12      Q    If you say you're not employed, I just want to

13  understand.

14      A    Well, but if I go and I mow my neighbor's yard

15  and they pay me for that, I don't fill out a W-2 for

16  that.  You know, or if I go clean a business or

17  something, I don't always do a W-2 for that.  You're

18  just -- I mean, you don't, you don't always have to do a

19  W-2, if it's going to be a one-time thing, if you're

20  expecting it to be a one-time thing.  These weren't --

21  this wasn't, wasn't like I was clocking in and coming in.

22  This was just if I wanted to do it or if I didn't want to

23  do it.

24      Q    Okay.  Besides the documents we've discussed,

25  what other documents would show your employment

1   relationship with the Bandas Law Firm?

2        A    I don't know.

3        Q    And you have a familial relationship with

4   Ms. Jan Petrus, correct?

5        A    I have a what?

6        Q    A familial relationship.  She's part of your

7   family.  She's your mom?

8        A    She's my mom.

9        Q    So there are documents that show she's your mom

10  also.

11            MR. SWALLOW:  Objection, calls for speculation.

12       Q    (By Mr. Hutchinson) Including, for example,

13  your birth certificate, I assume.  Correct?

14       A    Yeah.

15       Q    Yeah.  And there are other documents that show

16  she's your mom also, right?  You don't have to speculate

17  that there's a document somewhere that proves she's your

18  mom, right?

19       A    Well, I know there is a birth certificate, but

20  really I don't know if there would be anything else that

21  would show she was my mom.

22       Q    You don't think there's any document anywhere

23  else that would show she was your mom, except your birth

24  certificate?

25            MR. SWALLOW:  Objection, argumentative, asked

1   and answered.

2       Q    (By Mr. Hutchinson) If your birth certificate

3   was destroyed, would no one know that she's your mom?

4       A    Then you'd have to get ahold -- I don't know

5   enough about any of that to answer that.  But I would

6   just get ahold of the court and get another birth

7   certificate.

8           MR. HUTCHINSON:  Okay.  So those are all the

9   questions that I have.  I know that there are some folks

10  on the line, including Mr. Lynch of Wells Fargo.  I don't

11  know if anyone else has questions.

12          MR. LYNCH:  This is John Lynch for Wells Fargo,

13  and I do not have any questions.

14          MR. HUTCHINSON:  All right.  So with that, I

15  believe we're wrapped up.

16          MR. SWALLOW:  Give me, give me a quick break.

17  I think -- I don't think I have any questions, but I just

18  want to talk to my client for a second.  Can we take a

19  quick break, go off the record?

20          MR. HUTCHINSON:  Then we'll stop the deposition

21  and close it.

22          MR. SWALLOW:  Yeah, we'll come back and we'll

23  just stop it.  Yeah.  I don't think I have any questions.

24  I just want to take a quick break, look over my notes and

25  make sure.  Is that all right?  Do you mind hanging on

**129**

1  five minutes?

2          MR. HUTCHINSON:  See you in five minutes.

3          THE VIDEOGRAPHER:  All right.  It's 1:50.

4  We're off the record.

5      (Recess from 1:50 p.m. to 1:57 p.m.)

6          THE VIDEOGRAPHER:  All right.  It's 1:57.

7  We're back on the record.

8          MR. SWALLOW:  John Swallow, no questions.  We

9  can go off the record.

10          MR. HUTCHINSON:  Thank you for your time, Ms.

11  Yde.

12          THE WITNESS:  Thank you.

13          THE VIDEOGRAPHER:  All right.  It's 1:58.

14  We're off the record.

15      (Deposition concluded at 1:58 p.m.)

16

17

18

19

20

21

22

23

24

25

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION


STEVEN L. MARKOS, TIFFANY      §
DAVIS, AND GREGORY PAGE, ON    §
BEHALF OF THEMSELVES AND ALL   §
OTHERS SIMILARLY SITUATED,     §
                               §
      Plaintiffs,              §    CASE NO.
                               §    1:15-cv-01156-LMM
VS.                            §
                               §
WELLS FARGO BANK, N.A.,        §
                               §
      Defendant.               §
```

- - - - - -

REPORTER'S CERTIFICATION

DEPOSITION OF WANDA YDE

JANUARY 14, 2017

- - - - - -

    I, MOLLY CARTER, Certified Shorthand Reporter in and

for The State of Texas, hereby certify to the following:

    That the witness, WANDA YDE, was duly sworn and that

the transcript of the deposition is a true record of the

testimony given by the witness;

    I certify that pursuant to FRCP Rule 30(e)(1), that

the signature of the deponent was not requested by the

deponent, nor a party; therefore, the signature is

waived.

    That pursuant to information given to the deposition

officer at the time said testimony was taken, the

1  following includes all parties of record and the amount

2  of time used by each party at the time of the deposition:

3      MR. DANIEL M. HUTCHINSON, Counsel for Plaintiff

4  (02:45)

5      MR. AARON D. RADBIL, Counsel for Plaintiff (00:00)

6      MR. ALEXANDER BURKE, Counsel for Plaintiff (00:00)

7      MR. JOHN C. LYNCH, Counsel for Defendant (00:00)

8      MR. JOHN P. SWALLOW, Counsel for Objector (00:00)

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties in the

11  action in which this proceedings was taken; and further,

12  that I am not financially or otherwise interested in the

13  outcome of the action.

14      Certified to by me on this 15th day of January

15  2017.

16

17

18  _____
    MOLLY CARTER, CSR, RPR, CRR

19  CSR NO. 2613, Expires 12-31-17

20

21

22

23

24

25

## CLASS ACTION OBJECTOR FEE AGREEMENT

This agreement ("Agreement") is made between WANDA YDE ("Client(s)" or "you") and BANDAS LAW FIRM, P.C. (hereinafter "Attorneys" or "BLF").

In consideration of the mutual promises contained herein, Client(s) and Attorneys agree as follows:

1.     SCOPE AND METHOD OF REPRESENTATION

    1.1    **Attorneys' Legal Services.** You agree Attorneys will: Prepare and file on your behalf an objection to proposed class action settlements in the following matter and represent you in any appeal there from (the "Objection"): Case No. 1:15-cv-01156; *Steven L. Markos, et al v. Wells Fargo Bank, N.A.*; In the United States District Court for the Northern District of Georgia.

    1.2    **Method of Representation.** BLF is a Texas law firm located at 500 N. Shoreline, Suite 1020, Corpus Christi, Texas 78401, (361) 698-5200. Our lawyers are licensed in Texas and in certain federal courts. However, if necessary, Attorneys will seek admission before the Court *pro hac vice* and/or as required by the applicable federal and/or state and/or local rules of practice applicable this litigation and/or will seek to associate local counsel in order to effectuate this representation in compliance with any such rules. Attorneys may also advise, for purposes of cost efficiencies, that client file an objection under client's signature with disclosure to the Court that Attorneys assisted Client under ABA Formal Opinion 07-446. Client authorizes that Attorneys prepare any Objection(s) for filing with the Court and, if necessary, any appeals there from.

    1.3    **Purpose of Representation:** As a member of the above referenced class, your legal rights are affected by the proposed settlement in that case. As a class member, you have the right to comment and object to the proposed settlement as prescribed by the Court in the notice of proposed class action settlement and Rule 23 of the Federal Rules of Civil Procedure. As a class member, you have the right to seek legal advice and have a lawyer represent you with respect to making any comments or objections to the proposed settlement. You acknowledge that, prior to the execution of this agreement, you contacted me seeking legal advice about your rights and options as a class member. You further acknowledge the following: (1) that you were not solicited by me or any other lawyer; (2) you have not been paid or promised any money, incentive or any other consideration to assert your rights as a class member with an interest in the proposed settlement; and (3) you authorize the disclosure of this fee agreement to the Court or any counsel in the case if requested.

    1.4    The scope of our representation is limited. Although we will craft the legal arguments used in your objection, and handle the logistics of filing the objection, Bandas Law Firm will not make an appearance in the district court and your objection will be submitted without oral argument at the fairness hearing. You


EXHIBIT

understand and agree that this might affect the chances that the district court will approve a settlement or fee request over your objection. In the event of adverse decisions that we believe raises meritorious appellate issues, we will file a notice of appeal on your behalf, and either make an appearance or retain an attorney to make an appearance in appellate proceedings.

2.    YOUR REPRESENTATIONS AND DUTIES AS AN OBJECTOR

2.1    You represent that you are a member of the proposed settlement class based upon your review of the class definition contained in the class notice you have reviewed at the following website: http://www.markoswellsfargotepa.com/

2.2    If requested, you represent you can demonstrate you are a member of the settlement Class through documentation or by affidavit.

2.3    In return for your agreement and representations made herein, attorneys agree that no settlement or resolution will be made of your objection or any appeal there from without your prior approval and you shall retain the right to determine whether to proceed with this objection or any appeal there from, including the right to approve any settlement or resolution of same.

3.    ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO YOU

3.1    Class Action Settlement:  If the proposed class action settlement is approved by the Court, you will receive the full amount of any benefits you are entitled to receive under the settlement as a class member (If a Claim is required you will usually need to file a claim to receive benefits; Attorneys may assist you in filing a claim, but they are not required to do so).  Attorneys shall not be entitled to receive any portion of your share of the benefits under the class settlement and have no interest in any benefits you may be entitled to receive as a class member.  You understand that by objecting to this particular settlement you may make your receipt of benefits under this particular settlement less likely in the event a court rejects the settlement based upon the arguments asserted by Attorneys on your behalf.

3.2    Incentive Award or Payment: Attorneys may petition the Court for a payment to you, or may ask class counsel or defendant(s) to make a payment to you, in recognition of your service as an objector and/or for other factors related to your service as an objector.  This is referred to herein as an Incentive Award or Incentive payment.  You understand any incentive award or payment sought will never exceed $5,000.  You understand that it cannot be determined with certainty in advance whether you will qualify for an incentive payment or award at all. You understand that Attorneys must follow all applicable laws and rules (including but not limited to seeking court approval, if applicable) as it may apply to incentive payments and awards, and such laws and/or rules may prevent or limit Attorneys' ability to obtain such an incentive award or payment for you.  No incentive award or payment has been promised to you, and your service as an objector in this case is

not conditioned on your receipt of any incentive payment or award. In the event an incentive award or payment is not made, you will receive only the benefits set forth in section 3.1, if any.

3.3    Attorneys' Fees: You will not be responsible to pay attorneys' fees or expenses of any kind. Attorneys are not sharing any portion of your recovery under paragraphs 3.1 or 3.2 above, if any, and Attorneys have no contingent interest in your recovery under paragraphs 3.1 and 3.2 above. Attorneys are not sharing, and cannot share, any attorneys' fees they might earn in this case with you. You agree Attorneys may seek and/or receive a fee for their services if they are successful in pursuing an objection to the class settlement or any appeal therefrom if agreed to by opposing counsel and/or awarded by the Court, subject to applicable rules and laws. The attorneys' fees will be paid by the defendants and/or as part of the attorneys' fees awarded to class counsel and/or by award of the Court, and never from your portion of any recovery or settlement under paragraphs 3.1 or 3.2. You acknowledge you do not have any interest in any such fees, if any. You further acknowledge the attorneys' fees may substantially exceed any awards or payments to you as set forth above in Paragraphs 3.1 through 3.2.

4.    CONFLICTS OF INTEREST

Attorneys have explained and you understand that, if successful, the objection or any appeal there from may result in the disapproval or rejection of the proposed settlement which may, in turn, cause you to lose your right to receive settlement benefits under the proposed settlement, to which you object. You acknowledge and agree to this risk and waive any conflict of interest arising from the objection or any appeal there from.

5.    ADMINISTRATIVE MATTERS

5.1    Termination: Attorneys reserve the right to withdraw from this matter if you fail to honor this Agreement or for any reason permitted or required under the rules of the court or state in which the class action is pending.

5.2    Association of Co-counsel: Attorneys may associate lawyers apart from those with Bandas Law Firm, P.C. to assist in representing you. BLF will be responsible for any attorneys fees incurred with any other such lawyer. You authorize BLF to retain any other such lawyers on your behalf.

5.3    No Guaranty of Results: Attorneys will use their best efforts in representing you in this matter, but we cannot guarantee the outcome of any given matter. You acknowledge Attorneys have made no promises or guarantees concerning the outcome of this matter, and nothing in this agreement shall be construed as such a promise or guarantee.

5.4    Entire Agreement: This Agreement contains the entire agreement between us regarding this matter and the fees, expenses and payments relative thereto. This

Agreement shall not be modified except by written agreement signed by both parties.

I certify and acknowledge that I have had the opportunity to read this Agreement, that I have voluntarily entered into this Agreement fully aware of its terms and conditions, and that I have received a copy of this Agreement.

Effective date:  November 20, 2016

Client(s):

_Wanda Yde_

Wanda Yde

Attorneys:

_Christopher A. Pandas_

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| Steven L. Markos, Tiffany Davis, and Gregory Page, on behalf of themselves and all others similarly situated, | Case No. 1:15-cv-001156-LMM |
| Plaintiffs, | |
| v. | |
| Wells Fargo Bank, N.A. | |
| Defendant. | |

## OBJECTION OF WANDA YDE



1

# INTRODUCTION

This is a class action lawsuit brought against Wells Fargo by 3.3 million class members[1] who received automated phone calls from Wells Fargo in violation of the Telephone Consumer Protection Act ("TCPA"). 47 U.S.C. § 227.

The Markos' complaint was filed on April 4, 2015.[2] Just nine months later on January 25, 2016 the parties executed a memorandum of understanding,[3] and then executed a settlement agreement on June 10, 2016.[4]

The settlement provides a non-reversionary settlement fund of $16.4 million, from which class counsel seek $4.9 in attorneys' fees and costs, or 30% of the gross fund. The actual cash that will be distributed to the class after deduction of $4.9 million in attorneys' fees, $60,000 in incentive payments, and perhaps $1 million or more in settlement administration and notice costs,[5] will likely be around $10.4 million.[6]

---

[1] Plaintiffs' Unopposed Motion to Modify the Preliminary Approval Order, ECF Doc. 46, at 2 (noting that "Class Counsel and Defendant have worked diligently with the Court-approved Settlement Administrator to: . . . verify and process contact information for the approximately 3,316,666 persons who compromise the Settlement Class").

[2] Class Action Complaint, ECF Doc. 1.

[3] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, ECF Doc. 51-1, at 6 (citing Hutchinson Declaration).

[4] *Id.* at 6.

[5] It does not appear class counsel have yet disclosed settlement administration costs.

[6] $16,417,496 - $4,925,249 - $60,000 - $1,000,000 = $10,432,247.

Class counsel tout this as an extraordinary recovery, but it is less than 1% of the aggregate potential class damages. The minimum statutory penalty under the TCPA is $500 per violation; the maximum is $1500 per violation. 47 U.S.C. §227(b)(3). This puts the 3.3 million class members' aggregate potential damages between $1.6 billion and $4.9 billion (ECF Doc. 46, at 2).[7]

Less than 1% recovery is not extraordinary. It provides no basis for this Court to award anything above the benchmark, which is 25%, not 30% as suggested by class counsel. In fact, because the benchmark is even lower in TCPA cases, an award below 25% would be appropriate. Further, given the brevity of this litigation, Objector would urge a lodestar cross-check be performed to limit the windfall to class counsel.

Because every dollar awarded to class counsel is a dollar taken from the class in this common fund settlement, this Court must exercise is fiduciary duty to protect the absent class members, whose interests are not aligned with class counsel at this stage, and reject class counsels' excessive fee request.

## STANDING AND PROCEDURES TO OBJECT

Objector's full name, address, cellular telephone number, and email are as follows: Wanda Yde, 434 S. Whitney St., Aransas Pass, Texas 78336; (361) 717-2059.; and wcpetrus@yahoo.com.

Objector is a person is a user or subscriber to a wireless or cellular service within the United States who used or subscribed to a telephone number to which

---

[7] 3,316,666  x $500 = $1,658,333,000; 3,316,666 x $1,500 = $4,974,999,000.

Wells Fargo made or initiated one or more calls or non-emergency texts using an automatic telephone dialing system or artificial or prerecorded voice technology, according to Wells Fargo's available records, and who used or subscribed to a cellular phone number to which Wells Fargo made or initiated a call or non-emergency text in connection with a Residential Mortgage Loan from November 17, 2011 to February 29, 2016. The cellular telephone number at which Objector received a call or calls from the Defendant was (530) 736-6448. *See* Declaration of Wanda Yde, Exhibit "A" hereto, incorporated by reference as though set forth in full.

As such, Objector is a class member and has standing to make her objection. Additionally, Objector received a postcard notice in the mail, and thereafter filed a claim. *See* Exhibit A-1.[8]

Objector is represented by and has sought legal advice and assistance in this matter from Christopher Bandas, with the Bandas Law Firm, P.C., Corpus Christi, Texas (www.bandaslarvfirm.com), and this document was prepared with the assistance of counsel. No special favor or treatment is requested due to the fact that any document is submitted as pro se.

Objector objects to the proposed settlement in *Steven L. Markos, et al. v. Wells Fargo Bank* Case No. 1:15-cv-01156-LMM. The statement of the objections and the grounds therefore are set forth below. Objector is mailing this objection to the Court,

---

[8] Although Objector neglected to complete the subclass information requested on the claim form, she intends file a corrected claim form by the claims deadline. *See* Exhibit A and A-1.

the settlement claims administrator, and the attorneys as directed in the class notice. Objector does not intend on appearing or testifying at the fairness hearing either in person or through counsel, but asks that this objection be submitted on the papers for ruling at that time. Objector will not call any persons to testify at the Final Approval Hearing in support of the objection. Objector relies upon the documents contained in the Court's file in support of these objections. Objection is made to any procedures or requirements to object in this case that require information or documents other than those that are contained herein on grounds that such requirements seek irrelevant information to the objections, are vague and unnecessary, are not adequately described in the class notice, are unduly burdensome, are calculated to drive down the number and quality of objections to the settlement and violate Objector's and counsel's due process rights and/or Rule 23. Objector joins in and incorporates by reference the objections filed by other class member-objectors to the extent not inconsistent with this Objection.

## OBJECTIONS

I.     **30% of the Gross Settlement Fund is Excessive.**

Although it is difficult to discern from class counsels' motion for fees, the 30% fee request exceeds the 25% benchmark recognized in this district and in the Eleventh Circuit. *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1268–

69 (N.D. Ga. 2008); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694–96 (N.D. Ga. 2001).

"*Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991) . . . established that attorneys' fees should be a reasonable percentage of a common fund . . ., **and set a 25% recovery as an appropriate 'benchmark.'**" *Ingram*, , 200 F.R.D. at 695 (emphasis added); *see also Carpenters Health*, 587 F. Supp. 2d at 1269 (while "district courts usually award between 20% and 30% of the common fund . . . , 25% is "bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case")(quoting *Camden I*, 946 F.2d at 775). The "25% . . . 'bench mark' percentage fee award . . . may be adjusted in accordance with the individual circumstances of each case[.]" *Pedraza v. United Guar. Corp.*, CV100-108, 2001 WL 37071199, at *6 (S.D. Ga. June 22, 2001) (quoting *Camden I Condominium Ass'n*, 946 F.2d at 775).

The circumstances in this typical TCPA settlement that was settled quickly *do not* warrant an adjustment upward from 25%.

## A. This Court Has a Fiduciary Duty to the Class in Awarding Attorneys' Fees from the Common Fund.

This Court has a fiduciary obligation to protect the interests of the absentee Class members, including the responsibility to limit attorneys' fees to a reasonable amount. "[B]ecause the fee in this case will derive from the plaintiff class's settlement fund, and the defendants, therefore, no longer possess an economic interest in the

determination of the fee, the court must act as a fiduciary for class members and must be especially careful to scrutinize every factor relevant to determining the size of a reasonable attorney's fee." *Bowen v. SouthTrust Bank of Alabama*, 760 F. Supp. 889, 896–97 (M.D. Ala. 1991) (quoting *Parker v. Anderson,* 667 F.2d 1204, 1214 (5th Cir.), *cert. denied,* *897 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 255 (1985)). "Judicial scrutiny of class action fee awards and class settlements more generally is based on the assumption that class counsel behave as economically rational actors who seek to serve their own interests first and foremost." *In re Southwest Voucher Litigation*, 799 F.3d 701, 712 (7th Cir. 2015); *see also In re: Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010) ("the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage").

## B. 30% is Excessive for this Ordinary TCPA Settlement.

This Court should exercise its fiduciary duty on behalf of the absent class members and reject the excessive fee request here.

The 30% fee award is *not* within the norm for fees in TCPA class action settlements. While there are outliers, the "data available on past awards in TCPA cases and other class actions show[s] that the median fee for large TCPA class actions were between 20% and 24% of the settlement fund[.]" *Wilkins v. HSBC Bank Nevada, N.A.,* 14 C 190, 2015 WL 890566, at *10 (N.D. Ill. Feb. 27, 2015) (citing *In re Capital One Tel. Consumer Prot. Act Lit.,* No. 12 C 10064, 2015 WL 605203, at *11-12, 15 (N.D. Ill.

Feb. 12, 2015)). In recent TCPA cases, courts have commonly awarded a percentage of 20% or less to class counsel. *See Bayat* v. *Bank of the West*, 2015 WL 1744342, at *10 & n.10 (N.D. Cal. Apr. 15, 2015) (opting for the lodestar method but awarding the equivalent of 13.5% of the over $3.3 million settlement fund); *Rose* v. *Bank of Am. Corp.*, 2014 WL 4273358, at *5, *13 (N.D. Cal. Aug. 29, 2014) (choosing the lodestar method and awarding a fee that constituted about 7.5% of the over $32 million fund); *Michel* v. *WM Healthcare Solutions, Inc.*, 2014 WL 497031, at *23 (S.D. Ohio Feb. 7, 2014) (awarding 15% of the $4.3 million settlement fund); *Wilkins* v. *HSBC Bank Nev., N.A.*, 2015 WL 890566, at *12 (N.D. Ill. Feb. 27, 2015) (awarding 23.75% of the almost $40 million fund); *Arthur* v. *Sallie Mae, Inc.*, 2012 WL 4076119, at *2 (W.D. Wash. Sept. 17, 2012) (awarding 20% of the about $24 million fund).[9]

Class counsel urge 30% is within the norm for TCPA settlements[10] in this circuit by referencing two unpublished district court orders from the Southern District of Florida. The *Guarisma v. ADCAHBMed. Coverages, Inc.*, No. 13-cv-21016, Dkt. No. 95 (S.D. Fla. June 24, 2015) order cited by class counsel offers no analysis whatsoever, and it is not clear from the order that the fees were even disputed. The other unpublished order, *Soto v. The Gallup Org.*, No. 13-cv-61747, Dkt. No. 95 (S.D.Fla. Nov. 24, 2015) relied on *Guarisma* for the notion that the one-third fee was

---

[9] Objector would urge that cases cited by class counsel outside the context of the TCPA be given no deference in setting the percentage of the fund recovery here.

[10] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, ECF Doc. 51-1, at 20.

consistent with similar TCPA settlements. These unpublished orders are outliers,[11] not roadmaps for appropriate recovery.

Class counsel then ask this Court to measure this TCPA settlement "against twenty-five years of TCPA settlements" and provide a chart listing nine TCPA settlements from across the country.[12] Yet, these cases confirm that 30% in attorneys' fees is too much. In eight of the nine cases cited in class counsels' chart, attorneys' fees were 25% or below.[13] *See Gehrich v. Chase Bank USA, N.A.*, No. 12 C5510, 2016 WL 806549 (N.D. Ill. Mar. 3, 2016) (awarding class counsel **21%** of the common

---

[11] Class counsel cite outliers from other jurisdictions which involve exceptional facts justifying an award above the benchmark. *See* Motion for Attorneys' Fees, ECF Doc. 51-1, at 21 n.9. For example, in *Hageman v. AT&T Mobility LLC, et al.*, 1:13-cv-50, Dkt. No. 68 (D. Mont. Feb. 11, 2015), the district court awarded class counsel 33%, inclusive of costs. That settlement, however, purportedly resulted in the largest recovery per class member in the 25 year history of the TCPA. ECF Doc. 68, at 8-9. Similarly, the district court in *Ikuseghan v.Multicare Health Sys.*, No. C14-5539, 2016 WL 4363198, at *2 (W.D. Wash.Aug. 16, 2016), awarded 30%, plus costs in a case in which class counsel secured "an extraordinarily good result for the class." The class members received as much as they would had they successfully litigated their claims under the TCPA ($500 per call). *Id.* at *1-2. The district court observed that "[t]his recovery is significantly superior to other TCPA class action settlements that have been approved in this Circuit and justifies an upward departure from the 25% benchmark rate." *Id.* Similarly, in *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1209-10 (C.D. Cal. 2014), a 33% was justified where class counsel "achieved certification of the first federal TCPA class covering recipients of faxes that lacked compliant opt-out notices, regardless of whether the fax advertisements were solicited or unsolicited, and regardless of whether the defendant had an established business relationship with the persons to whom it sent the fax advertisements."

[12] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, at 11-12.

[13] In one of the nine cases, the court awarded 30%, "which departure from the 25% benchmark this Court finds is justified for the reasons set forth in the record." *Adams v. AllianceOne Receivables Mgmt. Inc.*, No. 08-cv-00248, ECF Doc. 137, at 5 (S.D. Cal.). The record in that case shows the class action was on file for four years before settling, and involved far more litigation than took place here. ECF Doc. 1 (filed February 8, 2008); ECF Doc. 109-1 (settlement executed February 22, 2012). Indeed, unlike this case, the plaintiffs faced "many potentially dispositive motions and discovery disputes." ECF Doc. 115-1, at 9.

fund); *Arthur v. Sallie Mae Inc.*, No. 10-cv-00198 (W.D. Wash.) (awarding **21%**); *Malta v. Fed. Home Loan Mortgage Corp.*, 10-CV-1290-BEN-NLS, 2013 WL 12095060, at *1 (S.D. Cal. June 21, 2013) (**22.5%**); *Duke v. Bank of Am., N.A.*, No. 5:12-cv-04009, ECF Doc. 59 (N.D. Cal.) (awarding **7.5%** of the gross fund on a percentage cross-check); *Connor v. JPMorgan Chase Bank*, No. 10 CV 1284 ECF Doc. 60-1 (S.D. Cal.) (class counsel sought **25%**); *Wilkins v. HSBC Bank Nevada, N.A.*, 14 C 190, 2015 WL 890566, (N.D. Ill. Feb. 27, 2015)(awarding **23.75%**); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 808 (N.D. Ill. 2015) (**20.77%**); *Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist., ECF Doc. 148, at 7-8 (N.D. Cal. Jan. 27, 2012) (awarding the **25%** benchmark). Meanwhile, six of the nine involved a greater class recovery; some far in excess of this case. *See e.g.*, *Gehrich*, 2016 WL 806549, at *2 ($34 million settlement fund); *Duke*, 5:12-cv-04009 ($32,083,905 settlement fund); *Wilkins v. HSBC Bank Nev., N.A.*, 2015 WL 890566, ($39,975,000 settlement fund); *Capital One*, 80 F. Supp. 3d at 808 ($75,455,098 settlement fund). This Court should not award fees based on class counsels' inflated benchmark.

## C. This is Not an Extraordinary TCPA Settlement and Class Counsel Should Not be Awarded Above the Benchmark.

In fact, there is no reason for this Court to award any amount above 20% to 25%. In determining whether an upward adjustment from the benchmark is appropriate, courts consider the twelve *Johnson* factors: (1) "the time and labor required," (2) "the novelty and difficulty of the questions," (3) "the skill requisite to

perform the legal service properly," (4) "the preclusion of other employment by the attorney due to acceptance of the case," (5) "the customary fee," (6) "whether the fee is fixed or contingent," (7) "time limitations imposed by the client or other circumstances," (8) "the amount involved and the results obtained," (9) "the experience, reputation, and ability of the attorneys," (10) "the 'undesirability' of the case," (11) "the nature and length of the professional relationship with the client," and (12) "awards in similar cases." *Carpenters Health*, 587 F. Supp. 2d at 1269 n.1 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–20 (5th Cir.1974)); *see also Camden I Condo. Ass'n*, 946 F.2d at 772 n.3, 776.

As Class counsel acknowledge, the most important factor is "the amount involved and the results obtained."[14] Yet, in the motion for attorneys' fees, they present only half the picture, praising the $16.4 million gross settlement fund while ignoring "the amount involved" – *i.e.*, the value of the class damages.

In a vacuum, the $16.4 million cash fund might be a "terrific result."[15] Relative to the $1.6 billion potential aggregate damages released, it is diminutive. This is particularly so considering the class will only receive something closer to $10.4 million.

---

[14] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, Doc. 51-1, at 11 (citing *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204-05 (S.D. Fla. 2006); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1342 (S.D. Fla. 2007); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 351 (N.D. Ga. 1993)).

[15] *Id.* at 11.

Without even considering the possibility of treble damages, this is little more than one half of one percent recovery. In a similar case, a district court remarked that the class recovery under the TCPA settlement "represents a whopping 99.5% discount from the theoretical verdict value were statutory damages to be awarded to the entire class. This cannot be credibly called an 'outstanding' result." *Bayat v. Bank of the W.*, C-13-2376 EMC, 2015 WL 1744342, at *5 (N.D. Cal. Apr. 15, 2015).

Other factors also weigh strongly against the high fee request. Although class counsel have not disclosed the amount of labor they expended in the case, the lawsuit was settled quickly. It does not appear that any formal discovery was conducted, nor have class counsel detailed any depositions that were taken apart from one taken after the settlement was reached.[16]

Likewise, class counsel took on only limited risk in pursuing this case. The TCPA is a strict liability statute. A single text message results in recovery between $500 and $1,500. See 47 U.S.C. §227(b)(3). This makes TCPA class actions very likely to settle. *See, e.g., Rose* v. *Bank of Am. Corp.*, 2014 WL 4273358, at *12 (N.D. Cal. Aug. 29, 2014) (reducing requested attorneys' fee award and noting "because the TCPA has the potential of ruinous financial liability . . . defendants will almost always settle if there is any merit at all to the case"); *Bayat*, 2015 WL 1744342, at *9 (noting that there is less risk in a TCPA case "where the potential recovery of statutory damages is as large as it is here . . . due solely to the size of the class and damages fixed by statute");

---

[16] *Id.* at 13-14.

*see also Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 237 (N.D. Ill. 2016) ("this case settled contemporaneously with or after several recent cases in this District and elsewhere that had established a template for TCPA litigation against large financial institutions, vastly reducing the uncertainty and risk for Class Counsel") (citations omitted). As a result, it not surprising that so many firms signed on to participate as class counsel.

While class counsel describe the risk as significant, the defenses outlined by class counsel, including consent, are not unique to this TCPA action. *See e.g., Wilkins v. HSBC Bank Nevada, N.A.*, 14 C 190, 2015 WL 890566, at *11 (N.D. Ill. Feb. 27, 2015) (noting defenses included "the class members' alleged consent to receive automated phone calls; Rule 23 manageability issues; and potentially forthcoming FCC orders"). In *Wilkins*, a TCPA settlement which provided a far greater $39.9 million fund, the court remarked, "this case is an average TCPA class action. There are serious obstacles for Plaintiffs to overcome in establishing liability, but they are typical obstacles faced by most TCPA plaintiffs." *Id.* (concluding that the risk of TCPA litigation did not warrant exceeding the scale). As in *Wilkins*, the defenses, obstacles, and risks here do not warrant going above the norm for fees in TCPA settlements.

Finally, whatever percentage this Court determines as appropriate should be taken from the settlement fund after reduction of costs of administration, and not before. *See e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) ("[T]he ratio that is relevant to assessing the reasonableness of attorneys' fees that the parties

agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received"). Regardless, class counsels' request for 30% of the gross settlement fund departs from the interests of the Class and should not be granted.

### D. This Court Should Perform a Lodestar Cross-Check; No Multiplier is Appropriate.

Class have not made their lodestar information accessible to the class. Although not mandated in every case, there is an obvious need for a lodestar cross-check here given the limited time in which this case has been on file relative to the substantial fee request. *See e.g., Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 696 (N.D. Ga. 2001) (cross-checking a percentage-based award with class counsels' lodestar information); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (in finding "no reason to depart upward or downward from the circuit's 25% benchmark[,]" the court conducted a lodestar cross-check to confirm reasonableness of the fee request)

Without access to class counsels' lodestar, Objector would nevertheless assert that anything above a 1.0 multiplier would be a windfall here. As the United States Supreme Court has explained there is "a 'strong presumption' that the lodestar represents the 'reasonable' fee, . . . and have placed upon the fee applicant who seeks more than that the burden of showing that such an adjustment is *necessary* to the determination of a reasonable fee." *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992) (emphasis original) (quotations omitted). A "lodestar figure includes most, if not all, of

the relevant factors constituting a 'reasonable attorney's fee.'" *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010). "[A]n enhancement may not be awarded on a factor that is subsumed in the lodestar calculation." *Id.* at 553.

As discussed *supra*, there is nothing extraordinary about this TCPA settlement that would support an adjustment above class counsels' lodestar.

## II.   This Court Should Judicially Supervise Allocation of Attorneys' Fees.

This Court should not simply "determine an aggregate fee and costs award and give co-lead Class Counsel the authority to allocate among Class Counsel" as proposed in the motion for attorneys' fees.[17] Class counsel cite two opinions in support of this proposition.

The first, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D. Ga. 1993), advised various firms making up class counsel to meet and negotiate an allocation for submission to the court. In the absence of such an agreement, the Court instructed it would set the matter "for a hearing and will allocate the overall award among participating counsel based on the reasonable efforts and relative responsibilities they exercised (not necessarily correlated to the hours expended) leading to the creation of the common fund for the benefit of the class." *Id.* In either case, judicial oversight of the fee allocation was required.

---

[17] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, ECF Doc. 51-1, at 9 n. 3.

The second, *Craft v. North Seattle Cmty. College Found.*, No. 07-cv-132, Dkt. No. 135 (M.D. Ga. Sept. 2, 2010), while allowing class counsel to allocate fees among themselves, only involved two law firms. This case involves an assortment of firms from around the nation. And in any case, *Craft* cited no authority for the notion that a court can simply hand over a lump sum to class counsel and trust that lead counsel will divide the funds fairly.

Although it does not appear that the Eleventh Circuit has reached the issue, several federal courts have observed that in "a class action settlement, the district court has an independent duty . . . to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *See In re High Sulfur Content Gasoline Prods. Litig.* (5th Cir. 2008) 517 F.3d 220, 227–28 ; *In re "Agent Orange" Prods. Liab. Litig.* (2d Cir. 1987) 818 F.2d 216, 223. The district court "must not . . . delegate that duty to the parties." *High Sulfur*, 517 F.3d at 228 (internal quotation omitted).

This Court's judicial supervision should not end with a lump sum payment to class counsel. The Court should oversee the allocation of funds. It should not simply trust that Class Counsel will do so fairly. While "lead counsel may be in a better position . . . to evaluate the contributions of all counsel seeking recovery of fees[,]" the allocation should be supervised by the court in light of inherent conflicts among the attorneys. (*Id.* at 234-35 [citing *In re Diet Drugs Prods. Liab. Litig.* (3d Cir. 2005) 401 F.3d 143, 173 (Ambro, J., concurring)]) ("They make recommendations on their own

fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?'").

### III. The Proposed $20,000 Incentive Award to Each of the Three Named Plaintiffs is Unfounded and Suggests a Conflict.

The settlement appears to provide an estimated $25 to $75 to each class member who files a claim, yet it rewards the three class representatives a disproportionate $20,000 service fee.[18] This amount is unsubstantiated and excessive, and unnecessarily reduces the benefits to the class even further. More importantly, rewarding the named plaintiffs with between 266 to 800 times the average class recovery renders the named plaintiffs inadequate representatives.

It is well-established "that class representatives in class actions act as fiduciaries to the class." *In re U.S. Bioscience Securities Litig.*, 155 F.R.D. 116, 120 (E.D. Pa. 1994) (citing *In re Fine Paper Litigation*, 632 F.2d 1081, 1086 (3d Cir.1980); *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975)). In that capacity, they "undertake to represent not only themselves, but all members of the class, in a fiduciary capacity, and are obligated to do so fairly and adequately, and with due regard for the rights of those class members not present to negotiate for themselves." *Women's Committee for Equal Employment Opportunity (WCEEO) v. National Broadcasting Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977). Significantly, "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries,

---

[18] Declaration of Daniel M. Hutchinson in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, ECF Doc. 51-2, at 17.

serious questions are raised as to the fairness of the settlements to the class." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) (quoting *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441–42 (S.D.N.Y.1981), *aff'd*, 668 F.2d 654 (2d Cir.1982)). For example, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interest they are appointed to guard." *U.S. Bioscience*, 155 F.R.D. at 120 (quoting *Weseley v. Spear Leeds & Kellogg*, 711 F.Supp. 713, 720 (E.D.N.Y. 1989)); *accord Staton v. Boeing Company*, 327 F.3d 938, 977 (9th Cir. 2003) ( if "such members of the class are provided with special 'incentives' in the settlement agreement, they may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large").

The $20,000 award here is out of step with the class recovery. This Court should require a significant reduction in the incentive award or refuse to approve the settlement altogether.

Although the Eleventh Circuit has not established a "rule that settlements benefit all class members equally, a disparate distribution favoring named plaintiffs requires careful judicial scrutiny...." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983). Courts commonly consider: (1) the risk to the representative in commencing the suit, financial or otherwise; (2) the amount of time and effort by the representative; (3) the personal benefit enjoyed by the representative as a result of the

litigation; and (4) the duration of the litigation. *Demsheck v. Ginn Dev. Co., LLC,* 3:09-CV-335-J-25TEM, 2014 WL 11370089, at *5 (M.D. Fla. Mar. 5, 2014), *aff'd sub nom. Greco v. Ginn Dev. Co., LLC,* 635 Fed. Appx. 628 (11th Cir. 2015).

In *Demsheck,* the district court rejected a request for a $15,000 incentive award where it exceeded the average settlement award by 19 times. *Id.* at *5. The court instead awarded $5,000 where "the record does not reflect a high level of risk to the Representative or an unusual commitment of time and effort to the litigation on behalf of the Class Representative." *Id.*

Apart from noting the representatives turned down an offer of judgment, class counsel have failed to explain what unique time and labor, if any, the class representatives expended that entitles them to such a disproportionate incentive fee.[19] *Compare with Craftwood Lumber Co. v. Interline Brands, Inc.,* 11-CV-4462, 2015 WL 1399367, at *6 (N.D. Ill. Mar. 23, 2015) ($25,000 for a corporate class representative was appropriate where its president spent nearly 200 hours working on the case, investigated the claims, provided substantial assistance in responding to discovery, was deposed, attended two separate mediations while assisting with a third, and regularly communicated with class counsel regarding case strategy). Without this explanation, three awards of $20,000 from the gross settlement fund cannot be in the best interests of the class.

---

[19] Memorandum in Support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs, and Service Awards for Class Representatives, ECF Doc. 51-1, at 22-23.

# CONCLUSION

Objector requests that this Court reject Class Counsels' request for 30% of the $16.4 million gross settlement fund, perform a lodestar cross-check, and award no more than 20% to 25% of the settlement fund (calculated after reduction of settlement administration expenses), with the excess remaining in the common fund for the benefit of the Class. Objector further requests that this Court refuse class counsels' request to award a lump sum of attorneys' fees for allocation by co-lead counsel without judicial supervision. Objector further requests that this Court reject the proposed $20,000 incentive fee for each the three class representatives. Alternatively, the settlement should be disapproved as unfair to the extent the incentive fee is not reduced.


DATED:  November 22, 2016             Respectfully submitted,


                                      _____
                                      Wanda Yde
                                      434 S. Whitney St.
                                      Aransas Pass, Texas 78336
                                      (530) 736-6448
                                      wepetrus@yahoo.com

Certificate of Service

The undersigned certifies that on November 22, 2016, she caused to be served via USPS First Class Mail, postage prepaid, a copy of this Objection and associated exhibits upon the following.

Markos v. Wells Fargo Bank, N.A.
Case No. 1:15-cv-01156-LMM (N.D. Ga.)
Clerk of the Court
U.S. District Court for the Northern District of Georgia
2211 United States Courthouse
75 Ted Turner Drive, SW
Atlanta Georgia 30303

Markos Wells Fargo TCPA Settlement Claims Administrator
c/o GCG
P.O. Box 10301
Dublin, OH 43017-5901

Leiff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111

Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

DATED:  November 22, 2016


_Wanda Yde_
Wanda Yde

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| Steven L. Markos, Tiffany Davis, and Gregory Page, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>Wells Fargo Bank, N.A.<br><br>       Defendant. | Case No. 1:15-cv-001156-LMM |

## DECLARATION IN SUPPORT OF OBJECTIONS TO CLASS ACTION SETTLEMENT

Comes now Wanda Yde and states the following under oath and under penalty of perjury in support of her objection:

"My name is Wanda Yde. I am over the age of eighteen (18) years. I have never been convicted of a felony. I am qualified and competent to make this declaration. The facts stated herein are within my personal knowledge. My address and contact information is as follows:

Wanda Yde
434 S. Whitney St.
Aransas Pass, Texas 78336
(361) 717-2059
wepetrus@yahoo.com.

I am a user or subscriber to a wireless or cellular service within the United States who used or subscribed to a telephone number to which Wells Fargo made or initiated one or more calls or non-emergency texts using an automatic telephone dialing system or artificial or prerecorded voice technology, according to Wells Fargo's available records. I used or subscribed to a cellular phone number to which Wells Fargo made or initiated a call or non-emergency text in connection with a Residential Mortgage Loan from November 17, 2011 to February 29, 2016. I am a class member as defined by the class notice.

The cellular telephone number which I received a call or calls from the Defendant was (530) 736-6448.

Additionally, I received a postcard notice in the mail for this class action lawsuit settlement, and filed a claim (a true and correct copy of which are attached as Exhibit A-1). I neglected to complete the subclass information requested on the claim form. I intend to file a corrected claim on the settlement website by the claims deadline."

Dated this the 22th day of November, 2016.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Wanda Yde

2

EXHIBIT A 1

Claim ID: 05090532
Confirmation No: 9604158531

**Wells Fargo Mortgage and Home Equity Line of Credit TCPA Settlement Claim Form**

THIS CLAIM FORM MUST BE **POSTMARKED** BY DECEMBER 22, 2016 AND MUST BE FULLY COMPLETED.
You may also submit your claim online at WWW.MARKOSWELLSFARGOTCPA.COM or by calling 1-866-562-0143.

Full Name:
Wanda Yde

Address:
434 So Whitney TX 78336

City: Aransas Pass   State: TX   Zip: 78336-   Zip 4 (optional):

Contact Phone Number:   Cell Phone Number On Which You Received A Call:
(361) 877-7884   (530) 734-6448

(Your cell phone number must be listed in our records as one of the phone numbers that was called by Wells Fargo Bank, N.A. and included as part of the settlement. If you are not certain which of your cell phone numbers may have been called, you may submit each of them separately.)

**SELECTION OF CLAIM TYPE:**

☐ Subclass One: I used or subscribed to a cellular phone number to which Wells Fargo made or initiated one or more calls or texts in connection with a Residential Mortgage Loan.

☐ Subclass Two: I used or subscribed to a cellular phone number to which Wells Fargo made or initiated one or more calls or texts in connection with a Home Equity Loan.

☐ Both Subclass One and Subclass Two   ☐ I don't know which Subclass I am in

**CERTIFICATION**
By submitting this Claim Form, I certify that I received a call or text in connection with a Wells Fargo residential mortgage loan and/or a home equity loan without my prior express consent.
This process takes time, please be patient.

Para ver este aviso en español, visite WWW.MARKOSWELLSFARGOTCPA.COM;
For more information, visit WWW.MARKOSWELLSFARGOTCPA.COM

---

**LEGAL NOTICE**

*Markos v. Wells Fargo*, 15-cv-1156-LMM (N.D.Ga.)

A settlement has been proposed in this lawsuit pending in U.S. District Court for the Northern District of Georgia ("Court").

This case claims that Wells Fargo Bank, N.A. ("Wells Fargo") violated the Telephone Consumer Protection Act by calling or sending texts to cellphones without prior express consent using an automatic telephone dialing system or artificial or prerecorded voice in connection with either a mortgage and/or a home equity loan. Wells Fargo denies that it did anything wrong.

Who Is Included? You are included in the Settlement as a "Class Member" if: (1) you live in the United States; and (2) you received one or more calls or texts to your cellular telephone from Wells Fargo Bank, N.A. in connection with either a residential mortgage loan ("Subclass One") and/or a home equity loan ("Subclass Two") during the Class Period, which is November 17, 2011 to February 29, 2016 for Subclass One and April 14, 2011 to February 29, 2016 for Subclass Two.

Markos Wells Fargo TCPA
Settlement Claims Administrator
c/o GCG
P.O. Box 10301
Dublin, OH 43017-5901

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
K&H

WF10551085907



Claim ID: 05090532
Confirmation No: 9604158531

***********AUTO**ALL FOR AADC 783
YDE WANDA
120 WOODHAVEN
INGLESIDE TX 78362-4674

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY PAGE, on behalf of herself and others )
similarly situated,                            )
                                               )
                          Plaintiff,           )
                                               )   Case No. 1:15-cv-06511
        v.                                     )
                                               )   Hon. Judge Matthew Kennelly
WELLS FARGO BANK, N.A.                         )   Hon. Mag. Judge Maria Valdez
                                               )
                          Defendants.          )

## OFFER OF JUDGMENT

Pursuant to Rule 68 of the Federal Rules of Civil Procedure, Defendant Wells Fargo

Bank, N.A. ("Wells Fargo") hereby offers to allow judgment to be entered in this action as

follows:

1. Wells Fargo will cause to be paid to Plaintiff the total amount of $46,501.00 (which

   sum will include Plaintiff's attorneys' fees and costs) in satisfaction of the individual

   claims that Plaintiff has asserted in this lawsuit under the Telephone Consumer

   Protection Act, 47 U.S.C. § 227, *et seq.*;

2. Both Plaintiff and Wells Fargo will otherwise bear their own attorneys' fees and

   costs; and

3. Injunctive relief will be granted to enjoin Wells Fargo from placing any further calls

   to Plaintiff's cell phone number using an ATDS, without his consent, for so long as

   Wells Fargo has reason to believe that he owns the number.

This Offer of Judgment is made for the purposes specified in Federal Rule of Civil

Procedure 68, and shall not be construed as an admission that Defendant is liable in any way in

this action, or that Plaintiff has suffered any damage.

07685.1518/5272880.1                    1



This Offer of Judgment will remain open until expressly revoked and does not expire.

If Plaintiff does not accept this offer, he may become obligated to pay Defendant's costs incurred after making this offer and may be precluded from seeking the recovery of its attorney's fees incurred and/or costs after the date of this Offer of Judgment.

Plaintiff may accept this Offer of Judgment, through his counsel, by execution of the below statement of acceptance.


Dated this 14th day of October, 2015.


By: _____

Eric J. Troutman (pro hac pending)
Divya S. Gupta (pro hac pending)
SEVERSON & WERSON
A Professional Corporation
The Atrium
19100 Von Karman Avenue, Suite 700
Irvine, California 92612
Telephone: (949) 442-7110
Facsimile: (949) 442-7118
ejt@severson.com
dsg@severson.com

Michelle Dohra
Michael Bornhorst
Linda Shi
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
Tel: (312) 782-0600

Attorneys for Defendant
WELLS FARGO BANK, N.A.

2

## ACCEPTANCE

Plaintiff hereby unconditionally accepts Defendant's Offer of Judgment based on the terms stated above.  Defendant may file this Offer of Judgment, and Judgment may be taken accordingly.

DATED: _____, 2015          KEOGH LAW, LTD.


By: _____
                    Keith J. Keogh

Attorneys for Plaintiff GREGORY PAGE

## CERTIFICATE OF SERVICE

I, Michelle V. Dohra, an attorney, hereby certify that on this 14th day of October, 2015, I caused the foregoing **RULE 68 OFFER OF JUDGMENT** to be served on the Parties of Record by sending a paper copy of the same via messenger to the address below:

> Keith Keogh
> KEOGH LAW, LTD
> 55 W. Monroe St.
> Suite 3390
> Chicago, IL  60603

Michelle V. Dohra

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Steven L. Markos, Tiffany Davis, and Gregory Page, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

Wells Fargo Bank, N.A.,

        Defendant,

Case No. 1:15-cv-01156-LMM

## NOTICE OF DEPOSITION OF WANDA YDE



EXHIBIT
4

1334486.2

1

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition upon oral examination of Wanda Yde.  The deposition will be taken on January 14, 2017, as agreed to by the parties, at 10:00 A.M., at Huseman & Stewart, 615 N. Upper Broadway, Suite 2000, Corpus Christi, TX 78401.  The deposition will be taken before a notary public authorized to administer oaths, may be videotaped, and will continue for up to four hours of testimony on the record, until completed.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs request that the Deponent produce the material identified in Exhibit 1, attached hereto, at least three days before the deposition.

Dated:  January 5, 2017

<u>/s/ Daniel M. Hutchinson</u>

SKAAR & FEAGLE, LLP

James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
2374 Main Street, Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
Kris Skaar
Georgia Bar No. 649610
krisskaar@aol.com
133 Mirramont Lake Drive
Woodstock, GA 30189
770 / 427-5600
404 / 601-1855 fax

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Jonathan D. Selbin (*pro hac vice*)
Email: jselbin@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Daniel M. Hutchinson (*pro hac vice*)
Email: dhutchinson@lchb.com
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Andrew R. Kaufman (*pro hac vice*)
Email: akaufman@lchb.com
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

BURKE LAW LLC

Alexander H. Burke (*pro hac vice*)
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

MEYER WILSON CO., LPA
Matthew R. Wilson (*pro hac vice*)
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (*pro hac vice*)
Email: mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, OH  43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

LAW OFFICES OF DOUGLAS J.
CAMPION, APC
Douglas J. Campion
Email: doug@djcampion.com
17150 Via Del Campo, Suite 100
San Diego, CA 92127
Telephone: (619) 299-2091
Facsimile:  (619) 858-0034

KEOGH LAW, LTD.
Keith Keogh
Email: keith@keoghlaw.com
55 W. Monroe, Ste. 3390
Chicago, Il. 60603
Telephone: 312-265-3258
Facsimile: 312-726-1093

GREENWALD DAVISON RADBIL PLLC
Michael L. Greenwald
Email:  mgreenwald@gdrlawfirm.com
5550 Glades Rd., Suite 500
Boca Raton, FL 33431
Telephone: (561) 826-5477
Facsimile: (561) 961-5684

Aaron D. Radbil
Email:  aradbil@gdrlawfirm.com
106 East Sixth Street, Suite 913
Austin, Texas 78701
Telephone: (512) 322-3912
Facsimile: (561) 961-5684

KAZAROUNI LAW GROUP, APC
Abbas Kazerounian
Email:  ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA  92626
Telephone:  (800) 400-6806
Facsimile:  (800) 520-5523

HYDE & SWIGART
Joshua B. Swigart, Esq.
josh@westcoastlitigation.com
2221 Camino del Rio South, Suite 101
San Diego, CA 92108
Telephone (619) 233-7770
Facsimile: (619) 297-1022

*Attorneys for Plaintiffs Steven L. Markos,
Tiffany Davis, and Gregory Page, and the
Certified Class*

## EXHIBIT 1

Plaintiffs request that objector Wanda Yde produce at least three days before her deposition scheduled for January 14, 2017, the following documents, electronically stored information, or objects.

### Instruction and Definition

1.  Pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedurre, if YOU withhold the production of any document which is responsive to the following requests on the grounds that the document is privilege or otherwise protected, YOU shall state in a privilege log the nature of the claim of privilege or protection; and describe generally the type and nature of the document, the date of the document, the identity of the author(s), the addresses, and any recipients of the document, the document's present location, and any other information that will enable Plaintiffs and the Court to assess the applicability of the privilege or protection.

2.  "Or" should be construed to require the broadest possible response, and should be read as "and/or."

3.  "YOU" means Wanda Yde.

## DOCUMENTS TO BE PRODUCED

1.  All documents that identify or evidence the date on which YOU retained Christopher Bandas, John Swallow, John Froelich, or any other attorney acting on your behalf in this litigation.

2.  All documents that identify or evidence the date of the first meeting or discussion between You and  Christopher Bandas, John Swallow, Jerome Froelich, or any other attorney acting on your behalf in this litigation.

3.  All documents evidencing any past or future payments by Christopher Bandas, John Swallow, John Froelich, or any other attorney acting on your behalf in this litigation to YOU for or related to this litigation, including all documents reflecting any promises or representations regarding payment or anything of value for objecting in this litigation.

4.  Documents sufficient to show any familial, professional, or employment relationship between YOU and Christopher Bandas, John Swallow, Jerome Froelich, or any other attorney acting on your behalf in this litigation.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I served the foregoing on Objector Wanda Yde's attorneys Christopher Bandas, Jerome J. Froelich, and John Swallow by Federal Express.

Jannuary 5, 2017.

/s/    Andrew R. Kaufman